UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                :

ANTHONY FIORANELLI,                   :

                                :

                                :

                     Plaintiff,     :     Index No. 15-cv-00952 (VSB)(SDA)

        - against-                   :

                                :     **CORRECTED RESPONSE AND**
CBS BROADCASTING INC., BBC       :     **COUNTERSTATEMENT OF**
WORLDWIDE AMERICAS, INC., T3MEDIA,   :     **MATERIAL FACTS OF ANTHONY**
INC., TESTIMONY FILMS, PARAMOUNT     :     **FIORANELLI MADE PURSUANT**
PICTURES CORPORATION,             :     <u>**TO LOCAL CIVIL RULE 56.1(B)**</u>
MORNINGSTAR ENTERTAINMENT, INC.,    :
CREATIVE DIFFERENCES, LLC, JVCT      :
PRODUCTIONS, INC., IPSE DIXIT, INC., and   :
A&E TELEVISION NETWORKS, LLC,      :

                                :

                    Defendants.     :

                                :

-------------------------------------------------------------- X

      Plaintiff Anthony Fioranelli ("Fioranelli"), by and through his undersigned

attorneys, pursuant to Local Civil Rule 56.1(b), submits this Response to the Statement of

Material Facts submitted by Defendants CBS Broadcasting Inc., BBC Studios Americas,

Inc. (formerly BBC Worldwide Americas, Inc.), Veritone, Inc. (formerly T3Media, Inc.),

Testimony Films, Ltd., Paramount Pictures Corporation, MorningStar Entertainment,

LLC, Creative Differences, LLC, JVCT Productions, Inc., Ipse Dixit Entertainment, Inc.,

and A&E Televisions Networks, LLC (collectively, "Defendants") (Dkt. 148) in support

of their Motion for Summary Judgment (Dkt. 144) and Counterstatement of Material

Facts in Opposition to Defendants' motion and in support of Fioranelli's Cross-Motion

for Partial Summary Judgment.

      As reflected herein and in the accompanying papers, including the Certification of

Anthony Fioranelli ("Fioranelli Cert.") and the Certification of Hillel I. Parness ("Parness

Cert."), and the exhibits attached thereto, the facts put forth by Defendants include material facts that are in fact disputed, and there are additional material facts that may or may not be disputed by Defendants.  All of this warrants denial of Defendants' Motion for Summary Judgment and grant of Plaintiff's Cross-Motion for Partial Summary Judgment, so that any remaining discovery may proceed in accordance with the Federal Rules of Civil Procedure.

**Plaintiff's Responses to Defendants' Local Civil Rule 56.1 Statement of Material Facts**

**I.   The Parties**

1. Plaintiff Anthony Fioranelli is a videographer and principal of Big Daddy Productions. 2d Am. Compl. ¶ 2, Feb. 8, 2017, Doc. 72; Cert. of Anthony Fioranelli ("[2018] Fioranelli Cert.") ¶¶ 1, 10, July 23, 2018, Doc. 122.

**Response:** Disputed.  Mr. Fioranelli is a professional photojournalist and a career video journalist, as well as a videographer and principal of Big Daddy Productions.  Fioranelli Cert. ¶¶ 1, 51.

2. Defendant CBS Broadcasting Inc. ("CBS") is a media company that is, among other things, engaged in the licensing of content.  Decl. of Joshua Lukaris ("Lukaris Decl.") ¶ 3.

**Response:** Undisputed, except to the extent that the Alleged Fact suggests that CBS lawfully licensed Fioranelli's copyrighted footage, as all of CBS's licenses of Fioranelli's copyright footage to the other Defendants were unauthorized.  2d Am. Compl. ¶¶ 6, 10-15; Fioranelli Cert. ¶¶ 39-42.

3. Defendant BBC Studios Americas, Inc., formerly BBC Worldwide Americas, Inc. ("BBC"), is a media company that is, among other things, engaged in the licensing of content. 2d Am. Compl. ¶ 4.

**Response:** Undisputed, except to the extent that the Alleged Fact suggests that Defendant BBC is a lawful sublicensee of Fioranelli's copyrighted footage, as it is an unauthorized sublicensee of CBS.  2d Am. Compl. ¶ 4; Fioranelli Cert. ¶¶ 39-42.

4.  Defendant Veritone, Inc. – which acquired Wazee Digital, Inc., formerly T3Media, Inc. ("T3Media"), in 2018 – is a technology company that is, among other things, engaged in the licensing of content.  2d Am. Compl. ¶ 5.

**Response:** Undisputed, except to the extent that the Alleged Fact suggests that Defendant T3Media is a lawful sublicensee of Fioranelli's copyrighted footage, as it is an unauthorized sublicensee of CBS.  2d Am. Compl. ¶ 5; Fioranelli Cert. ¶¶ 39-42.

5.  Defendants Testimony Films, Ltd. ("Testimony"), Paramount Pictures Corporation ("Paramount"), MorningStar Entertainment, LLC ("MorningStar"), Creative Differences, LLC ("Creative Differences"), JVCT Productions, Inc. ("JVCT"), Ipse Dixit Entertainment, Inc. ("Ipse Dixit"), and A&E Television Networks, LLC ("AETN") produced a number of the films and television programs at issue in this case, which included sublicensed footage at issue in this case from BBC and/or T3Media.  2d Am. Compl. ¶¶ 6, 10-15.

**Response:** Undisputed, except to the extent that the Alleged Fact suggests that Defendants Testimony, Paramount, MorningStar, Creative Differences, JVCT, Ipse Dixit and AETN are lawful sublicensee of Fioranelli's copyrighted footage, as it they are all unauthorized sublicensees of Defendant CBS.  2d Am. Compl. ¶¶ 6, 10-15; Fioranelli Cert. ¶¶ 39-42.

## II.    The Footage at Issue

6.  After the World Trade Center attack on September 11, 2001, Fioranelli recorded video at the World Trade Center site on that day and several days that followed.  2d Am. Compl.  ¶ 18; [2018] Fioranelli Cert. ¶ 2.

**Response:** Undisputed, except to the extent that the Alleged Fact suggests that Fioranelli's recording was limited to the World Trade Center Site, when in fact it was not. Fioranelli Cert. ¶¶ 39-42.

7. In 2001, Fioranelli provided to CBS for CBS's use five Betacam SX videocassettes containing the footage he shot at the World Trade Center site following the attack on September 11, 2001 (the "Footage"). 2d Am. Compl. Ex. B; Lukaris Decl. ¶ 4; Declaration of Ryan Relyea ("Relyea Decl.") ¶ 5 & Ex. 1 (digital copies of videocassettes with burnt-in time codes added).

**Response:** Disputed. Mr. Fioranelli never owned a Betacam SX camera, and never provided CBS with any Betacam SX videocassettes, or any videocassettes of any kind. Fioranelli Cert. ¶ 29.

Defendants allege that Relyea Decl. Ex. 1 are complete copies made by CBS of Fioranelli's videocassettes of 9-11 footage. They are not copies of videocassettes provided by Mr. Fioranelli to CBS, as Mr. Fioranelli never provided CBS with videocassettes. All of the footage that comprises Relyea Dec. Ex. 1 is Fioranelli original 9-11 footage, but Fioranelli does not know and cannot know if they are complete copies of CBS's copies of his 9-11 footage. Fioranelli Cert. ¶ 34.

8. Fioranelli authorized CBS to publish the Footage in connection with CBS News' coverage of the 9/11 attack and its aftermath. Lukaris Decl. ¶ 6.

**Response:** Disputed. CBS agreed to pay Fioranelli for the use of his 9-11 footage, but then refused to pay Fioranelli in accordance with their agreement. Fioranelli sued CBS for breach of contract, and CBS entered into a Settlement Agreement with Fioranelli in which CBS agreed to pay Fioranelli and agreed to ongoing restrictions as to CBS's use of Fioranelli's footage. Fioranelli's authorization to CBS was strictly limited, and CBS violated those

4

restrictions, resulting in the Settlement Agreement, which CBS also violated.  Fioranelli Cert. ¶¶
36-39 & Exs. 9-11.

9.  The Footage that Fioranelli provided to CBS included a combined total of two hours,
42 minutes, and 56 seconds of footage.  Relyea Decl. ¶ 6 & Ex. 1.

**Response:** Disputed.  Defendants allege that Relyea Decl. Ex. 1 are complete copies
made by CBS of Fioranelli's videocassettes of 9-11 footage.  They are not copies of
videocassettes provided by Mr. Fioranelli to CBS, as Mr. Fioranelli never provided CBS with
videocassettes.  All of the footage that comprises Relyea Dec. Ex. 1 is Fioranelli original 9-11
footage, but Fioranelli does not know and cannot know if they are complete copies of CBS's
copies of his 9-11 footage.  Fioranelli Cert. ¶ 34.

10.    The Footage is informational in nature, documenting the aftermath of the attack
on the World Trade Center.  Relyea Decl. Ex. 1.

**Response:** Disputed.  Fioranelli's 9-11 footage depicts true events.  Fioranelli sought out
and captured iconic and unique video footage.  He brought his many years of experience to bear
when deciding where to go, what to capture, how to frame the shots, and how to selectively edit
what he captured in real time.  Fioranelli's 9-11 footage includes far more than the "aftermath of
the attack on the World Trade Center."  Fioranelli Cert. ¶¶ 18-24.

11.    The Footage serves as a "photographic memory of the events of 9/11 for
posterity" and "a historical repository of what happened on that day."  2d Am. Compl. ¶ 18.

**Response:** Disputed.  Fioranelli <u>created</u> the video footage, and that video footage <u>that he
created</u> serves as a photographic memory of the events of 9/11 for posterity. The footage that
Fioranelli created is entitled to protection, and is protected, under U.S. Copyright Law.  The

5

copyrighted footage <u>that Mr. Fioranelli created</u> <u>has become famous</u> as a historical repository of the events on and after September 11, 2001.  2d Am. Compl. ¶ 18; Fioranelli Cert. ¶ 19.

12.     The Footage does not depict the impact of the two planes on the World Trade Center towers or the towers' collapse, but rather the work of firefighters, police officers, and other first responders in the aftermath of those events.  Relyea Decl. Ex. 1.

**Response:** Disputed.  Fioranelli's iconic video and still images includes video and images that precede the towers' collapse, and it includes far more than the work of firefighters, police officers, and other first responders in the aftermath of those events.  Relyea Dec. Ex. 1; Fioranelli Cert. ¶¶ 18-24.

13.     The Footage is the work that Fioranelli claims Defendants allegedly infringed. Relyea Decl. Ex. 1; 2d Am. Compl. ¶ 18.

**Response:** Disputed, to the extent the Alleged Fact suggests there is only one copyrighted work at issue for purposes of analyzing Defendants' *de minimis* and fair use defenses, which is an incorrect legal premise.  Each video sequence on Fioranelli's original footage is a separate work, independently created by Fioranelli and independently entitled to copyright protection.  Each time CBS, BBC, T3Media and the other Defendants used, copied, edited, publicly performed or distributed portions of Fioranelli's footage, they infringed the copyright inherent in the original sequence of footage from which the portion they used was taken.

14.     Fioranelli has neither marketed the Footage in its entirety nor made the entire Footage available to anyone else since providing it to CBS 2001.  2d Am. Compl. ¶ 23.

**Response:** Disputed.  Fioranelli provided his 9-11 footage to other news entities, all of whom honored and did not breach their agreements with Fioranelli.  In addition, Fioranelli

continued to advertise and market his 9-11 video footage in various forms on his websites,

www.bdpny.com and www.multimedianetworknews.com.  Fioranelli Cert. ¶¶ 44-51 & Exs. 12-

13.

### III.    The 2002 Settlement

15.    In early 2002, Fioranelli sued CBS, claiming that CBS made use of the Footage

beyond the scope of permission granted by Fioranelli.  2d Am. Compl. Ex. B. at 1; Lukaris Decl.

¶ 5.

**Response:** Disputed.  Fioranelli sued CBS in 2002 because CBS breached its agreement

to pay Fioranelli for the use of his 9-11 footage in accordance with their agreement.  Fioranelli

Cert. ¶¶ 36-37 & Exs. 9-10.

16.    When he sued CBS in early 2002, Fioranelli asserted and believed that CBS had

made unauthorized use of his Footage.  2d Am. Compl. Ex. B.

**Response:** Disputed.  Fioranelli sued CBS in 2002 because CBS breached its agreement

to pay Fioranelli for the use of his 9-11 footage in accordance with their agreement.  Fioranelli

Cert. ¶¶ 36-37 & Exs. 9-10.

17.    CBS and Fioranelli amicably settled that dispute pursuant to an agreement dated

March 7, 2002 (the "Agreement"), thereby resolving Fioranelli's claims that CBS violated his

rights in the Footage.  2d Am. Compl. ¶¶ 22, 46 & Ex. B. at 1; Lukaris Decl. ¶ 6.

**Response:** Disputed.  CBS and Fioranelli did not settle the 2002 lawsuit amicably.

Fioranelli did not sue CBS for violating his rights in his 9-11 footage but for failing to pay

Fioranelli for the use of his 9-11 footage in accordance with their agreement.  In settlement talks,

Fioranelli demanded that all of his material be removed from all of CBS's servers worldwide.

CBS represented that such removal would be nearly impossible, and instead offered to pay

liquidated damages in the event that CBS violated the Settlement Agreement.  Fioranelli

demanded liquidated damages of $10,000 per minute or any part thereof, but ultimately agreed to liquidated damages of $3,000 per minute or any part thereof for certain types of violations, as reflected in the Settlement Agreement.  Fioranelli Cert. ¶¶ 36-39 & Exs. 9-11.

18.    The Agreement grants CBS a non-exclusive license to use Fioranelli's footage in its news programming and news magazine programs and in the advertising, publicity, promotions thereof.  2d Am. Compl. Ex. B ¶ 4(a).

**Response:** Disputed.  The Settlement Agreement provides as follows:

a.    "(a) Fioranelli hereby grants to [CBS Broadcasting Inc. ("CBS")], effective as of the date of this Agreement, a non-exclusive, irrevocable, perpetual worldwide right and license to use the [footage provided by Fioranelli to CBS in 2001 relating to the World Trade Center disaster (the "Footage")] in all regularly-scheduled and breaking news programming and all news magazine programs (such as, without limitation, 60 MINUTES and 48 HOURS), and in the advertising, publicity and promotions therefor, <u>produced by CBS owned television stations and CBS News</u>, in all media now known or hereafter developed, except as provided herein. It is understood and agreed by and between the parties that the right and license granted herein <u>does not include authorization to use the Footage in CBS Entertainment Division programming, including docudramas, nor in CBS News documentary specials</u>."

b.    "(b) It is understood and agreed by and between the parties that the right and license granted herein <u>does not include authorization to use the Footage in programs produced by CBS News Productions for third party clients</u>; provided however, that in the event that despite commercially reasonable efforts to exclude

the Footage from such programs, Footage is included in such programs, CBS shall pay Fioranelli (or his heirs, executors, assigns, agents, affiliated companies, successors, or successors in interest) <u>$3000 per minute (or part thereof)</u> for each minute used within the program, for rights in all media, now known or hereafter developed, in perpetuity."

c.   "(c) It is understood and agreed by and between the parties that the right and license granted herein <u>does not include authorization to use the Footage on CBS websites</u>; provided however, that in the event that despite commercially reasonable efforts to exclude the Footage or any still frame thereof, Footage is included on the websites, CBS shall pay Fioranelli (or his heirs, executors, assigns, agents, affiliated companies, successors, or successors in interest) <u>$3000 per minute (or part thereof) for each minute used on the websites or $1000 for any still frame</u> thereof."

Fioranelli Cert. ¶ 39 & Ex. 11 (emphasis added).

## IV.   CBS's Reporting on 9/11

19.   CBS's news division is among the world's most respected news organizations. Lukaris Decl. ¶ 3.

**Response:** Disputed.  Mr. Lukaris' statement is self-serving puffery.  CBS's behavior toward Fioranelli and other copyright owners does not reflect an organization worthy of respect. Fioranelli Cert. ¶ 56.

20.   CBS extensively covered and reported on the 9/11 disaster and its aftermath as that tragic event unfolded.  Lukaris Decl. ¶ 7.

**Response:** Undisputed, except to the extent that the Alleged Fact suggests that CBS's coverage of 9-11 was materially different from the coverage by other news organizations, and

except to the extent that the Alleged Fact suggests that CBS was in any way responsible for the footage it obtained.  CBS obtained much of its most valuable, iconic and unique 9-11 footage from Fioranelli.  Fioranelli Cert. ¶ 35.

21.     CBS generated hundreds of hours of coverage and raw footage relating to the 9/11 attack and its aftermath.  Lukaris Decl. ¶ 7.

**Response:** Undisputed, except to the extent that the Alleged Fact suggests that CBS's coverage of 9-11 was materially different from the coverage by other news organizations, and except to the extent that the Alleged Fact suggests that CBS was in any way responsible for the footage it obtained.  CBS obtained much of its most valuable, iconic and unique 9-11 footage from Fioranelli.  Fioranelli Cert. ¶ 35.

22.     In addition to providing coverage of the 9/11 attack and its aftermath on the CBS Network, CBS made some of its 9/11 coverage available for use by others.  Lukaris Decl. ¶ 8.

**Response:** Undisputed, except to the extent that the Alleged Fact suggests that Fioranelli's 9-11 footage was ever owned by CBS, and except to the extent that the Alleged Fact suggests that CBS lawfully licensed Fioranelli's 9-11 footage to others, as all such actions on the part of CBS were unauthorized sublicenses.  Fioranelli Cert. ¶¶ 39-42.

23.     Among other things, in or about 2002, CBS created multiple newsreels suitable for licensing to others for their use, which contained video footage created by CBS relating to the 9/11 attack and its aftermath (the "CBS 9/11 Newsreels").  The video contained in the CBS 9/11 Newsreels is suitable for use as filler, background, and building block elements for other video productions.  Lukaris Decl. ¶ 9.

**Response:** Undisputed, except to the extent that the Alleged Fact suggests that Fioranelli's 9-11 footage was ever owned by CBS, and except to the extent that the Alleged Fact

suggests that CBS lawfully placed Fioranelli's 9-11 footage on the CBS Reels, as all such actions on the part of CBS were unauthorized, violative of the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

24.    The CBS 9/11 Newsreels contain a wide variety of footage relating to the 9/11 attack, including not just of the aftermath at Ground Zero, but also of the World Trade Center towers collapsing, the aftermath at the other sites that were attacked on that day, ordinary people fleeing the attack, public displays of mourning, public officials and celebrities responding to the tragedy, and more.  *See, e.g.*, Relyea Decl. Ex. 3 at 00:10.000-1:04.900, 58:17.966-01:00:16.600; *Id.* Ex. 2 at 51:44.166-53:11.916.

**Response:** Undisputed

25.    In 2014, CBS became aware that a small amount of Fioranelli's Footage had been mixed with CBS's own footage and inadvertently was included in two of the CBS 9/11 Newsreels.  Lukaris Decl. ¶ 10; Relyea Decl. ¶ 7 & Exs. 2 and 3.

**Response:** Disputed.  Mr. Lukaris' statement in paragraph 10 of his Declaration that Mr. Fioranelli's footage had "somehow been mixed with CBS's own footage and inadvertently was included in two of the CBS 9/11 Newsreels" (emphasis added) is a non-credible, self-serving conclusory statement without any basis in fact.  Other than Mr. Lukaris' pronouncement, there is no evidence in the record that CBS's violation of Fioranelli's rights was accidental or inadvertent.  To the contrary, all of Fioranelli's footage was marked on the screen as NOT FOR BROADCAST, and the portions of Fioranelli's footage on the CBS Reels were edited by someone at CBS, which means that someone at CBS reviewed Fioranelli's footage with its prominent NOT FOR BROADCAST markings, decided which portions of Fioranelli's NOT FOR BROADCAST footage he or she wished to use, and then made edited copies of those

portions for placement on the CBS Reels.  Relyea Dec. Exs. 1-3; Parness Cert. ¶¶ 2, 31 & Exs. 8, 24.

Mr. Lukaris' statement in paragraph 10 of his Declaration that "CBS became aware" of the foregoing in 2014 is misleading, false or both.  Fioranelli discovered the violation of his rights and advised Defendants of what he had discovered.  Fioranelli Cert. ¶¶ 52-55 & Exs. 14-17, 22.  CBS claims that it did not know of its own admitted violations until Fioranelli brought it to CBS's attention in 2014.  Lukaris Dec. ¶ 10.

26.    One of the reels, approximately 76 minutes long, contains four clips of Fioranelli's Footage for a total time of approximately 8.333 seconds between time codes 12:58.916 and 13:07.249.  Relyea Decl. ¶¶ 8-9 & Ex. 2.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the CBS Reels is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that footage onto the Compilation Reels.  Relyea Dec. Exs. 1-3; Parness Cert. ¶¶ 2, 31 & Exs. 8, 24.

27.    Each clip from Fioranelli's Footage contained on the 76-minute long reel is approximately two seconds long.  Relyea Decl. ¶ 10 & Ex. 2 at 00:12:58.916-00:13:07.249.

**Response:** Disputed.  The duration of each of the individual infringing segments of Fioranelli's 9-11 footage on the CBS Reels, as well as infringing segments that are not found on the CBS Reels, vary in duration from 2 seconds to 16 seconds, and are a function of the deliberate actions of one or more of the Defendants:

    a.    Silhouette: DEF-VIDEO-0001 at 0:12:07-0:12:10 (3 seconds), edited by CBS from DEF-VIDEO-0016-3 at 0:24:49-0:25:46 (57 seconds)

b. Doll: DEF-VIDEO-0001 at 0:12:10-0:12:12 (2 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:27:55-0:28:07 (12 seconds)

c. Truck: DEF-VIDEO-0001 at 0:12:18-0:12:20 (2 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:00:41-0:01:08 (27 seconds)

d. Ambulance: DEF-VIDEO-0001 at 0:12:22-0:12:25 (3 seconds) and DEF-VIDEO-0008 at 0:13:00-0:13:03 (3 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:01:08-0:01:37 (29 seconds)

e. Workers 1: DEF-VIDEO-0001 at 0:12:12-0:12:15 (3 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:10:36-0:11:06 (30 seconds)

f. Workers 2: DEF-VIDEO-0001 at 0:12:15-0:12:18 (3 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:10:36-0:11:06 (30 seconds)

g. Firefighter Sitting: DEF-VIDEO-0001 at 0:12:25-0:12:27 (2 seconds) and DEF-VIDEO-0008 (2 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:14:44-0:15:21 (37 seconds)

h. Horizontal Void 1: DEF-VIDEO-0001 at 0:12:03-0:12:07 (4 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:28:14-0:30:54 (2 minutes, 40 seconds)

i. Horizontal Void 2: DEF-VIDEO 0015 (*The Miracle of Stairway B*) at 0:29:53-0:30:08 (15 seconds).  Edited by one or more of the Defendants from DEF-VIDEO-0016-1 at 0:26:15-0:27:07 (52 seconds)

j. Climbing Column: DEF-VIDEO 0015 (*The Miracle of Stairway B*) at 0:30:37-0:30:43 (6 seconds).  Edited by one or more of the Defendants from DEF-VIDEO-0016-1 at 0:31:21-0:31:57 (36 seconds)

Parness Cert. ¶ 6.

28.    A total of 8.333 seconds of the two hours, 42 minutes, and 56 seconds of Fioranelli's Footage, comprising approximately 0.08% of the Footage, appears in the one hour, 16 minutes, and two seconds of the first newsreel, comprising approximately 0.18% of that newsreel.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of each of the individual infringing segments of Fioranelli's 9-11 footage on the CBS Reels, as well as infringing segments that are not found on the CBS Reels, vary in duration from 2 seconds to 16 seconds, and are a function of the deliberate actions of one or more of the Defendants. Parness Cert. ¶ 6.

29.    The second reel, just under 74 minutes long, contains eleven clips of Fioranelli's Footage, totaling approximately 33.433 seconds (some of it duplicative of the footage in the first reel), between time codes 11:55.900 and 12:29.333.  Relyea Decl. ¶¶ 11-12 & Ex. 3.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the CBS Reels is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that footage onto the Compilation Reels.  Relyea Dec. Exs. 1-3; Parness Cert. ¶¶ 2, 31 & Exs. 8, 24.

30.    The longest of the eleven clips in this second, 74-minute long reel is about <u>seven seconds long</u>, and the others last between about two and four seconds.  Relyea Decl. ¶ 13 & Ex.3 at 11:55.900-12:29.333.

**Response:** Disputed.  The duration of each of the individual infringing segments of Fioranelli's 9-11 footage on the CBS Reels, as well as infringing segments that are not found on

14

the CBS Reels, vary in duration from 2 seconds to 16 seconds, and are a function of the deliberate actions of one or more of the Defendants:

a. Silhouette: DEF-VIDEO-0001 at 0:12:07-0:12:10 (3 seconds), edited by CBS from DEF-VIDEO-0016-3 at 0:24:49-0:25:46 (57 seconds)

b. Doll: DEF-VIDEO-0001 at 0:12:10-0:12:12 (2 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:27:55-0:28:07 (12 seconds)

c. Truck: DEF-VIDEO-0001 at 0:12:18-0:12:20 (2 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:00:41-0:01:08 (27 seconds)

d. Ambulance: DEF-VIDEO-0001 at 0:12:22-0:12:25 (3 seconds) and DEF-VIDEO-0008 at 0:13:00-0:13:03 (3 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:01:08-0:01:37 (29 seconds)

e. Workers 1: DEF-VIDEO-0001 at 0:12:12-0:12:15 (3 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:10:36-0:11:06 (30 seconds)

f. Workers 2: DEF-VIDEO-0001 at 0:12:15-0:12:18 (3 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:10:36-0:11:06 (30 seconds)

g. Firefighter Sitting: DEF-VIDEO-0001 at 0:12:25-0:12:27 (2 seconds) and DEF-VIDEO-0008 (2 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:14:44-0:15:21 (37 seconds)

h. Horizontal Void 1: DEF-VIDEO-0001 at 0:12:03-0:12:07 (4 seconds), edited by CBS from DEF-VIDEO-0016-1 at 0:28:14-0:30:54 (2 minutes, 40 seconds)

i. Horizontal Void 2: DEF-VIDEO 0015 (*The Miracle of Stairway B*) at 0:29:53-0:30:08 (15 seconds).  Edited by one or more of the Defendants from DEF-VIDEO-0016-1 at 0:26:15-0:27:07 (52 seconds)

      j.    Climbing Column: DEF-VIDEO 0015 (*The Miracle of Stairway B*) at 0:30:37-

0:30:43 (6 seconds).  Edited by one or more of the Defendants from DEF-

VIDEO-0016-1 at 0:31:21-0:31:57 (36 seconds)

Parness Cert. ¶ 6.

     31.    A total of 33.433 seconds of the two hours, 42 minutes, and 56 seconds of

Fioranelli's Footage, comprising approximately 0.34% of the Footage, appears in the one hour,

13 minutes, and 46 seconds of the second newsreel, comprising approximately 0.75% of that

newsreel.

    **Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures

are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of

each of the individual infringing segments of Fioranelli's 9-11 footage on the CBS Reels, as well

as infringing segments that are not found on the CBS Reels, vary in duration from 2 seconds to

16 seconds, and are a function of the deliberate actions of one or more of the Defendants.

Parness Cert. ¶ 6.

     32.    In both reels of the CBS 9/11 Newsreels, Fioranelli's Footage comprises only a

small part of a larger collection of footage from 9/11 and its aftermath.  Lukaris Decl. ¶ 11;

Relyea Decl. ¶ 14 & Exs. 2, 3.

    **Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures

are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of

each of the individual infringing segments of Fioranelli's 9-11 footage on the CBS Reels, as well

as infringing segments that are not found on the CBS Reels, vary in duration from 2 seconds to

16 seconds, and are a function of the deliberate actions of one or more of the Defendants.

Parness Cert. ¶ 6.

## V.    CBS's Stock Footage Distribution

33.    In 2002, CBS and BBC entered a representation agreement, under which CBS granted BBC the right to sublicense to third parties stock video footage from CBS's news archives.  Lukaris Decl. ¶ 12.

**Response:** Disputed.  The 2002 CBS-BBC agreement was dated February 1, 2002and granted BBC rights to the entirety of the "CBS News Archive,"  defined as "CBS's archive presently comprising audio-visual footage of news events…as supplemented during the Term," and the "CBS Sequences," defined as "Sequences derived from or included in the CBS News Archive in which CBS now has or shall during the Term own or acquire the right to exploit Library Rights, provided each such Sequence is at least seven (7) days old."  Parness Cert. ¶ 34 & Ex. 6 at DEF000065_U & DEF0070_U.  The Alleged Fact is also disputed to the extent it suggests that CBS's grant of any rights to BBC in Fioranelli's footage was lawful, as it was in fact unauthorized.  Fioranelli Cert. ¶¶ 39-42.

34.    The stock video footage that CBS authorized BBC to sublicense to others included a vast amount of material relating to a wide range of news subjects that had been covered by CBS over the years.  Lukaris Decl. ¶ 13.

**Response:** Disputed.  There is no evidence in the record to support what footage CBS provided to BBC, or authorized the BBC to license to others, although Fioranelli assumes it included footage of news events other than 9-11.  The 2002 CBS-BBC agreement was dated February 1, 2002and granted BBC rights to the entirety of the "CBS News Archive,"  defined as "CBS's archive presently comprising audio-visual footage of news events…as supplemented during the Term," and the "CBS Sequences," defined as "Sequences derived from or included in the CBS News Archive in which CBS now has or shall during the Term own or acquire the right to exploit Library Rights, provided each such Sequence is at least seven (7) days old."  Parness

Cert. ¶ 34 & Ex. 6 at DEF000065_U & DEF0070_U.  The Alleged Fact is also disputed to the extent it suggests that CBS's grant of any rights to BBC in Fioranelli's footage was lawful, as it was in fact unauthorized.  Fioranelli Cert. ¶¶ 39-42.

35.    Included among the material that CBS authorized BBC to sublicense to others was the CBS 9/11 Newsreels.

**Response:** Disputed.  There is no evidence in the record to support what footage CBS provided to BBC, or authorized the BBC to license to others, although Fioranelli assumes it included portions of his 9-11 footage.  The 2002 CBS-BBC agreement was dated February 1, 2002and granted BBC rights to the entirety of the "CBS News Archive,"  defined as "CBS's archive presently comprising audio-visual footage of news events…as supplemented during the Term," and the "CBS Sequences," defined as "Sequences derived from or included in the CBS News Archive in which CBS now has or shall during the Term own or acquire the right to exploit Library Rights, provided each such Sequence is at least seven (7) days old."  Parness Cert. ¶ 34 & Ex. 6 at DEF000065_U & DEF0070_U.  The Alleged Fact is also disputed to the extent it suggests that CBS's grant of any rights to BBC in Fioranelli's footage was lawful, as it was in fact unauthorized.  Fioranelli Cert. ¶¶ 39-42.

36.    In 2006, CBS and BBC entered into another agreement under which CBS granted BBC the right to sublicense to third parties stock video footage from CBS's news archives. Lukaris Decl. ¶ 15.

**Response:** Disputed.  The 2006 CBS-BBC agreement was dated December 1, 2006.  In it, CBS extended the rights it granted to BBC in the 2002 CBS-BBC agreement, discussed above in response to Alleged Fact 33.  Parness Cert. ¶ 34 & Ex. 6 at DEF000093_U & DEF00095_U.

The Alleged Fact is also disputed to the extent it suggests that CBS's grant of any rights to BBC in Fioranelli's footage was lawful, as it was in fact unauthorized.  Fioranelli Cert. ¶¶ 39-42.

37.    CBS and T3Media subsequently entered into an agreement under which CBS granted T3Media the right to sublicense to third parties stock video footage from CBS's news archives.  Lukaris Decl. ¶ 16.

**Response:** Disputed.  On December 23, 2013, CBS and T3Media entered into a letter agreement with an effective date of January 1, 2014 that appeared to replace T3Media as the exclusive distributor of the CBS News Archive and CBS News Sequences.  Parness Cert. ¶ 34 & Ex. 6 at DEF000129_U.

38.    Included among the material that CBS authorized T3Media to sublicense to others was the CBS 9/11 Newsreels.  Lukaris Decl. ¶ 17.

**Response:** Disputed.  There is no evidence in the record to support what footage CBS provided to T3Media.  The Alleged Fact is also disputed to the extent it suggests that CBS's grant of any rights to BBC in Fioranelli's footage was lawful, as it was in fact unauthorized. Fioranelli Cert. ¶¶ 39-42.

**VI.    Uses Challenged by Fioranelli**

39.    Fioranelli claims that, "in about 2005-2006, in violation of the contract between Plaintiff and CBS, . . . CBS began an extensive program of sublicensing Plaintiff's works."  2d Am. Compl. ¶ 24.

**Response:** Undisputed

**Rush to War**

40.    *Rush to War* is an 86-minute political documentary about the motivations for the Iraq War and American foreign policy after 9/11.  2d Am. Compl. ¶ 30; Relyea Decl. ¶ 15 & Ex. 4.

**Response:** Undisputed

41.    On or about September 22, 2004, BBC licensed footage from the CBS 9/11 Newsreels to non-party RTW Productions, LLC, the producer of *Rush to War*.  2d Am. Compl. ¶ 30.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

42.    The portion of the CBS 9/11 Newsreels that RTW used in *Rush to War* included a small clip of Fioranelli's Footage such that the clip of the Footage appears in the film for approximately 1.459 seconds, between time codes 3:30.541 and 3:32.000.  Relyea Decl. ¶ 16 & Ex. 4.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *Rush to War* includes a 2-second portion of Fioranelli's copyrighted video segment "Doll", and it occupies the entire screen.  Parness Cert. ¶¶ 3-5.  The "Doll" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 12-second NOT FOR BROADCAST copyrighted video segment.  Parness Cert. ¶ 6.  The 2 seconds of Mr. Fioranelli's footage is among a total of 13 seconds of comparable footage in the film.  Parness Cert. ¶ 5.

43.    The clip of the Footage used in *Rush to War* shows a rescue worker holding a doll and appears early in the film as part of a montage of footage from 9/11 and its aftermath, set to instrumental music and prefaced by the narration: "It was a day no one will ever forget.  Why did nineteen young men from another part of the world want to kill themselves and so many others?" Relyea Decl. Ex. 4 at 2:40.416-3:34.041.

**Response:** Undisputed.

44. *Rush to War* was released to the public in 2007. Relyea Decl. Ex. 4 at 01:25:40.333.

**Response:** Disputed. There is no evidence in the record as to when *Rush to War* was shown, distributed, sold or licensed after its initial release in 2007. There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with *Rush to War*. Parness Cert. ¶ 28 & Ex. 5.

45. A total of 1.459 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.02% of the Footage, appears in the one hour, 25 minutes, and 47 seconds of *Rush to War*, comprising approximately 0.03% of *Rush to War.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses. The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**Celsius 41.11**

46. *Celsius 41.11* is a 71-minute political documentary produced as a conservative response to Michael Moore's film *Fahrenheit 9/11*. 2d Am. Compl. ¶ 34; Relyea Decl. ¶ 17 & Ex. 5.

**Response:** Undisputed.

47.     On or about October 11, 2004, BBC licensed footage from the CBS 9/11 Newsreels to non-party Adams County Productions LLC ("ACP"), the producer of *Celsius 41.11*.  2d Am. Compl. ¶ 34.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

48.     The portion of the CBS 9/11 Newsreels that ACP used in *Celsius 41.11* included a small clip of Fioranelli's Footage such that the Footage appears in the film for approximately 1.166 seconds, between time codes 13:49.583 and 13:50.749.  Relyea Decl. ¶ 18 & Ex. 5.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *Celsius 41.11* includes a 2-second portion of Fioranelli's copyrighted video segment "Silhouette", and it occupies the entire screen.  Parness Cert. ¶¶ 3-5.  The "Silhouette" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 57-second NOT FOR BROADCAST copyrighted video segment.  Parness Cert. ¶ 6.  The 2 seconds of Mr. Fioranelli's footage is among a total of 7 seconds of comparable footage in the film.  Parness Cert. ¶ 5.

49.     The clip of the Footage used in *Celsius 41.11* appears during a montage of footage from Pearl Harbor and 9/11, juxtaposed with audio and video from President George W. Bush's September 20, 2001 speech to a joint session of Congress following the terrorist attack. Relyea Decl. Ex. 5 at 13:14.999-14:00.958.

**Response:** Undisputed

50.    The clip of the Footage shows a firefighter in silhouette at Ground Zero and appears during the words "on thousands" in the following statement by President Bush: "Americans have known surprise attacks, but never before on thousands of civilians."  Relyea Decl. Ex. 5 at 13:45.874-13-52.374.

**Response:** Undisputed

51.    The sequence showing the Footage is presented as part of a rebuttal to the view held among some of the President's detractors that "Bush didn't do enough to stop 9/11."  *Id.* at 13:03.749-13:14.166.

**Response:** Undisputed

52.    *Celsius 41.11* was released to the public in 2004.  2d Am. Compl. ¶ 34.

**Response:** Disputed.  There is no evidence in the record as to when *Celsius 41.11* was shown, distributed, sold or licensed after its initial release in 2004.  There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with *Celsius 41.11*.  Parness Cert. ¶ 28 & Ex. 5.

53.    A total of 1.166 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising less than 0.01% of the Footage, appears in the one hour, 11 minutes, and 22 seconds of *Celsius 41.11*, comprising approximately 0.03% of *Celsius 41.11.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more

23

of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

### World Trade Center

54.     *World Trade Center* is a 129-minute docudrama telling the true story of two Port Authority police officers who were trapped in the rubble at Ground Zero.  2d Am. Compl. ¶ 31; Relyea Decl. ¶ 19 & Ex. 6.

**Response:** Disputed.  *World Trade Center* is a feature film starring Nicholas Cage and Maggie Gyllenhaal and directed by Oliver Stone.  The film had a domestic gross total of over $70 million, and a worldwide gross total of over $162 million.  www.boxofficemojo.com.  The film tells the parallel stories of officers trapped in the rubble, and their families seeking information about their loved ones.  Relyea Decl. Ex. 6.

55.     On or about January 27, 2006, BBC licensed footage from the CBS 9/11 Newsreels to Paramount, the producer of *World Trade Center*.  2d Am. Compl. ¶ 31.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

56.     The portion of the CBS 9/11 Newsreels that Paramount used in *World Trade Center* included a small clip of Fioranelli's Footage such that the clip of the Footage appears in the film for approximately 2.084 seconds, between time codes 56:50.249 and 56:52.333.  Relyea Decl. ¶ 20 & Ex. 6.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *World Trade Center* includes a 2-second portion of Fioranelli's copyrighted video segment "Firefighters", and it occupies the entire screen of a television set, which in turn

occupies most of the screen. Parness Cert. ¶¶ 3-5. The 2 seconds of Mr. Fioranelli's footage is among a total of 13 seconds of comparable footage in the film. Parness Cert. ¶ 5.

The creators of *World Trade Center* chose <u>not</u> to show images of the planes hitting the World Trade Center towers, and <u>not</u> to show images of the towers collapsing, and to be very sparing with their use of actual 9-11 footage, of which 2 seconds are taken up by Fioranelli's copyrighted segment "Firefighters." Relyea Decl. Ex. 7; Parness Cert. ¶ 5.

57.     The clip of the Footage used in *World Trade Center* appears in a scene depicting family members of one missing police officer gathered in a kitchen, watching the news on a small television set. Relyea Decl. Ex. 6 at 56:16.374-58:06.124. The clip of the Footage shows a group of firefighters walking at Ground Zero and is one of several clips used in what is portrayed as a news report, superimposed with a chyron that reads, "Breaking News/America Under Attack/Terrorists Crash Hijacked Airliners Into World Trade Center, Pentagon." *Id.* at 56:38.458-57:06.249.

**Response:** Undisputed.

58.     In the scene, the family members react emotionally to the news that hundreds of emergency responders are missing and feared lost. Relyea Decl. Ex. 6 at 56:16.374-58:06.124.

**Response:** Undisputed.

59.     *World Trade Center* was released to the public in 2006. 2d Am. Compl. ¶ 31.

**Response:** Disputed. There is no evidence in the record as to when *World Trade Center* was shown, distributed, sold or licensed after its initial release in 2006. There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with *World Trade Center*. Parness Cert. ¶ 28 & Ex. 5.

60.    A total of 2.084 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.02% of the Footage, appears in the two hours, nine minutes, and 10 seconds of *World Trade Center*, comprising approximately 0.03% of *World Trade Center.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

### World Trade Center *Featurette*

61.    The *World Trade Center* DVD also includes a 53-minute "making of" documentary.  Relyea Decl. ¶ 21 & Ex. 7.

**Response:** Undisputed.

62.    A portion of the scene from *World Trade Center* discussed in paragraphs 57 to 58 above, including the same 2.084-second clip of the Footage, appears in the documentary.  Relyea Decl. ¶ 23 & Ex. 7 at 23:27.041-23:29.125.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *World Trade Center* and the *World Trade Center Featurette* includes a 2-second portion of Fioranelli's copyrighted video segment "Firefighters", and it occupies the entire screen of a television set, which in turn occupies most of the screen.  Parness Cert. ¶ 3-5.  The 2 seconds of Mr. Fioranelli's footage is among a total of 13 seconds of comparable footage in the film and the *World Trade Center Featurette*.  Parness Cert. ¶ 5.

The creators of *World Trade Center* and the *World Trade Center Featurette* chose <u>not</u> to show images of the planes hitting the World Trade Center towers, and <u>not</u> to show images of the towers collapsing, and to be very sparing with their use of actual 9-11 footage, of which 2 seconds are taken up by Fioranelli's copyrighted segment "Firefighters."  Relyea Decl. Ex. 7; Parness Cert. ¶ 5.

63.    In the sequence in which the clip of the Footage appears, filmmaker Oliver Stone explains that he chose to restrict the use of real 9/11 footage in the movie "to television playback, because you have to keep in mind that the wives know the story as a parallel story through television.  So, taking that into account, you have to show a certain amount of basic reference point stuff."  Relyea Decl. Ex. 7 at 22:47.083-23.21.166.

**Response:** Disputed.  The full quote from Mr. Stone is "You don't want to repeat all the documentary footage that's been out there, although it was very helpful to us to us to recreate.  You don't want to repeat it.  This is a dramatization, with actors.  You want to keep it as real as possible.  At the same time, if you go to that footage it seems like it's a *deja vu* for a lot of people.  So we pretty much restricted that footage to television playback, because you have to keep in mind that the wives know the story as a parallel story through television.  So, taking that into account, you have to show a certain amount of basic reference point stuff."

64.    Immediately following this commentary, the scene of the family watching the news is shown, and the words "Marriage and Home Life" appear in the center of the frame. Relyea Decl. Ex. 7 at 23:21.250- 23:29.125.

**Response:** Undisputed.

65.    A total of 2.084 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.02% of the Footage, appears in the 53 minutes and 32 seconds of

the *World Trade Center* featurette, comprising approximately 0.07% of the *World Trade Center* featurette.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses. The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

### The Miracle of Stairway B

66.     The *Miracle of Stairway B* is a 48-minute documentary telling the story of a group of firefighters and civilians who miraculously survived the collapse of the North Tower of the World Trade Center on 9/11. 2d Am. Compl. ¶ 27; Relyea Decl. ¶ 24 & Ex. 8.

**Response:** Undisputed.

67.     On or about June 26, 2006, BBC licensed footage from the CBS 9/11 Newsreels to Testimony, the producer of *The Miracle of Stairway B*. 2d Am. Compl. ¶ 27.

**Response:** Disputed. *The Miracle of Stairway B* includes segments of Fioranelli's copyrighted footage that was contained within the CBS Video Archives, but which was <u>not</u> included on the CBS Reels. Parness Cert. ¶ 2. Also disputed to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act. Fioranelli Cert. ¶¶ 39-42.

68.     The portion of the CBS 9/11 Newsreels that Testimony used in *The Miracle of Stairway B* included two small clips of Fioranelli's Footage such that the clips of the Footage

appear in the documentary for approximately 5.417 seconds, between time codes 28:29.458 and 28:34.875.  Relyea Decl. ¶ 25 & Ex. 8.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *The Miracle of Stairway B* includes Fioranelli's copyrighted footage that was contained within the CBS Video Archives, but which was <u>not</u> included on the CBS Reels.  Parness Cert. ¶¶ 2, 6.  A total of <u>four</u> clips comprising Mr. Fioranelli's footage appear in the film, each occupying the full screen.  Parness Cert. ¶¶ 3-5.  *The Miracle of Stairway B* includes: a 3-second portion of the Fioranelli copyrighted segment "Vertical Void," a 2-second portion of the Fioranelli copyrighted segment "Horizontal Void 1," a 15-second portion of the Fioranelli copyrighted segment "Horizontal Void 2," and a 6-second portion of the iconic video clip "Climbing Column."  Parness Cert. ¶¶ 6, 15-17 & Ex. 15-17.  Horizontal Void 1 was edited by CBS from a 2 minute, 40 second original NOT FOR BROADCAST segment, Horizontal Void 2 was edited from a 52-second original NOT FOR BROADCAST segment, and Climbing Column was edited from a 36-second original NOT FOR BROADCAST segment.  The 26 seconds of Mr. Fioranelli's footage is among a total of 13 minutes, 29 seconds of comparable footage in the film.  Parness Cert. ¶ 5.

69.    In a scene of *The Miracle of Stairway B*, after the narrator says, "News that the firemen of Ladder 6 had survived the collapse of the North Tower got through to [Jay Jonas's] wife, Judy, but she was told they were still trapped," the two clips of the Footage showing firefighters digging in the rubble at Ground Zero play in succession as Judy Jonas recounts, "It was a relief in some ways to hear that he was alive and that he was trapped, but there was many stories of guys being trapped and not coming out."  Relyea Decl. Ex. 8 at 28:20.000-28:40.791.

**Response:** Undisputed.

70.    The first clip showing the Footage is approximately 3.2 seconds long and the second clip showing the Footage is approximately 2.2 seconds long.  Relyea Decl. ¶ 26 & Ex. 8 at 28:29.458-28:34.875.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

71.    On June 4, 2019, Fioranelli for the first time identified two additional clips of his Footage used in *The Miracle of Stairway B.  See* Doc. No. 143.  These clips appear in the documentary for approximately 20.9 seconds, between time codes 29:53.833 and 30:08.333 and 30:37.041 and 30:43.375.  Relyea Decl. ¶ 25 & Ex. 8.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

72.    The first additional clip appears as the narrator explains that "Glenn Rohan and his Ladder 43 crew were one of the first rescue teams sent out to try and find the Stairway B

survivors" and then Rohan describes his experience looking for the missing firefighters and concern that his team would be safe in the hazardous situation.  Relyea Decl. Ex. 8 at 29:53.833-30:20.583.

**Response:** Undisputed.

73.    The second additional clip appears after an interview with Josephine Harris, one of the people trapped in the rubble describing her feelings waiting for rescue, shown as the narrator says that "the next thing that the survivors remember is that down in the depths of Stairway B, the dust lifted and it was as if another miracle had happened."  Relyea Decl. Ex. 8 at 30:27:500-30:46.916.

**Response:** Undisputed.

74.    *The Miracle of Stairway B* was released to the public in 2006.  2d Am. Compl. ¶ 27.

**Response:** Disputed.  There is no evidence in the record as to when *The Miracle of Stairway B* was shown, distributed, sold or licensed after its initial release in 2006.  There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with *The Miracle of Stairway B*.  Parness Cert. ¶ 28 & Ex. 5.

75.    A total of 26.3 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising less than 0.27% of the Footage, appears in the 48 minutes of *The Miracle of Stairway B*, comprising approximately 0.91% of *The Miracle of Stairway B.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit

Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**Crime Scene 9/11**

76.     *Crime Scene 9/11* is a 50-minute historical documentary telling the story of the recovery and identification effort at Ground Zero from the perspective of first responders, construction workers, volunteers, and others who contributed to the effort.  2d Am. Compl. ¶ 29; Relyea Decl. ¶ 27 & Ex. 9.

**Response:** Disputed.  *Crime Scene 9/11* has a running time of 46 minutes.  Relyea Dec. Ex. 9.

77.     No later than September 1, 2007, BBC licensed footage from the CBS 9/11 Newsreels to Testimony, the producer of *Crime Scene 9/11*.  2d Am. Compl. ¶ 29.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

78.     The portion of the CBS 9/11 Newsreels that Testimony used in *Crime Scene 9/11* included two small clips of Fioranelli's Footage such that the clips of the Footage appear in the documentary for approximately 8.292 seconds, between time codes 4:17.791 and 4:26.083. Relyea Decl. ¶ 28 & Ex. 9.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *Crime Scene 9/11* includes a 6-second portion of Fioranelli's copyrighted video segment "Vertical Void," and a 3-second portion of Fioranelli's copyrighted video segment

"Horizontal Void 1," each occupying the full screen.  Parness Cert. ¶¶ 3-5.  The "Horizontal

Void 1" segment was edited by CBS and one or more of the other Defendants from Fioranelli's

original 2 minute, 40 second NOT FOR BROADCAST copyrighted video segment.  Parness

Cert. ¶ 6.  The 9 seconds of Fioranelli's footage is among a total of 15 minutes, 43 seconds of

comparable footage of comparable footage in the film.  Parness Cert. ¶ 5.

79.    The two clips of the Footage used in *Crime Scene 9/11*, depicting firefighters

digging in the rubble, appear as part of a montage of footage from Ground Zero as the narrator

states, "The frantic efforts to search for survivors continued throughout the day of 9/11, while

families waited at home desperate for news of missing loved ones.  But amidst the chaos of the

crime scene, rumor and false hope were rife."  Relyea Decl. Ex. 9 at 4:13.000-4:28.041.

**Response:** Undisputed

80.    The first clip showing the Footage is approximately 5.5 seconds long and the

second clip showing the Footage is approximately 2.5 seconds long. Relyea Decl. ¶ 29 & Ex. 9 at

4:17.791-4:26.083.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures

are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of

Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit

Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that

NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more

of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted

footage and to copy that footage onto the infringing film.

81.    *Crime Scene 9/11* was released to the public in 2007.  2d Am. Compl. ¶ 29.

**Response:** Disputed.  There is no evidence in the record as to when *Crime Scene 9/11*

was shown, distributed, sold or licensed after its initial release in 2007.  There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with *Crime Scene 9/11*.  Parness Cert. ¶ 28 & Ex. 5.

82.    A total of 8.292 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising slightly over 0.08% of the Footage, appears in the 49 minutes and 33 seconds of *Crime Scene 9/11*, comprising approximately 0.28% of *Crime Scene 9/11.*

**Response:** Disputed.  *Crime Scene 9/11* has a running time of 46 minutes.  Relyea Dec. Ex. 9.  Also disputed to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**How It Was: Voices of 9/11**

83.    *How It Was: Voices of 9/11* is a 53-minute oral history of 9/11 from the perspective of radio dispatchers who worked on that day.  2d Am. Compl. ¶ 33; Relyea Decl. ¶ 30 & Ex. 10.

**Response:** Disputed.  *How It Was: Voices of 9/11* is not an oral history but an audiovisual documentary, complete with footage, witness interviews, graphics and stock footage.  Relyea Decl. Ex. 10.

84.    On or about October 17, 2007, BBC licensed footage from the CBS 9/11 Newsreels to Creative Differences, the producer of *How It Was: Voices of 9/11*.  2d Am. Compl. ¶ 33.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

85.    The portion of the CBS 9/11 Newsreels that Creative Differences used in *How It Was: Voices of 9/11* included five small clips of Fioranelli's Footage such that the clips of the Footage appear in the film for approximately 9.749 seconds, between time codes 38:58.833 and 39:00.958, 39:12.416 and 39:17.749, and 39:29.333 and 39:31.624.  Relyea Decl. ¶ 31 & Ex. 10.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *How It Was: Voices of 9/11* includes a 2-second portion of Fioranelli's copyrighted video segment "Firefighters," a 2-second portion of Fioranelli's copyrighted video segment "Workers 2," a 3-second portion, followed by a 1-second portion, of Fioranelli's copyrighted video segment "Silhouette," and a 1-second portion of Fioranelli's copyrighted video segment "Doll," all of which occupy the full screen.  Parness Cert. ¶¶ 3-5.

In the case of "Workers 2," the 2-second segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 30-second NOT FOR BROADCAST copyrighted video segment.  In the case of "Silhouette," the 1-second segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 57-second NOT FOR BROADCAST copyrighted video segment.  In the case of "Doll," the 1-second segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 12-second NOT FOR

BROADCAST copyrighted video segment.  Parness Cert. ¶ 6.  The 7 seconds of Fioranelli's footage is among a total of 4 minutes, 46 seconds of comparable footage in the film.  Parness Cert. ¶ 5.

86.     The five clips of the Footage that appear in *How It Was: Voices of 9/11* show the search-and-rescue efforts at Ground Zero and are interspersed in a montage of footage from Ground Zero, set to music and snippets of voicemails from ordinary people to their loved ones, as the narrator states, "The tide of phone calls sweeping the nation continued even after the towers fell.  But instead of bearing news, these callers anxiously listened for a familiar voice." Relyea Decl.  Ex. 10 at 38:55.291-39:33.541.

**Response:** Undisputed.

87.     The first clip showing the Footage is approximately 2.1 seconds long, the second clip showing the Footage is approximately 1.6 seconds long, the third clip showing the Footage is approximately 3.7 seconds long, the fourth clip showing the Footage is approximately 1.1 seconds long, and the fifth clip showing the Footage is approximately 1.2 seconds long.  Relyea Decl. ¶ 32 & Ex. 10 at 38:58.833-39:00.958; 39:12.416-39:17.749; 39:29.333-39:31.624.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

88.    *How It Was: Voices of 9/11* was released to the public in 2007.  2d Am. Compl. ¶ 33.

**Response:** Disputed.  There is no evidence in the record as to when *How It Was: Voices of 9/11* was shown, distributed, sold or licensed after its initial release in 2004.  There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with *How It Was: Voices of 9/11*.  Parness Cert. ¶ 28 & Ex. 5.

89.    A total of 9.749 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.09% of the Footage, appears in the 53 minutes and 32 seconds of *How It Was: Voices of 9/11*, comprising approximately 0.31% of *How It Was: Voices of 9/11.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**ZERO: An Investigation into 9/11**

90.    *ZERO: An Investigation into 9/11* is a 123-minute documentary seeking to challenge the official version of the events surrounding 9/11.  2d Am. Compl. ¶ 35; Relyea Decl. ¶ 33 & Ex. 11.

**Response:** Undisputed.

91.     On or about October 20, 2007, BBC licensed footage from the CBS 9/11 Newsreels to non-party Telemaco, the producer of *ZERO: An Investigation into 9/11*.  2d Am. Compl. ¶ 35.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

92.     The portion of the CBS 9/11 Newsreels that Telemaco used in *ZERO: An Investigation into 9/11* included a small clip of Fioranelli's Footage such that the clip of the Footage appears in the film for approximately 1.083 seconds, between time codes 8:35.583 and 8:36.666.  Relyea Decl. ¶ 34 & Ex. 11.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *ZERO: An Investigation into 9/11* includes a 1-second portion of Fioranelli's copyrighted video segment "Firefighter Sitting", and it occupies the entire screen.  Parness Cert. ¶¶ 3-5.  The "Firefighter Sitting" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 37-second NOT FOR BROADCAST copyrighted video segment.  Parness Cert. ¶ 6.  The 1 second of Mr. Fioranelli's footage is among a total of 1 minute, 9 seconds of comparable footage in the film.  Parness Cert. ¶ 5.

93.     The clip of the Footage that appears in *ZERO: An Investigation into 9/11* depicts a firefighter sitting in the rubble at Ground Zero and is part of a sequence of slow-motion footage from Ground Zero, set to music, that follows a firefighter's description of his escape from the North Tower collapse.  Relyea Decl. Ex. 11 at 7:33.958-8:44.041.

**Response:** Undisputed.

38

94.     The documentary then proceeds to cast doubt on "the official justification for the inexplicable collapse of the Twin Towers" through interviews with a number of conspiracy theorists. *Id.* at 9:04.999-9:08.499.

**Response:** Undisputed.

95.     *ZERO: An Investigation into 9/11* was released to the public in 2007.  2d Am. Compl. ¶ 35.

**Response:** Disputed.  There is no evidence in the record as to when *ZERO: An Investigation into 9/11* was shown, distributed, sold or licensed after its initial release in 2007. There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with *ZERO: An Investigation into 9/11*.  Parness Cert. ¶ 28 & Ex. 5.

96.     A total of 1.083 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.01% of the Footage, appears in the two hours, two minutes, and 59 seconds of *ZERO: An Investigation into 9/11*, comprising approximately 0.02% of *ZERO: An Investigation into 9/11.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**Seven Signs of the Apocalypse**

97.    *Seven Signs of the Apocalypse* is a 92-minute television program exploring a possible connection between modern-day world events and biblical prophecies of the apocalypse. 2d Am. Compl. ¶ 39; Relyea Decl. ¶ 35 & Ex. 12.

**Response:** Undisputed.

98.    On or about December 5, 2008, BBC licensed footage from the CBS 9/11 Newsreels to MorningStar, the producer of *Seven Signs of the Apocalypse*, and AETN, the distributor of *Seven Signs of the Apocalypse*. 2d Am. Compl. ¶ 39.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act. Fioranelli Cert. ¶¶ 39-42.

99.    The portion of the CBS 9/11 Newsreels that MorningStar and AETN used in *Seven Signs of the Apocalypse* included a small clip of Fioranelli's Footage such that the clip of the Footage appears in the program for approximately 1 second, between time codes 1:14:38.500 and 1:14:39.500. Relyea Decl. ¶ 36 & Ex. 12.

**Response:** Disputed. The characterization of "small" is relative, subjective and self-serving. *Seven Signs of the Apocalypse* includes a 1-second portion of Fioranelli's copyrighted video segment "Ambulance," and it occupies the entire screen. Parness Cert. ¶¶ 3-5. The "Ambulance" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 29-second NOT FOR BROADCAST copyrighted video segment. Parness Cert. ¶ 6. The 1-second portion of "Ambulance" is one of two clips representing 9-11 selected by the film's creators. The other clip representing 9-11 is a 2-second clip depicting a man being wheeled on a stretcher by two rescue workers. Parness Cert. ¶ 14 & Ex. 14.

40

100.     The clip of the Footage that appears in *Seven Signs of the Apocalypse* depicts an ambulance being lifted out of the rubble of Ground Zero and is shown in a segment on the prophesy of the oceans and river turning to blood from the Book of Revelation.  Relyea Decl. Ex. 12 at 1:14:30.00-1:14:53.833.  The clip of the Footage is part of a montage of video footage and images – including a painting of Satan whispering in Jesus's ear, archival footage of Hitler, and a missile strike – that accompanies the following commentary by a biblical scholar: "I think what God is specifically saying, he's saying to the rebellious planet earth, to the Antichrist and his forces, you've martyred my people, you've spilled their blood, you've killed millions of people that believe in God by taking their blood."  *Id.*  The clip of the Footage appears just as the scholar says the word "martyred," then immediately fades into the next clip of a man being wheeled on a stretcher.  *Id.* at 1:14:38.500-1:14:41.166.

**Response:** Undisputed.

101.     *Seven Signs of the Apocalypse* was released to the public in 2008.  2d Am. Compl. ¶ 39.

**Response:** Disputed.  There is no evidence in the record as to when *Seven Signs of the Apocalypse* was shown, distributed, sold or licensed after its initial release in 2008.  There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with *Seven Signs of the Apocalypse*.  Parness Cert. ¶ 28 & Ex. 5.

102.     A total of 1 second of the two hours, 42 minutes, and 56 seconds of Footage, comprising less than 0.01% of the Footage, appears in the one hour, 31 minutes, and 56 seconds of *Seven Signs of the Apocalypse*, comprising approximately 0.02% of *Seven Signs of the Apocalypse*.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses. The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**9/11: Day That Changed the World**

103.    *9/11: Day that Changed the World* is a 94-minute historical documentary that was televised on the Smithsonian Channel. 2d Am. Compl. ¶ 25; Relyea Decl. ¶ 37 & Ex. 13.

**Response:** Undisputed

104.    On or about September 6, 2011, BBC licensed footage from the CBS 9/11 Newsreels to non-party Brook Lapping Productions Ltd. ("BLP"), the producer of *9/11: Day that Changed the World*. Relyea Decl. Ex. 13.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act. Fioranelli Cert. ¶¶ 39-42.

105.    The portion of the CBS 9/11 Newsreels that BLP used in *9/11: Day that Changed the World* included five small clips of Fioranelli's Footage such that the clips of the Footage appear in the documentary for a total time of approximately 17.709 seconds, between time codes 57:41.624 and 57:44.583, 1:06:01.249 and 1:06:03.291, 1:06:09.833 and 1:06:13.458, and 1:06:23.541 and 1:06:32.624. Relyea Decl. ¶ 38 & Ex. 13.

**Response:** Disputed. The characterization of "small" is relative, subjective and self-serving. *9/11: Day that Changed the World* includes a 3-second portion of Fioranelli's copyrighted video segment "Silhouette," a 2-second portion of the iconic video clip "Doll," a 4-second portion of the iconic video clip "Workers 1," a 2-second portion of the iconic video clip "Horizontal Void 1," and a 4-second portion of the iconic video clip "Vertical Void," each of which occupies the entire screen. Parness Cert. ¶¶ 3-5.

In the case of "Silhouette," the 2-second portion was edited by CBS and one or more of the other Defendants from Fioranelli's original 57-second NOT FOR BROADCAST copyrighted video segment. In the case of "Doll," the 4-second portion was edited by CBS and one or more of the other Defendants from Fioranelli's original 12-second NOT FOR BROADCAST copyrighted video segment. In the case of "Workers 1," the 2-second portion was edited by CBS and one or more of the other Defendants from Fioranelli's original 30-second NOT FOR BROADCAST copyrighted video segment. In the case of "Horizontal Void 1," the 4-second portion was edited by CBS and one or more of the other Defendants from Fioranelli's original 2 minute, 40-second NOT FOR BROADCAST copyrighted video segment. Parness Cert. ¶ 6.

106.    The five clips of the Footage that appear in *9/11: Day That Changed the World* illustrate talking-head interviews with New York City Deputy Mayor Rudy Washington and Fire Commissioner Thomas Von Essen about their experiences on the day of the attack. In the first interview, Washington recounts, "A block away, I could see one fireman digging with his hands, and I look down and it's lights, and I realized, I'm standing on top of a fire truck." Relyea Decl. Ex. 13 at 57:37.458-57:51.208. After the word "hands," the camera cuts to a clip of the Footage showing a firefighter in silhouette at Ground Zero. *Id.* at 57:41.624-57:44.583.

**Response:** Undisputed

107.    Later, two clips of the Footage totaling about six seconds play as Von Essen recalls, "The devastation was overwhelming, and if there were people that were going to be rescued, you couldn't see them, and you knew it would be a while that you could get to them because everything was so heavy."  Relyea Decl. Ex. 13 at 1:05:58.416-1:06:15.249.  The first clip of the Footage, showing a rescue worker holding a doll, plays during the word "overwhelming."  *Id.* at 1:06:01.249-1:06:03.291.  The second clip of the Footage, showing a bucket brigade working to clear the rubble, plays as Essen says, "you knew it would be a while that you could get to them."  *Id.* at 1:06:09.833-1:06:13.458.

**Response:** Undisputed

108.    Finally, two separate clips of the Footage totaling nine seconds and showing firefighters climbing into rubble at Ground Zero play as Washington explains, "[E]ven when the firemen showed up, they were throwing water on the fire, but they couldn't move all this rubble and this steel.  By mid-day, I knew saving people was going to be fairly limited."  Relyea Decl. Ex. 13 at 1:06:19.083-1:06:33.049.

**Response:** Undisputed

109.    The first clip showing the Footage is approximately 3 seconds long, the second clip showing the Footage is approximately 2 seconds long, the third clip showing the Footage is approximately 3.6 seconds long, the fourth clip showing the Footage is approximately 2.5 seconds long, and the fifth clip showing the Footage is approximately 6.6 seconds long.  Relyea Decl. ¶ 39 & Ex. 13 at 57:41.624-57:44.583; 1:06:01.249-1:06:03.291; 1:06:09.833-1:06:13.458; 1:06:23.541-1:06:32.624.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of

44

Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

110.    *9/11: Day that Changed the World* was released to the public in 2011.  Relyea Decl. Ex. 13 at 01:33:50.583.

**Response:** Disputed.  There is no evidence in the record as to when *9/11: Day that Changed the World* was shown, distributed, sold or licensed after its initial release in 2011. There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with *9/11: Day that Changed the World*.  Parness Cert. ¶ 28 & Ex. 5.

111.    A total of 17.709 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.18% of the Footage, appears in the one hour, 33 minutes, and 55 seconds of *9/11: Day that Changed the World*, comprising approximately 0.31% of *9/11: Day that Changed the World.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**The Conspiracy Files: 9/11 10 Years On**

112.    *The Conspiracy Files: 9/11 Ten Years On* is a one-hour television program for BBC Two exploring and debunking various conspiracy theories about 9/11.  2d Am. Compl. ¶ 26; Relyea Decl. ¶ 40 & Ex. 14.

**Response:** Undisputed.

113.    No later than February 1, 2012, BBC, the producer of *The Conspiracy Files: 9/11 10 Years On*, obtained a license to use footage from the CBS 9/11 Newsreels in that program.  2d Am. Compl. ¶ 26.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

114.    The portion of the CBS 9/11 Newsreels that BBC used in *The Conspiracy Files: 9/11 10 Years On* included a small clip of Fioranelli's Footage such that the clip of the Footage appears in the program for approximately 1.625 seconds, between time codes at 35:31.999 and 35:33.624.  Relyea Decl. ¶ 41 & Ex. 14.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *The Conspiracy Files: 9/11 10 Years On* includes a 2-second portion of Fioranelli's copyrighted video segment "Silhouette," and it occupies the entire screen.  Parness Cert. ¶¶ 3-5.  The "Silhouette" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 57-second NOT FOR BROADCAST copyrighted video segment.  Parness Cert. ¶ 6.  The 2 seconds of Fioranelli's footage is among a total of 2 minutes, 20 seconds of comparable footage in the film.  Parness Cert. ¶ 5.

115.    The clip of the Footage used in *The Conspiracy Files: 9/11 10 Years On* appears in a segment debunking a conspiracy theory about explosives causing the collapse of World Trade Center 7, in which Carnegie Mellon University Professor Richard Fruehan explains, "They concluded that it was a highly energetic material, and on a kilogram basis, it is less – it gives off less energy than burning paper."  Relyea Decl. Ex. 14 at 35:29.041-35:43.416.  The clip of the Footage, showing a firefighter in silhouette at Ground Zero, appears with the words "energetic material."  *Id.*

**Response:** Undisputed.

116.    *The Conspiracy Files: 9/11 Ten Years On* was released to the public in 2011. Relyea Decl. Ex. 14 at 59:10.833.

**Response:** Disputed.  There is no evidence in the record as to when *The Conspiracy Files: 9/11 Ten Years On* was shown, distributed, sold or licensed after its initial release in 2011. There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with *The Conspiracy Files: 9/11 Ten Years On*.  Parness Cert. ¶ 28 & Ex. 5.

117.    A total of 1.625 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.016% of the Footage, appears in the one hour and 16 seconds of *The Conspiracy Files: 9/11 Ten Years On*, comprising approximately 0.05% of *The Conspiracy Files: 9/11 Ten Years On.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit

47

Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**The Miracle Survivor**

118.    *The Miracle Survivor* is a 48-minute documentary investigating the story of a man who claimed he miraculously survived the World Trade Center attack by "surfing" down from the 86th floor as the tower collapsed.  2d Am. Compl. ¶ 28; Relyea Decl. ¶ 42 & Ex. 15.

**Response:** Undisputed.

119.    On or about September 6, 2012, BBC licensed footage from the CBS 9/11 Newsreels to Testimony, the producer of *The Miracle Survivor*.  2d Am. Compl. ¶ 28.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that BBC's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

120.    The portion of the CBS 9/11 Newsreels that Testimony used in *The Miracle Survivor* included a small clip of Fioranelli's Footage such that the clip of the Footage appears in the program for approximately 2.97 seconds, between time codes 1:32:50.18 and 1:32:53.15. Relyea Decl. ¶ 43 & Ex. 15.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *The Miracle Survivor* includes a 3-second portion of Fioranelli's copyrighted video segment "Horizontal Void 1", and it occupies the entire screen.  Parness Cert. ¶¶ 3-5.  The "Horizontal Void 1" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 2 minute, 40 second NOT FOR BROADCAST copyrighted video segment.

Parness Cert. ¶ 6.  The 2 seconds of Fioranelli's footage is among a total of 6 minutes, 31 seconds of comparable footage in the film.  Parness Cert. ¶ 5.

121.    The clip of the Footage used in *The Miracle Survivor* shows a firefighter digging in the rubble at Ground Zero and accompanies firefighter Mike Lyons' commentary: "And we were searching voids and areas that we thought we could find people or our fellow firemen, or whoever, in the debris."  Relyea Decl. Ex. 15 at 1:32:49.00-1:32:58.18.

**Response:** Undisputed

122.    A total of 2.97 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.03% of the Footage, appears in the 47 minutes and 29 seconds of *The Miracle Survivor*, comprising approximately 0.1% of *The Miracle Survivor.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**Conspiracy Theory: Death Ray**

123.    *Conspiracy Theory: Death Ray* is a 53-minute episode of the television series hosted by Jesse Ventura exploring a conspiracy about a deadly secret weapon.  2d Am. Compl. ¶ 37; Relyea Decl. ¶ 44 & Ex. 16.

**Response:** Disputed.  *Conspiracy Theory: Death Ray* has a running time of 44 minutes.

124.    On or about September 28, 2012, T3Media licensed footage from the CBS 9/11 Newsreels to JVCT, producer of *Conspiracy Theory: Death Ray*.  2d Am. Compl. ¶ 37.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that T3Media's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

125.    The portion of the CBS 9/11 Newsreels that JVCT used in *Conspiracy Theory: Death Ray* included two small clips of Fioranelli's Footage such that the clips of the Footage appear in the program for a total time of approximately 3.375 seconds, between time codes 32:35.416 and 32:38.791.  Relyea Decl. ¶ 45 & Ex. 16.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *Conspiracy Theory: Death Ray* includes a 2-second portion of Fioranelli's copyrighted video segment "Silhouette," and a 1-second portion of Fioranelli's copyrighted video segment "Workers 1," each of which occupies the entire screen.  Parness Cert. ¶¶ 3-5.  The 3 seconds of Fioranelli's footage is among a total of 17 seconds of comparable footage in the film.  Parness Cert. ¶ 5.

126.    The two clips of the Footage that appear in *Conspiracy Theory: Death Ray* show a firefighter in silhouette at Ground Zero and a bucket brigade working to clear the rubble and are used as part of a preview for an upcoming segment of the program featuring 9/11 conspiracy theorist Judy Wood, in which the narrator announces, "Coming up on 'Conspiracy Theory':  The death ray investigation leads to the most devastating attack on American soil."  Relyea Decl.  Ex. 16 at 32:29.166-32:38.791.

**Response:** Undisputed

127.    The first clip showing the Footage is approximately 2.1 seconds long and the second clip showing the Footage is approximately 1.3 seconds long.  Relyea Decl. ¶ 46 & Ex. 16 at 32:35.416-32:38.791.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

128.    A total of 3.375 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.03% of the Footage, appears in the 53 minutes and 42 seconds of *Conspiracy Theory: Death Ray*, comprising approximately 0.1% of *Conspiracy Theory: Death Ray.*

**Response:** Disputed.  *Conspiracy Theory: Death Ray* has a running time of 44 minutes. Also disputed to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**The Untold History of the United States**

129.    *The Untold History of the United States* is a ten-part documentary series by Oliver Stone focusing on under-reported aspects of American history.  2d Am. Compl. ¶ 38; Relyea Decl. ¶ 47 & Ex. 17.

**Response:** Disputed.  The series does not appear to be about under-reported events. Relyea Dec. Ex. 17.

130.    On or about December 20, 2012, T3Media licensed footage from the CBS 9/11 Newsreels to Ipse Dixit, producer of *The Untold History of the United States*.  2d Am. Compl. ¶ 38.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that T3Media's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act.  Fioranelli Cert. ¶¶ 39-42.

131.    The portion of the CBS 9/11 Newsreels that Ipse Dixit used in *The Untold History of the United States* included three small clips of Fioranelli's Footage such that the clips of the Footage appear in the 58-minute episode 9 of the series for a total time of approximately 6.959 seconds, between time codes 51:33.124 and 51:40.083.  Relyea Decl. ¶ 48 & Ex. 17.

**Response:** Disputed.  The characterization of "small" is relative, subjective and self-serving.  *The Untold History of the United States* includes a 1-second portion of Fioranelli's copyrighted video segment "Silhouette," a 2-second portion of Fioranelli's copyrighted video segment "Doll," and a 3-second portion of Fioranelli's copyrighted video segment "Workers 1," each of which occupies the entire screen.  Parness Cert. ¶¶ 3-5.

The "Silhouette" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 57-second NOT FOR BROADCAST copyrighted video segment.

Parness Cert. ¶ 6.  The "Doll" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 12-second NOT FOR BROADCAST copyrighted video segment.  Parness Cert. ¶ 6.  The "Workers 1" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 30-second NOT FOR BROADCAST copyrighted video segment.  Parness Cert. ¶ 6.   The 7 seconds of Fioranelli's footage is among a total of 12 seconds of comparable footage in the film.  Parness Cert. ¶ 5.

132.    The three clips of the Footage used in episode 9 of *The Untold History of the United States* – which show a firefighter in silhouette, a rescue worker holding a doll, and a bucket brigade working to clear the rubble – appear in succession toward the end of the 58-minute episode, during a discussion of the effect of the 9/11 attack on the American people and their leaders.  Relyea Decl. Ex. 17 at 51:29.708-51:41.999.  Stone narrates, "And now, to some very powerful American leaders, it was as if they, the outliers of empire, these terrorists, had dropped Hiroshima on us, at the very least, Pearl Harbor."  *Id.*  In the sequence, the Footage is juxtaposed with archival footage from World War II.  *Id.*

**Response:** Disputed.  *See* response to Alleged Fact 131.

133.    The first clip showing the Footage is approximately 1.2 seconds, the second clip showing the Footage is approximately 2.5 seconds, and the third clip showing the Footage is approximately 3.2 seconds.  Relyea Decl. ¶ 49 & Ex. 17 at 51:33.124-51:40.083.

**Response:** Undisputed.

134.    A total of 6.959 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.07% of the Footage, appears in the 58 minutes and 13 seconds of episode 9 of *The Untold History of the United States*, comprising approximately 0.2% of episode 9 of *The Untold History of the United States.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses. The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

**9/11: Relics from the Wreckage**

135.    *9/11: Relics from the Wreckage* is a 30-minute documentary for the HISTORY network about the National 9/11 Memorial & Museum and its artifacts hosted by its president, Joe Daniels. 2d Am. Compl. ¶ 40; Relyea Decl. ¶ 50 & Ex. 18.

**Response:** Undisputed.

136.    T3Media licensed footage from the CBS 9/11 Newsreels to AETN, producer of *9/11: Relics from the Wreckage*, on or about September 10, 2013. 2d Am. Compl. ¶ 40.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that T3Media's licensing of Fioranelli's footage was lawful, when in fact it was unauthorized and a violation of Fioranelli's rights under the Settlement Agreement and the Copyright Act. Fioranelli Cert. ¶¶ 39-42.

137.    The portion of the CBS 9/11 Newsreels that AETN used in *9/11: Relics from the Wreckage* included seven small clips of Fioranelli's Footage such that the clips of the Footage appear in the program for a total time of approximately 17.3 seconds, between time codes 7:59.700 and 8:02.766, 20:24.033 and 20:28.133, 20:28.233 and 20:35.033, and 20:36.766 and 20:40.100. Relyea Decl. ¶ 51 & Ex. 18.

**Response:** Disputed. The characterization of "small" is relative, subjective and self-serving. *9/11: Relics from the Wreckage* includes a 3-second portion of Fioranelli's copyrighted video segment "Workers 1," another 4-second portion of Fioranelli's copyrighted video segment "Workers 1," a 2-second portion of Fioranelli's copyrighted video segment "Vertical Void," a 3-second portion of Fioranelli's copyrighted video segment "Horizontal Void 1," a 2-second portion of Fioranelli's copyrighted video segment "Workers 2," a 2-second portion of Fioranelli's copyrighted video segment "Truck," and a 2-second portion of Fioranelli's copyrighted video segment "Ambulance," each of which occupies the entire screen. Parness Cert. ¶¶ 3-5.

The first and second "Workers 1" segments were edited by CBS and one or more of the other Defendants from Fioranelli's original 30-second NOT FOR BROADCAST copyrighted video segment. Parness Cert. ¶ 6. The "Horizontal Void 1" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 2 minute, 40-second NOT FOR BROADCAST copyrighted video segment. Parness Cert. ¶ 6. The "Workers 2" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 30-second NOT FOR BROADCAST copyrighted video segment. Parness Cert. ¶ 6. The "Truck" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 27-second NOT FOR BROADCAST copyrighted video segment. Parness Cert. ¶ 6. The "Ambulance" segment was edited by CBS and one or more of the other Defendants from Fioranelli's original 29-second NOT FOR BROADCAST copyrighted video segment. Parness Cert. ¶ 6. The 17 seconds of Fioranelli's footage is among a total of 2 minutes, 23 seconds of comparable footage in the film. Parness Cert. ¶ 5.

138.    One three-second clip of the Footage that appears in *9/11: Relics from the Wreckage* depicts a bucket brigade working to clear the rubble appears as part of a montage of Ground Zero footage, as Daniels narrates, "The rescue and recovery efforts at Ground Zero involved thousands of people working day and night for nine months." Relyea Decl. Ex. 18 at 7:58.000-8:04.166.

**Response:** Undisputed

139.    Multiple clips of the same portion of the Footage also appear in another montage later in the program, along with clips of the Footage showing firefighters digging in the rubble and an ambulance being lifted out of the rubble, as Daniels narrates, "After the collapse of the towers, the first priority was to rescue those who may have survived and recover the deceased. This effort involved hundreds of workers – firefighters, iron workers, engineers, boilermakers, carpenters, masons, electricians, plumbers, riggers, and truckers." *Id.* at 20:24.066-20:42.700.

**Response:** Undisputed

140.    The first clip showing the Footage is approximately 3.1 seconds, the second clip showing the Footage is approximately 4.1 seconds, the third clip showing the Footage is approximately 2.6 seconds, the fourth clip showing the Footage is approximately 3 seconds, the fifth clip showing the Footage is approximately 1.2 seconds, the sixth clip showing the Footage is approximately 2.1 seconds, and the seventh clip showing the Footage is approximately 1.2 seconds. Relyea Decl. ¶ 52 & Ex. 18 at 7:59.700-8:02.766; 20:24.033-20:28.133; 20:28.233-20:35.033; 20:36.766-20:40.100.

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses. The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit

Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

141.    A total of 17.3 seconds of the two hours, 42 minutes, and 56 seconds of Footage, comprising approximately 0.18% of the Footage, appears in the 30 minutes and eight seconds of *9/11: Relics from the Wreckage*, comprising approximately 0.96% of *9/11: Relics from the Wreckage.*

**Response:** Undisputed, except to the extent the Alleged Fact suggests that these figures are in any way determinative of Defendants' *de minimis* or fair use defenses.  The duration of Fioranelli's footage in any of the infringing films is a function of CBS's own decision to edit Fioranelli's NOT FOR BROADCAST copyrighted footage to those durations and to copy that NOT FOR BROADCAST footage onto the Compilation Reels, and the decision of one or more of the other Defendants to further edit Fioranelli's NOT FOR BROADCAST copyrighted footage and to copy that footage onto the infringing film.

### Plaintiff's Counterstatement of Material Facts in Opposition to Defendants' Motion for Summary Judgment and in Support of Plaintiff's Cross-Motion for Partial Summary Judgment

**Anthony Fioranelli**

142.    For the last 27 years, Plaintiff Anthony Fioranelli has worked as a photojournalist, adding video to his business in 1999, and specializing in capturing and delivering high-value photographs and video footage for the news industry.  Fioranelli Cert. ¶ 1.

143.    Over the course of his career, Fioranelli has gone to extraordinary lengths to try to get the best photographs and footage he can, which often required taking chances with his

safety, running toward dangerous situations along with the first responders.  He learned that was the only way to get the best content, and that approach paid off for him many times.  *Id*.

144.    Fioranelli is well-known within his industry, and he has been recognized for his work on multiple occasions by industry leaders.  *Id*.

145.    In 1996, Fioranelli was one of the photographers who went out on the water the night of the crash of TWA Flight 800.  Once he got out there, he was able to take a photograph capturing the real-time recovery effort immediately after the crash, which he was able to license for $60,000.  *Id.* ¶ 2.

146.    Fioranelli risked his life obtaining that photo.  That night, Fioranelli was able to find someone to take him and a cameraman from WPIX ten miles out to sea, on a 24 foot boat with no life preservers and an inexperienced captain.  *Id.*

147.    At the end of that year, the BBC included a discussion of his Flight 800 photograph in a year-end retrospective.  *Id.* ¶ 3.

148.    Seth Jones, Picture Editor of the New York Post, was interviewed by the BBC for a segment about the use of two photographs – Fioranelli's and another one – to depict the TWA Flight 800 disaster (available at https://youtu.be/9odTaJ5y2uQ).  Mr. Jones explained as follows:

> At the New York Post we were lucky enough that we had at least two photographs to choose from that we could have put on page one.  One was the fin photograph that did end up on page 1.  The second photograph showed two vessels at sea, moving a body from one vessel to the other to be taken back to port.  That picture was taken by Tony Fioranelli, one of our freelancers.
>
> ….
>
> Tony's photograph was an essential part of the story, and it was a part of the story that we had to illustrate.  I don't think it was a difficult decision to decide what was the page 1 photograph – that was the wing in the water.  But it probably wasn't too difficult to decide that this photograph should be used, but somewhere inside.

*Id.*

149.    In 1997, immediately after the death of Princess Diana, Court TV asked Fioranelli to appear on a show on the network as an expert panelist to discuss what the photographers were doing at the time of the car crash.  *Id.* ¶ 4.

150.    He appeared, and spoke about whether or not the photographers had a duty to help, due to the Good Samaritan laws of France.  *Id.*

151.    He also appeared as an expert on the same topic on programs on New York One, ABC, NBC and FOX News Network.  *Id.*

152.    In 1998, John Taylor, in his college journalism textbook "Body Horror: Photojournalism, Catastrophe and War," (Fioranelli Cert. Ex. 1) wrote about Fioranelli's unique and iconic photo of the recovery efforts around TWA Flight 800, and the extraordinary lengths to which he went to get that photo.  *Id.* ¶ 5 & Ex. 1.

153.    In this passage from his book, Taylor used Fioranelli's photograph to explain the choice that editors had to make between using a metaphoric or real photograph to illustrate the story:

> [The front page photo] suited the mood better than the more explicit image taken from Tony Fioranelli, who had joined the flotilla of small boats at the scene on the night of the crash and had taken a picture of a dead woman held by her limbs face down as her body was transferred from a pleasure craft to a coastguard vessel. The photograph was used by The New York Post, Time and Newsweek but on their inside pages so that it was not staring out from the news-stands.  Fioranelli was displeased, because he had been at the scene during the night at moments of high drama and danger, and had witnessed raw news. Regardless of that, editors judged that the metaphorical value of Levy's picture was more suited to the front page than Fioranelli's revelation of dead flesh.

*Id.* Ex. 1.

154.    Mr. Taylor is described as a founding editor of the photographic journal Ten.8, and a Senior Lecturer in History of Art and Design at the Manchester Metropolitan University. *See* https://nyupress.org/9780814782392/body-horror/.

155.    In 2006, David Friend – then Vice President/News Director at WCBS-TV/WLNY-TV, and since 2010 Senior Vice President of News at CBS Television Stations – wrote about Fioranelli's 9-11 coverage in his book "Watching The World Change: The Stories Behind The Images Of 9/11." *Id.* ¶ 6 & Ex. 2. *See*

https://newyork.cbslocal.com/personality/david-friend/.

156.    In his book, Mr. Friend wrote the following about Fioranelli:

> Astoundingly, dozens of photographers continued to shoot even as they sensed that their own lives were at risk – when clouds of debris, from the falling towers, mushroomed up and down the streets. Suzanne Plunkett was immovable on the sidewalk, composing pictures. In one frame a half-dozen men stampede coward her, away from the swarm; a man in a tie seems to be screaming (Image 6). Doug Kanter photographed pedestrians running from smothering dust balls, as did Tony Fioranelli, Robert Mecca, Allan Tannenbaum, and Magnum's Susan Meiselas, who planted herself in the center of Church Street to confront the rushing wall of white, like some latter-day Mount St. Helens.

*Id.* Ex. 2.

**Fioranelli's Photo- and Video-Journalism Businesses**

157.    In 1992, Fioranelli started working as a photojournalist.  He made money by capturing photographs of newsworthy events and selling or licensing his photographs to the newspapers. *Id.* ¶ 1.

158.    In 1999, Fioranelli added video services to the business, and named the business Big Daddy Productions. *Id.*.

159.    In January 2004 Fioranelli rebranded the business as Multi Media Network News LLC. *Id.* ¶ 51.

160.    As the business grew, Fioranelli began taking on additional photo- and

videojournalists as independent contractors to take on the load of the growth of the business.  *Id.*

¶ 7.

161.    By 2005, Fioranelli grew the business to the largest spot news business in the

country.  *Id.*

162.    At the height of the business, Fioranelli had 8 dedicated cameramen working for

him, 24 hours a day, 7 days a week, plus many other independent contractors who would

contribute content to the company.  *Id.*

163.    Fioranelli's was also the only spot news company with five microwave news

trucks, which allowed to them to offer the option to their customers of live-broadcasting their

footage as they captured it.  *Id.*

164.    In 2005, editors and news directors at the New York affiliates of FOX, UPN and

NBC all wrote letters on Fioranelli's behalf to Nextel Communications.  *Id.* ¶ 8 & Ex. 3.

165.    In their letters, each of the editors and news directors explained to Nextel as

follows:

> We have come to rely heavily on services provided by Multi Media Network
> News, LLC, including the delivery by Multi Media Network News, LLC of
> remote live and taped programming, and consider these services indispensable to
> our dally operations. Furthermore, Multi Media Network News, LLC began
> providing these services prior to November 22, 2004.

*Id.* Ex. 3 (the letter from the FOX affiliate had slightly different wording).

166.    The photo- and videojournalism business is a high-pressure and fast-moving

environment.  *Id.* ¶ 9.

167.    Fioranelli learned, and taught his colleagues, to shoot for effect, and with the

needs of their news customers in mind.  *Id.*

168.    They thus took an approach that allowed them to frame their shots and to edit themselves in real time, and capture just what we they needed to meet their clients' needs.  *Id.*

169.    Often times, because it is such a fast-paced industry, and their clients needed the video for airing immediately, they have to furnish the video directly into their live trucks for airing.  *Id.*

170.    There is no time for editing, and the customers have to air what Fioranelli gives them.  *Id.*

171.    Fioranelli and his company became known as a reliable source for on-air-ready video footage that required little to know work before broadcast.  *Id.*

172.    Often, the photographs and video that Fioranelli and his colleagues captured were time-sensitive, and would sometimes be broadcast within minutes of the filming.  *Id.* ¶ 10.

173.    Because of this dynamic, it was and is customary for photo- and video-journalists to cut real-time oral license agreements with news outlets, to allow the outlets to use the footage when it is most valuable.  *Id.*

174.    Typically, if a news outlet wished to use Fioranelli's photographs or video, he would reach an agreement with them, hand over the content for their use, and invoice them a few days later.  *Id.*

175.    Fioranelli maintained a standing deal with all of the local New York television stations, including CBS's local station.  He used a fixed pricing scheme for local news outlets (at the time of 9-11, he was charging $250 per video segment).  *Id.* ¶ 11 & Ex. 4.

176.    Pricing for photographs and videos was either fixed – for spot news – or tied to how valuable the image or footage was to the national network.  *Id.*

177.     Pricing was not a function of the duration of the video, or whether it was video or still images being licensed.  *Id.*

178.     Fioranelli regularly charged the same prices whether something was a video or a "video grab," a still image made from a video.  *Id.* & Ex. 4.

179.     Fioranelli charged news organizations a separate fee when they used his content but failed to provide the proper credit.  *Id.*

180.     In this case, the New York Daily News had already paid $250 for the use of an image, but then failed to provide the proper credit.  Fioranelli then charged the Daily News, and the Daily News paid, an additional $400 for its error.  *Id.* & Ex. 4 at 4.

181.     Fioranelli's standard prices increased over time.  *Id.* ¶ 11.

182.     On March 14, 2005, for example, Fioranelli sent letters to all of the news directors of the local New York television stations, in which he told them that he was raising prices for "spot news."  *Id.* ¶ 12 & Ex. 5.

183.     When Fioranelli licensed his video footage and photographs to national news outlets and television networks he used a higher, flexible scale for national networks (for example, $850 or higher).  *Id.* ¶ 13.

184.     The higher pricing for the national networks was warranted by the fact that the networks shared what Fioranelli gave them with their local affiliates.  *Id.*

185.     Separate and apart from these pricing considerations was the pricing for disaster footage, like air crashes and natural disasters.  *Id.* ¶ 14.

186.     In these situations, Fioranelli negotiated separate deals relating to the exclusivity and urgency of the footage.  *Id.*

187.    In fact Fioranelli specifically told the news directors that "[t]he fee for disaster and terrorist attack footage will be negotiated at the time of sale." *Id.* Ex. 5.

188.    Thus, individual photographs or video recordings would sometimes give rise to a much more substantial license fee, often based on the unique or iconic nature of the photograph or videos involved. *Id.* ¶ 15.

189.    For example, on the night of July 17, 1996, when TWA Flight 800 crashed into the Atlantic Ocean off of Long Island, Fioranelli was one of the only photo- or videojournalist on the scene. *Id.* ¶ 2.

190.    The night of the crash, Fioranelli hired a boat – a 24 foot boat with an inexperienced captain and no life preservers – to take him 10 miles out to sea to the site of the crash. *Id.*

191.    Once he got out there, Fioranelli captured real-time photographs of the rescue and recovery efforts, including this photograph depicting the transfer of the body of a victim from one boat to another:



*Id.* & Ex. 18.

192.    Fioranelli's agent licensed the rights to this photograph for $60,000, and it was

selected by numerous publications, including the New York Post, Newsweek, Time Magazine,

and was published worldwide, in countries including India, China and Japan, to depict what had

happened:





*Id.* & Ex. 18.

193.    Fioranelli's work in connection with the TWA Flight 800 disaster, and the photograph he captured, was discussed in a BBC year-end documentary (available at https://youtu.be/9odTaJ5y2uQ) and in David Taylor's 1998 book.  *Id.* ¶ 3, 5 & Ex. 1.

194.    In the BBC documentary, Seth Jones of the New York Post spoke about the importance of Fioranelli's photo, calling it "an essential part of the story, and [] a part of the story that we had to illustrate."  *Id.* ¶ 3.

195.    Fioranelli would also license his photographs and video for use in entertainment or documentary, where the pricing was very dynamic based on the uniqueness of the photos or footage, the iconic nature of the photos or footage, and the ability of the entities in question to pay. *Id.* ¶ 10.

196.    On November 15, 2002, Fioranelli entered into a non-exclusive license agreement with Suzy Vaughan Associates to license a single still photograph entitled "Bill Clark looking at body in field," for use in the television program "Inside NYPD Blue: A Decade on the Job" and a companion book. *Id.* ¶ 16 & Ex. 6.

197.    In accordance with their agreement, Fioranelli was paid $3,000 for the non-exclusive license. *Id.* & Ex. 6.

198.    On September 28, 2005, Fioranelli entered into a non-exclusive license agreement with HARPO Productions, Inc. (Oprah Winfrey's production company) to license less than a minute of video footage entitled "aftermath footage of Tyson Beckford's car accident," for use in an episode of "The Oprah Winfrey Show." *Id.* ¶ 16 & Ex. 7.

199.    One of Fioranelli's cameramen, who he had trained, came upon a vehicle totally engulfed in flames on New Jersey Route 3, and he captured footage of the vehicle. *Id.*

200.    As Fioranelli had taught him, the cameraman moved in for a tight shot of the vehicle on fire. *Id.*

201.    They later learned the vehicle belonged to supermodel Tyson Beckford, and they had obtained the only footage of the incident. *Id.*

202.    Just like the Flight 800 footage, their video was exclusive, and obtained by going into a dangerous situation to capture the best images, making it extremely valuable to Fioranelli and to potential licensees. *Id.* ¶ 17.

203.    Fioranelli licensed the footage to HARPO, and in accordance with their agreement, Fioranelli was paid $5,000 for the non-exclusive license. *Id.* ¶ 16 & Ex. 7.

204.    On May 1, 2006, Fioranelli entered into a non-exclusive license agreement with Bruce Nash Entertainment to license less than a minute of video footage entitled "Woman Pulled From 25th Story Fire," for use in "World's Most Amazing Videos 3." *Id.* ¶ 16 & Ex. 8.

205.    In accordance with their agreement, Fioranelli was paid $5,000 for the non-exclusive license. *Id.* & Ex. 8.

**September 11, 2001 Attacks**

206.    When the September 11, 2001 attacks began, Fioranelli was in Long Island City with a view of the World Trade Center. *Id.* ¶ 18.

207.    All of Fioranelli's 9-11 footage depicts true events. *Id.*

208.    On September 11 and the days that followed, he sought out and captured iconic and unique video footage, and he brought his many years of experience to bear when deciding where to go, what to capture, how to frame the shots, and how to selectively edit what he captured in real time. *Id.*

209.    Fioranelli created all of his 9-11 video footage, and the video footage that he created serves as a photographic memory of the events of 9/11 for posterity. *Id.* ¶ 19.

210.    The footage that he created is entitled to protection, and is protected, under U.S. Copyright Law. *Id.*

211.    The copyrighted footage that he created has become famous as a historical repository of the events on and after September 11, 2001. *Id.*

212.    Fioranelli approached the 9-11 disaster the way he approached all of his work. *Id.* ¶ 20.

213.    Nobody knew what was going on or whether more attacks were on the way, but Fioranelli decided that he had to get to the site of the disaster, no matter what it took, in order to

get photos and video footage of whatever was happening there, to record history and share it with the world. *Id.*

214.    Some of the first footage Fioranelli captured that day was a closeup of the burning towers, and an interview of a bystander with the burning towers in the background, as shown in these exemplar images taken from Fioranelli's original video footage (Relyea Dec. Ex. 1) (DEF-VIDEO 0016):



*Id.* ¶ 21 & Ex. 19; Parness Cert. ¶ 33 & Ex. 26; Relyea Dec. Ex. 1.

215.    Fioranelli made his way as fast as he could into lower Manhattan, and once he arrived he began capturing video footage of survivors, rescue workers, and the damage in the blocks near the World Trade Center, as shown in these exemplar images taken from Fioranelli's original video footage (Relyea Dec. Ex. 1) (DEF-VIDEO 0016):

 



Fioranelli Cert. ¶ 21 & Ex. 19; Parness Cert. ¶ 33 & Ex. 26; Relyea Dec. Ex. 1.

216.    Shortly after that, the second tower of the World Trade Center started to collapse. Fioranelli attempted to move closer to the site of the attacks, videotaping the collapse of the building, and moving against the panic flow of people fleeing the site.  Fioranelli Cert. ¶ 22.

217.    Finally Fioranelli was stopped by police, who told him nobody was allowed to enter.  *Id.*

218.    However, he bypassed the police barricade anyway, and headed toward the World Trade Center site.  *Id.*

219.    As he was able to move closer to the site of the towers, the area that became known as "Ground Zero," Fioranelli continued to capture video footage.  *Id.* ¶ 23.

220.    The remains of the buildings were engulfed in flames, and the air was thick with smoke.  *Id.*

221.    As Fioranelli made his way toward the World Trade Center site, there were constant explosions from stores of ammunition being ignited, and larger explosions, which the firefighters he was with explained were exploding oxygen tanks in ambulances and other vehicles.  *Id.*

222.    There was also a constant rain of broken glass all around him, coming off of the buildings.  *Id.*

223.    Fioranelli continued to move forward and capture video footage of firefighters and other rescue workers searching for survivors.  *Id.*

224.    Throughout the day, more firefighters and rescue workers showed up at the site to continue the task of searching for survivors.  *Id.*

225.    Fioranelli remained on site throughout the day of September 11, and returned to the site on most of the subsequent days.  *Id.*

226.    On most of the days that Fioranelli was at the Ground Zero site, and especially on September 11 itself, there were no other videographers in the areas that he was able to access. *Id.* ¶ 24.

227.    Fioranelli captured hundreds of segments of video footage, including many segments that he believes are both one-of-a-kind and iconic, 13 of which are at the heart of this case because CBS and the other defendants misappropriated them.  *Id.* & Ex. 20; Parness Cert. ¶¶ 31, 33 & Exs. 24, 26.

228.    Still image exemplars of the 13 iconic video segments are depicted below:





Fioranelli Cert. ¶ 24 & Ex. 20; Parness Cert. ¶¶ 5, 31, 33 & Exs. 24, 26; Relyea Dec. Exs. 1-3.

229.     On September 11, 2011, after filming for many hours at the World Trade Center site, Fioranelli called all of the local New York news stations, informed them that he had been at the disaster site, and that he had video footage of the disaster that he was interested in licensing. *Id.* ¶ 25.

230.    Because of the exclusivity and uniqueness of the disaster footage, Fioranelli informed each of the news directors that the price for use of the footage was $1,000 per use, per day.  *Id.*

231.    The CBS local news desk and WOR Channel 9 agreed to the pricing structure and Fioranelli told each of them that they had an agreement.  *Id.*

232.    Because CBS local news had agreed to his price, Fioranelli went to the CBS building to meet with the local news director.  *Id.* ¶ 26.

233.    Fioranelli entered the lobby, covered in dust.  *Id.*

234.    Fioranelli was approached in the lobby by a CBS Early Show producer, who asked him if I had been at the World Trade Center site, and if he had captured footage from the site.  *Id.*

235.    Fioranelli responded that he had in fact captured footage from the World Trade Center site.  *Id.*

236.    The CBS Early Show producer asked to look at the footage, and Fioranelli showed the producer some of the footage on his camera.  *Id.* ¶ 27.

237.    The producer became very excited and rushed Fioranelli into the offices of the CBS Early Show, where he was introduced to other CBS representatives, who also asked to see Fioranelli's footage.  *Id.*

238.    After they saw Fioranelli's footage, the larger group of CBS representatives asked to use his footage, and they agreed to pay Fioranelli's price of $1,000 per use for any portion of any day's footage.  *Id.* ¶ 28.

239.     After they reached an agreement, Fioranelli plugged his Sony Digital 8 camcorder into CBS's Early Show dubbing system, and the CBS representatives used their system to copy Fioranelli's footage into the CBS Early Show system.  *Id.*

240.     Fioranelli then went to the CBS local news offices and repeated the process – plugging his camera into their system and allowing them to copy his footage into their system. *Id.*

241.     Fioranelli has never owned a Betacam SX camera.  *Id.* ¶ 29.

242.     Fioranelli never provided CBS with any Betacam SX videocassettes, or any videocassettes of any kind.  *Id.*

243.     It was critical to Fioranelli that CBS local news and the CBS Early Show had agreed to pay him $1,000 per use per filming day.  *Id.* ¶ 30.

244.     By way of example, if CBS used two clips of his footage of any length – one from September 11 and one September 12 – they would pay Fioranelli $2,000.

245.     It was also critical to Fioranelli that CBS local news and the CBS Early Show had agreed that the rights to use his footage would be strictly limited to the CBS news division, and CBS could not use it, or allow others to use it, for any other purpose.  *Id.*

246.     In accordance with their agreement, Fioranelli returned to CBS's offices five more times – after each day of filming – and repeated the dubbing process with the additional footage. *Id.* ¶ 31.

247.     Fioranelli invoiced CBS for the use of his footage on the Early Show, and in their local news programs, at the agreed-upon rate of $1,000 per use per filming day.  *Id.* ¶ 32.

248.     As Fioranelli learned of additional uses by CBS of his footage, he continued to invoice CBS on the same terms they had agreed to – $1,000 per use per day of filming.  *Id.*

249.    Fioranelli also invoiced CBS for their use of his footage to promote an unrelated 9-11 documentary entitled "9/11," directed by French filmmakers Jules and Gédéon Naudet, narrated by Robert DeNiro, and aired by CBS in 2002.  *Id.* ¶ 33.

250.    All of the footage on Relyea Dec. Ex. 1 is Fioranelli's 9-11 footage, but Fioranelli does not know if it is complete.  *Id.* ¶ 34.

251.    Because Fioranelli did not give CBS videocassettes, but rather connected his camera directly to their system, Fioranelli does not know and cannot know if the files on Relyea Dec. Ex. 1 are complete copies of CBS's copies of Fioranelli's 9-11 footage.  *Id.*

252.    Fioranelli was one of the only videographers, if not the only videographer, on-site at Ground Zero immediately after the September 11 attacks and in the days that followed.  *Id.* ¶ 35.

253.    This made Fioranelli's 9-11 footage, exclusive, unique, iconic and valuable.  CBS obtained much if not all of its most important footage of Ground Zero immediately after the September 11 attacks and in the days that followed from Fioranelli.  *Id.*

**2002 Lawsuit and Settlement with CBS**

254.    On December 12, 2001, Fioranelli's attorney wrote to CBS, demanding payment of certain of the outstanding invoices, noting that CBS's settlement offer of $1,250 was rejected, and that if CBS failed to pay what they owed him, Fioranelli would sue them.  *Id.* ¶ 36 & Ex. 9.

255.    CBS continued to refuse to pay for its use of Fioranelli's 9-11 footage, and on January 9, 2002 Fioranelli sued CBS in the Supreme Court for the State of New York, County of New York, for breach of contract.  *Id.* ¶ 37 & Ex. 10.

256.    Soon after Fioranelli sued CBS, they began settlement negotiations.  *Id.* ¶ 38.

257.    The negotiation and settlement process was highly contentious, and not amicable. In the course of the settlement talks, Fioranelli demanded that CBS remove all of his footage from all of CBS's systems worldwide.  *Id.*

258.    CBS responded to Fioranelli that such removal would be nearly impossible, and they offered to put in place monetary penalties against CBS, in the event that CBS engaged in unauthorized use of Fioranelli's footage.  *Id.*

259.    Fioranelli demanded a monetary penalty of $10,000 per minute or any part thereof, but he ultimately agreed to a monetary penalty of $3,000 per minute or any part thereof for certain (but not other) improper uses, as reflected in the Settlement Agreement.  *Id.* ¶¶ 38-39 & Ex. 11.

260.    On March 7, 2002, CBS and Fioranelli settled the State Court Lawsuit.  *Id.* ¶ 39 & Ex. 11.

261.    As reflected in the Settlement Agreement, CBS agreed to pay Fioranelli most of what he was asking for the outstanding invoices, and further agreed to the following terms (emphasis added):

a.    "4.(a) Fioranelli hereby grants to [CBS Broadcasting Inc. ("CBS")], effective as of the date of this Agreement, a non-exclusive, irrevocable, perpetual worldwide right and license to use the [footage provided by Fioranelli to CBS in 2001 relating to the World Trade Center disaster (the "Footage")] in all regularly-scheduled and breaking news programming and all news magazine programs (such as, without limitation, 60 MINUTES and 48 HOURS), and in the advertising, publicity and promotions therefor, produced by CBS owned television stations and CBS News, in all media now known or hereafter developed, except as provided herein. It is understood and agreed by and between the parties that the right and license granted herein does not include authorization to use the Footage in CBS Entertainment Division programming, including docudramas, nor in CBS News documentary specials."

b.    "4.(b) It is understood and agreed by and between the parties that the right and license granted herein does not include authorization to use the Footage in programs produced by CBS News Productions for third party clients; provided

however, that in the event that despite commercially reasonable efforts to exclude the Footage from such programs, Footage is included in such programs, CBS shall pay Fioranelli (or his heirs, executors, assigns, agents, affiliated companies, successors, or successors in interest) $3000 per minute (or part thereof) for each minute used within the program, for rights in all media, now known or hereafter developed, in perpetuity.  Within twenty (20) days of the initial broadcast of any program produced by CBS News Productions devoted to the subjects of the attacks on the World Trade Center or the events of September 11, 2001, CBS shall provide to Fioranelli a VHS time-coded copy of such program."

c.       "4.(c) It is understood and agreed by and between the parties that the right and license granted herein does not include authorization to use the Footage on CBS websites; provided however, that in the event that despite commercially reasonable efforts to exclude the Footage or any still frame thereof, Footage is included on the websites, CBS shall pay Fioranelli (or his heirs, executors, assigns, agents, affiliated companies, successors, or successors in interest) $3000 per minute (or part thereof) for each minute used on the websites or $1000 for any still frame thereof."

d.       "4.(d) Fioranelli hereby grants to CBS a non-exclusive, irrevocable, perpetual worldwide right and license to use the Footage in promotions for the special program about the World Trade Center disaster currently entitled "9/11"; provided, however, that such license does not include the right to use the Footage within the "9/11" special. It is understood and agreed by and between the parties that Fioranelli shall be credited in the end credits of "9/11" with the following credit: "Anthony Fioranelli/BDP"; however, the size, placement, and location of such credit will be at CBS' sole discretion and any failure to include the credit as a result of program timing shortages or technical failure shall not be deemed a material breach of this Agreement."

*Id.* ¶ 39 & Ex. 11.

262.    CBS did not ask Fioranelli to grant, and Fioranelli did not grant to CBS, and Fioranelli would not have granted to CBS if asked, a license to use any of Fioranelli's 9-11 footage except as specifically indicated in Section 4 of the Settlement Agreement.  *Id.* ¶ 40.

263.    CBS did not ask Fioranelli to grant, Fioranelli did not grant to CBS, and Fioranelli would not have granted to CBS if asked, a license to share any of Fioranelli's 9-11 footage with any other party.  *Id.* ¶ 41.

264.    Both CBS and Fioranelli understood that if CBS had done so, it would be an incurable material breach of the Settlement Agreement.  *Id.*

265.    For this reason, the Settlement Agreement provides no "cure" provision for such a violation, whereas it did include "cure" provisions for violations of the restrictions against CBS using the footage in productions by CBS for third parties, and against CBS using the footage on CBS websites.  *Id.*

266.    CBS did not ask Fioranelli to grant, Fioranelli did not grant to CBS, and Fioranelli would not have granted to CBS if asked, the right to sub- license any of Fioranelli's 9-11 footage to any other party.  *Id*.

267.    Both CBS and Fioranelli understood that if CBS had done so, it would be an incurable material breach of the Settlement Agreement.  *Id.*

268.    For this reason, the Settlement Agreement provides no "cure" provision for such a violation, whereas it did include "cure" provisions (assuming that CBS had taken "commercially reasonable efforts to exclude" Fioranelli's 9-11 footage) for violations of the restrictions against CBS using the footage in productions by CBS for third parties, and against CBS using the footage on CBS websites.  *Id.*

269.    CBS did not ask Fioranelli to grant, Fioranelli did not grant to CBS, and Fioranelli would not have granted to CBS if asked, a license to use any of Fioranelli's 9-11 footage for CBS entertainment programs or documentary programs.  *Id.*

270.    Both CBS and Fioranelli understood that if CBS had done so, it would be an incurable material breach of the Settlement Agreement.  *Id.*

271.    For this reason, the Settlement Agreement provides no "cure" provision for such a violation, whereas it did include "cure" provisions (assuming that CBS had taken "commercially

reasonable efforts to exclude" Fioranelli's 9-11 footage) for violations of the restrictions against CBS using the footage in productions by CBS for third parties, and against CBS using the footage on CBS websites. *Id.*

272.    Any use, copying, editing, distribution or public performance of Fioranelli's 9-11 footage, except as set forth in the Settlement Agreement, was and is unauthorized. *Id.* ¶ 39-42.

273.    This includes but is not limited to the inclusion of Fioranelli's 9-11 footage on the CBS Reels, and the inclusion of Fioranelli's 9-11 footage in any of the 15 films at issue in this case. *Id.*

274.    If any of the Defendants had asked Fioranelli for permission to use his 9-11 footage in the manner that they have in the CBS Reels or in any of the 15 films at issue in this case, Fioranelli would have either refused the request or demanded licensing fees in accordance with his past business practices and in accordance with the market value of each such use. *Id.* ¶ 42.

275.    CBS's licenses to BBC and T3Media to use Fioranelli's 9-11 footage were and are unauthorized. *Id.* ¶¶ 39-42.

276.    If any of these Defendants had asked Fioranelli for permission to license his 9-11 footage in the manner that they have, Fioranelli would have either refused the request or demanded licensing fees in accordance with his past business practices and in accordance with the market value of each such use. *Id.* ¶ 42.

277.    BBC's and T3Media's licenses to the other Defendants to use Fioranelli's 9-11 footage were and are unauthorized. *Id*.

278.    If any of these Defendants had asked Fioranelli for permission to use his 9-11 footage in the manner that they have, Fioranelli would have either refused the request or

demanded licensing fees in accordance with his past business practices and in accordance with the market value of each such use.  *Id.*

**The 9-11 Photography Exhibits and Library of Congress**

279.    In 2002, Fioranelli participated in an exhibit of 9-11 photography at a gallery in New York City, where he displayed a number of his iconic photographs.  *Id.* ¶ 43.

280.    Proceeds from the exhibit were donated to a charity providing assistance to the widows and orphans of 9-11 first responders.  *Id.*

281.    The Library of Congress purchased two of Fioranelli's photographs from that exhibit, neither of which are among the 13 iconic images at issue in this case.  *Id.*

282.    Fioranelli also donated a collage of 35 iconic images he selected from his 9-11 footage, as shown below.  *Id.* & Ex. 21.



283.    The collage included still photographs made from three of the iconic segments that are at issue in this case – Silhouette, Doll and Climbing Column – which can be seen in the bottom two rows of the collage.  *Id.* & Ex. 21.



**Agreements with Others Regarding 9-11 Footage**

284.    In September 2001 Fioranelli reached an agreement with WOR for the use of his 9-11 footage.  *Id.* ¶ 44.

285.    WOR paid Fioranelli for what they used, and did not use his footage beyond the scope of the agreement.  *Id.*

286.    On January 28, 2002, Home Box Office requested access to Fioranelli's 9-11 footage for potential inclusion in a documentary they were preparing, with the express understanding that HBO could not use any of Fioranelli's 9-11 footage without paying him in accordance with an agreement to be negotiated later.  *Id.* ¶ 45 & Ex. 12.

287.    Thereafter, HBO decided to change the format of their documentary, limiting it to interviews only, without any footage of the Ground Zero rescue efforts.  HBO honored the agreement, and has not used any of Fioranelli's footage.  *Id.*

288.     Similarly, in May 2002, Fioranelli reached a verbal agreement with ABC to license his 9-11 footage for use in a documentary ABC was preparing, at the rate of $10,000 per minute with a producer credit.  *Id.* ¶ 46 & Ex. 13.

289.     Some time thereafter, ABC decided not to use any 9-11 footage in their documentary, and they did not move forward with the agreement.  *Id.*

**Fioranelli's Efforts to Monetize and Create His Own Films from His 9-11 Footage**

290.     In 2002 Fioranelli created the first of two documentaries about 9-11, using his exclusive 9-11 footage.  *Id.* ¶ 47.

291.     The film was called "Hell on Earth," and focused on the efforts of the first responders following the attacks.  *Id.*

292.     The film was never finalized or released, due to an impasse with the film's editor.  *Id.*

293.     In 2008, Fioranelli created a second 9/11 documentary entitled "Behind the Lens: Covering 9/11," using his exclusive 9/11 footage and focusing on the photographers who were at Ground Zero.  *Id.* ¶ 48.

294.     Fioranelli and his distributor tried to sell the documentary in 2008, in time for the 10th anniversary of the attacks.  *Id.*

295.     What they learned, however, was that there was a glut of 9/11 documentaries already on the market with Ground Zero footage – 32 such films were released that year.  *Id.* ¶ 49.

296.     The abundance of 9-11 documentaries made it very difficult to generate interest in Fioranelli's film, and they were unable to find a buyer.  *Id.*

297.    In 2014 and thereafter, Fioranelli learned that 8 of the 32 films released that year contained his 9-11 footage, and are among the films now at issue in this case.  *Id.* ¶ 50.

298.    Back in 2011, Fioranelli had believed that CBS was complying with the Settlement Agreement, and that his 9-11 footage had not been released.  *Id.*

299.    This allowed Fioranelli to claim that the footage in his film was unique and exclusive, which was of significant importance to the value of his film.  *Id.*

300.    Fioranelli now knows that his footage had been unlawfully used in 8 of the other films on the market at the time.  *Id.*

301.    Prior to 2004, Fioranelli maintained a website for Big Daddy Productions at www.bdpny.com.  *Id.* ¶ 51.

302.    In January 2004, Fioranelli rebranded Big Daddy Productions as Multi Media Network News LLC.  *Id.*

303.    In conjunction with that rebrand, Fioranelli launched a second website for the new entity at www.multimedianetworknews.com.  *Id.*

304.    The www.multimedianetworknews.com website contained Fioranelli's 9-11 images and video clips.  *Id.*

305.    The www.multimedianetworknews.com website contained Fioranelli's 9-11 video clips.  *Id.*

306.    Fioranelli included these images and video clips in an effort to sell or license them.  *Id.*

**Discovery of Infringements in 2014**

307.    In March 2002, CBS and Fioranelli settled his 2002 lawsuit, and they entered into the Settlement Agreement.  *Id.* ¶ 39 & Ex. 11.

308.    The Settlement Agreement specifically provided that CBS only had permission to use Fioranelli's 9-11 footage for CBS news programs, and were prohibited from using it for any other purpose, including – specifically – CBS documentary and entertainment programs.  *Id.* & Ex. 11.

309.    The Settlement Agreement also provided that CBS may not use the footage for programs CBS produced for third parties or for CBS's websites, but if they did use it, "despite commercially reasonable efforts to exclude the Footage from such programs," they would pay Fioranelli $3,000 per use per minute or part thereof for video, and $1,000 per use of still images on the websites.  *Id.* & Ex. 11 ¶¶ 4(b) & 4(c).

310.    CBS was also required to tell Fioranelli if they used his footage in third-party productions or on CBS's websites: "Within twenty (20) days of the initial broadcast of any program produced by CBS News Productions devoted to the subjects of the attacks on the World Trade Center or the events of September 11, 2001, CBS shall provide to Fioranelli a VHS time-coded copy of such program."  *Id.* & Ex. 11 ¶ 4(b).

311.    CBS assured Fioranelli repeatedly that they would mark his 9-11 footage in such a way that it would not be used for any prohibited purpose whatsoever.  *Id.* ¶ 52.

312.    The Settlement Agreement made no provision whatsoever that would allow CBS to distribute or sub-license Fioranelli's 9-11 footage to other parties, and no provision to cure such activity, even if it was distributed or sub-licensed "despite commercially reasonable efforts to exclude the Footage."  *Id.* Ex. 11.

313.    From 2002 to 2014, Fioranelli relied upon CBS's promises, along with the clear terms of the Settlement Agreement, to prevent CBS from using or distributing his 9-11 footage. *Id.* ¶ 53.

314.    In February 2014, however, Fioranelli happened to watch the film entitled *9/11: Day that Changed the World* (DEF-VIDEO 0015) (Relyea Dec. Ex. 13), a documentary that was originally shown on the Smithsonian Channel, and immediately recognized portions of Fioranelli's iconic footage.  *Id.* ¶ 54.

315.    Specifically, the documentary included portions of five of his iconic segments, "Silhouette," "Doll," "Workers 1," "Horizontal Void 1," and "Vertical Void":



DEF-VIDEO 0015 - 9-11 The Day That Changed The World

00:57:42.541



DEF-VIDEO 0015 - 9-11 The Day That Changed The World

01:06:02.083







*Id.* & Ex. 22; Parness Cert. ¶ 32 & Ex. 25.

316.    Fioranelli immediately contacted Brook Lapping Productions, the producer of the film, asking how they obtained his 9-11 footage.  Fioranelli Cert. ¶ 55 & Ex. 14.

317.    In Fioranelli's follow-up email to the producer on March 4, 2014, Fioranelli specifically referred the producer to two of the iconic segments: "The firefighter standing on the pile and the civilian looking at me holding a rag doll."  *Id.* & Ex. 15.

318.    On March 11, 2014, the producer wrote to Fioranelli, stating that "the master material was supplied and licensed to us by another party who warranted that they had the right to license us the material."  *Id.* & Ex. 16.

319.    Fioranelli later learned that the producer had unlawfully licensed the footage from Defendant BBC, who had in turn unlawfully licensed it from Defendant CBS.  *Id.* & Ex. 17.

320.    On October 16, 2014, CBS wrote to Fioranelli's lawyer.  *Id.* & Ex. 17.

321.    In that letter, CBS told Fioranelli that they had investigated his claims of infringement, and that: "Based on information furnished to CBS by BBC Worldwide Limited and T3 Media, Inc., CBS News believes a total of fifteen licenses in the aggregate had been granted by BBC Worldwide Limited and T3 Media, Inc., that included Big Daddy Material covering the period 2004 through 2013." *Id.* & Ex. 17.

322.    CBS calls its news division "among the world's most respected news organizations."  Lukaris Dec. ¶ 3.  Because of how CBS has treated Fioranelli and other copyright owners, Fioranelli strongly disagrees with this statement, and he does not believe CBS is worthy of his respect.  *Id.* ¶ 56.

**Analysis of Infringing Works**

323.    There are 15 films at issue in this case that incorporated portions of Anthony Fioranelli's copyrighted footage (the "Infringing Films").  Relyea Dec. Exs. 4-18.

324.    Defendants also produced what they purport to be "[a] true and correct copy of the digitized and BITC version of the footage shot by Fioranelli at the World Trade Center site following the September 11, 2001 attack." (the "Fioranelli Footage").  Relyea Dec. Ex. 1.

325.    Defendants also produced what they purport to be "two CBS newsreels of video relating to the 9/11 attack and its aftermath." (the "CBS Reels").  Relyea Dec. Exs. 2-3.

326.    The CBS Reels include at least 11 segments of Fioranelli Footage.  Parness Cert. ¶ 2.

327.    All 11 of these segments are watermarked with "NOT FOR BROADCAST" diagonally across the screen.  *Id.*

328.    Still image exemplars of these 11 video segments are depicted below:





*Id.* & Ex. 8.

329.    At least 10 of these 11 segments also appear in the Infringing Films.  Relyea Dec.,

*passim*.

330.    At least two more segments of Fioranelli Footage are not found on the CBS Reels,

but appear in at least one of the Infringing Films, *The Miracle of Stairway B*.  Parness Cert. ¶ 2.

331.    The segments on the Fioranelli Footage are watermarked "NOT FOR

BROADCAST" across the top and bottom of the frame.  *Id.*

332.    Still image exemplars of these two video segments are depicted below:



*Id.* ¶ 2 & Ex. 8.

333.  "Silhouette" appears in 5 of the infringing films.  Parness Cert. ¶ 3:

    a.  *Celsius 41.11* (DEF-VIDEO 0014) (Relyea Dec. Ex. 5).

    b.  *How It Was: Voices of 9/11* (DEF-VIDEO 0025) (Relyea Dec. Ex. 10).

    c.  *The Conspiracy Files: 9/11 10 Years Later* (DEF-VIDEO 0005) (Relyea Dec. Ex. 14).

    d.  *Conspiracy Theory: Death Ray* (DEF-VIDEO 0011) (Relyea Dec. Ex. 16).

    e.  *The Untold History of the United States* (DEF-VIDEO 0015) (Relyea Dec. Ex. 17).

334.  "Doll" appears in 4 of the infringing films.  Parness Cert. ¶ 3:

    a.  *Rush To War* (DEF-VIDEO 0017) (Relyea Dec. Ex. 4).

    b.  *How It Was: Voices of 9/11* (DEF-VIDEO 0025) (Relyea Dec. Ex. 10).

    c.  *9/11: Day That Changed the World* (DEF-VIDEO 0015) (Relyea Dec. Ex. 13).

    d.  *The Untold History of the United States* (DEF-VIDEO 0015) (Relyea Dec. Ex. 17).

335.  "Horizontal Void 1" appears in 5 of the Infringing Films.  Parness Cert. ¶ 3:

    a.  *The Miracle of Stairway B* (DEF-VIDEO 0015) (Relyea Dec. Ex. 8).

    b.  *Crime Scene 9/11* (DEF-VIDEO 0026) (Relyea Dec. Ex. 9).

    c.  *9/11: Day That Changed the World* (DEF-VIDEO 0015) (Relyea Dec. Ex. 13).

    d.  *9/11: Relics from the Wreckage* (DEF-VIDEO 0002) (Relyea Dec. Ex. 18).

    e.  *The Miracle Survivor* (DEF-VIDEO 0012) (Relyea Dec. Ex. 15).

336.  "Vertical Void" appears in 4 of the Infringing Films.  Parness Cert. ¶ 3:

    a.  *The Miracle of Stairway B* (DEF-VIDEO 0015) (Relyea Dec. Ex. 8).

    b.  *Crime Scene 9/11* (DEF-VIDEO 0026) (Relyea Dec. Ex. 9).

    c.  *9/11: Day That Changed the World* (DEF-VIDEO 0015) (Relyea Dec. Ex. 13).

    d.  *9/11: Relics from the Wreckage* (DEF-VIDEO 0002) (Relyea Dec. Ex. 18).

337.   "Workers 1" appears in 4 of the Infringing Films.  Parness Cert. ¶ 3:

    a.  *9/11: Day That Changed the World* (DEF-VIDEO 0015) (Relyea Dec. Ex. 13).

    b.  *Conspiracy Theory: Death Ray* (DEF-VIDEO 0011) (Relyea Dec. Ex. 16).

    c.  *The Untold History of the United States* (DEF-VIDEO 0015) (Relyea Dec. Ex. 17).

    d.  *9/11: Relics from the Wreckage* (DEF-VIDEO 0002) (Relyea Dec. Ex. 18).

338.   "Firefighters" appears in 3 of the Infringing Films.  Parness Cert. ¶ 3:

    a.  *World Trade Center* (DEF-VIDEO 0022) (Relyea Dec. Ex. 6).

    b.  *World Trade Center Making Of DVD* (DEF-VIDEO 0022) (Relyea Dec. Ex. 7).

    c.  *How It Was: Voices of 9/11* (DEF-VIDEO 0025) (Relyea Dec. Ex. 10).

339.   "Workers 2" appears in 2 of the Infringing Films.  Parness Cert. ¶ 3:

    a.  *How It Was: Voices of 9/11* (DEF-VIDEO 0025) (Relyea Dec. Ex. 10).

    b.  *9/11: Relics from the Wreckage* (DEF-VIDEO 0002) (Relyea Dec. Ex. 18).

340.   "Ambulance" appears in 2 of the Infringing Films.  Parness Cert. ¶ 3:

    a.  *Seven Signs of the Apocalypse* (DEF-VIDEO 0004) (Relyea Dec. Ex. 12).

    b.  *9/11: Relics from the Wreckage* (DEF-VIDEO 0002) (Relyea Dec. Ex. 18).

341.   "Firefighter Sitting" appears in *ZERO: An Investigation Into 9/11* (DEF-VIDEO 0015) (Relyea Dec. Ex. 11).

342.   "Truck" appears in *9/11: Relics from the Wreckage* (DEF-VIDEO 0002) (Relyea Dec. Ex. 18).

343.   "Horizontal Void 2" appears in *The Miracle of Stairway B* (DEF-VIDEO 0015) (Relyea Dec. Ex. 8).

344.    "Climbing Column" appears in *The Miracle of Stairway B* (DEF-VIDEO 0015) (Relyea Dec. Ex. 8).

345.    "Police" does not appear in the Infringing Films.

346.    *9/11: Relics from the Wreckage* (DEF-VIDEO 0002) (Relyea Dec. Ex. 18) used 6 of the segments.  Parness Cert. ¶ 3:

      a.    "Horizontal Void 1" (used twice)

      b.    "Ambulance"

      c.    "Vertical Void"

      d.    "Truck"

      e.    "Workers 1"

      f.    "Workers 2"

347.    *The Miracle of Stairway B* (DEF-VIDEO 0015) (Relyea Dec. Ex. 8) used 4 of the segments.  Parness Cert. ¶ 3:

      a.    "Horizontal Void 1"

      b.    "Vertical Void"

      c.    "Horizontal Void 2"

      d.    "Climbing Column"

348.    *How It Was: Voices of 9/11* (DEF-VIDEO 0025) (Relyea Dec. Ex. 10) used 4 of the segments.  Parness Cert. ¶ 3:

      a.    "Silhouette"

      b.    "Doll"

      c.    "Workers 2"

      d.    "Firefighters"

349.  *9/11: Day That Changed the World* (DEF-VIDEO 0015) (Relyea Dec. Ex. 13) used 4 of the segments.  Parness Cert. ¶ 3:

    a.  "Doll"

    b.  "Horizontal Void 1"

    c.  "Vertical Void"

    d.  "Workers 1"

350.  *The Untold History of the United States* (DEF-VIDEO 0015) (Relyea Dec. Ex. 17) used 3 of the segments.  Parness Cert. ¶ 3:

    a.  "Silhouette"

    b.  "Doll"

    c.  "Workers 1"

351.  *Crime Scene 9/11* (DEF-VIDEO 0026) (Relyea Dec. Ex. 9) used 2 of the segments.  Parness Cert. ¶ 3:

    a.  "Horizontal Void 1"

    b.  "Vertical Void"

352.  *Conspiracy Theory: Death Ray* (DEF-VIDEO 0011) (Relyea Dec. Ex. 16) used 2 of the segments.  Parness Cert. ¶ 3:

    a.  "Silhouette"

    b.  "Workers 1"

353.  *Rush To War* (DEF-VIDEO 0017) (Relyea Dec. Ex. 4) used "Doll."

354.  *Celsius 41.11* (DEF-VIDEO 0014) (Relyea Dec. Ex. 5) used "Silhouette."

355.  *World Trade Center* (DEF-VIDEO 0022) (Relyea Dec. Ex. 6) used "Firefighters."

356.  *World Trade Center Making Of DVD* (DEF-VIDEO 0022) (Relyea Dec. Ex. 7) used "Firefighters."

357.    *ZERO: An Investigation Into 9/11* (DEF-VIDEO 0015) (Relyea Dec. Ex. 11) used "Firefighter Sitting."

358.    *Seven Signs of the Apocalypse* (DEF-VIDEO 0004) (Relyea Dec. Ex. 12) used "Ambulance."

359.    *The Conspiracy Files: 9/11 10 Years Later* (DEF-VIDEO 0005) (Relyea Dec. Ex. 14) used "Workers 1."

360.    *The Miracle Survivor* (DEF-VIDEO 0012) (Relyea Dec. Ex. 15) used "Horizontal Void 1."

361.    In each instance, when one of the Infringing Films uses one of the 13 segments from Fioranelli's copyrighted footage, the segment occupies the entire screen.  Parness Cert. ¶ 4.

362.    In *World Trade Center* and in the *World Trade Center Featurette*, the segment occupies the entire screen of a television set in the film, and the television set occupies most of the screen.  *Id.*

363.    The chart below reflects, for each Infringing Film, the duration of the film, the duration of footage recovery efforts at Ground Zero during the time that Mr. Fioranelli recorded the Fioranelli Footage ("Comparable Footage"), the duration of Fioranelli Footage, and a calculation of Fioranelli Footage as a percentage of Comparable Footage.  Parness Cert. ¶ 5.

| Film | Film Length | Comparable Footage | Fioranelli Footage | Percent |
|---|---|---|---|---|
| *Rush To War* (DEF-VIDEO 0017) (Relyea  Dec. Ex. 4) | 1:26:00 | 0:00:13 | 0:00:02 | 15.4% |
| *Celsius 41.11* (DEF-VIDEO 0014) (Relyea  Dec. Ex. 5) | 1:11:00 | 0:00:07 | 0:00:02 | 28.6% |
| *World Trade Center* (DEF-VIDEO 0022) (Relyea  Dec. Ex. 6) | 2:09:00 | 0:00:13 | 0:00:02 | 15.4% |
| *World Trade Center Making Of DVD* (DEF-VIDEO 0022) (Relyea  Dec. Ex. 7) | 0:53:00 | 0:00:13 | 0:00:02 | 15.4% |
| *The Miracle of Stairway B* (DEF-VIDEO 0015) (Relyea  Dec. Ex. 8) | 0:48:00 | 0:13:29 | 0:00:26 | 3.2% |

| | | | | |
|---|---|---|---|---|
| *Crime Scene 9/11* (DEF-VIDEO 0026) (Relyea  Dec. Ex. 9) | 0:46:00 | 0:15:43 | 0:00:09 | 1.0% |
| *How It Was: Voices of 9/11* (DEF-VIDEO 0025) (Relyea  Dec. Ex. 10) | 0:53:00 | 0:04:46 | 0:00:09 | 3.1% |
| *ZERO: An Investigation Into 9/11* (DEF-VIDEO 0015) (Relyea  Dec. Ex. 11) | 2:03:00 | 0:01:09 | 0:00:01 | 1.4% |
| *Seven Signs of the Apocalypse* (DEF-VIDEO 0004) (Relyea  Dec. Ex. 12) | 1:32:00 | 0:00:03 | 0:00:01 | 33.3% |
| *9/11: Day That Changed the World* (DEF-VIDEO 0015) (Relyea  Dec. Ex. 13) | 1:34:00 | 0:03:58 | 0:00:18 | 7.6% |
| *The Conspiracy Files: 9/11 10 Years Later* (DEF-VIDEO 0005) (Relyea  Dec. Ex. 14) | 0:01:00 | 0:02:20 | 0:00:02 | 1.4% |
| *The Miracle Survivor* (DEF-VIDEO 0012) (Relyea  Dec. Ex. 15) | 0:48:00 | 0:06:31 | 0:00:03 | 0.8% |
| *Conspiracy Theory: Death Ray* (DEF-VIDEO 0011) (Relyea  Dec. Ex. 16) | 0:44:00 | 0:00:17 | 0:00:03 | 17.6% |
| *The Untold History of the United States* (DEF-VIDEO 0015) (Relyea  Dec. Ex. 17) | 0:58:00 | 0:00:12 | 0:00:07 | 58.3% |
| *9/11: Relics from the Wreckage* (DEF-VIDEO 0002) (Relyea  Dec. Ex. 18) | 0:30:00 | 0:02:23 | 0:00:17 | 11.9% |

364.    The chart below depicts, for each segment, the duration of the segment on the CBS Reels, the duration of the source segment on the Fioranelli Footage, and a calculation of the duration of the CBS Reel Segment as a percentage of the duration of the source segment on the Fioranelli Footage.  As noted above, two of the segments were not on the CBS Reels, but were used in the Infringing Film *The Miracle of Stairway B*.  Parness Cert. ¶ 6.

| Segment | Length on CBS Reels | Length on Fioranelli Footage | Percent |
|---|---|---|---|
| "Silhouette" | 0:00:03 | 0:00:57 | 5.3% |
| "Doll" | 0:00:02 | 0:00:12 | 16.7% |
| "Horizontal Void 1" | 0:00:04 | 0:02:40 | 2.5% |
| "Ambulance" | 0:00:03 | 0:00:29 | 10.3% |
| "Firefighter Sitting" | 0:00:02 | 0:00:37 | 5.4% |
| "Truck" | 0:00:02 | 0:00:27 | 7.4% |
| "Workers 1" | 0:00:03 | 0:00:30 | 10.0% |
| "Workers 2" | 0:00:03 | 0:00:30 | 10.0% |
| Segment | Length on *The Miracle of Stairway B* | Length on Fioranelli Footage | Percent |
| "Horizontal Void 2" | 0:00:15 | 0:00:52 | 28.8% |
| "Climbing Column" | 0:00:06 | 0:00:36 | 16.7% |

**"Fighter Jet"**

365.    The producers of the film *Conspiracy Theory: Death Ray* (DEF-VIDEO 0011) (Relyea  Dec. Ex. 16) licensed less than one second of footage from one of the CBS Reels, depicting a fighter jet as seen from the cockpit of another fighter jet, for $1,242.50.  Parness Cert. ¶ 7 & Ex. 1.

366.    Below are exemplary screen shots matching the time indices of the licensed "Fighter Jet" footage on the CBS Reels.  Parness Cert. ¶ 9 & Ex. 2, 9.



367.    Below are exemplary screen shots of the full segment on the CBS Reels from which the "Fighter Jet" footage was taken.  The full segment began at time index 01:59:18 and ended at 02:05:09 (approximately 6 seconds).  Parness Cert. ¶ 9 & Ex. 9.



368.    Below are exemplary screen shots from *Conspiracy Theory: Death Ray* from time indices 00:21.541 and 00:21.916 (about half a second).  Parness Cert. ¶ 10 & Ex. 10; Relyea Dec. Ex. 16.



**Analysis of Specific Films**

*The Miracle Survivor*

369.    *The Miracle Survivor* (DEF-VIDEO 0012) (Relyea Dec. Ex. 15), is a film investigating stories about a 9-11 survivor who allegedly survived the collapse of the towers. Relyea Dec. Ex. 15.

370.    In the film, a firefighter is being interviewed about his rescue efforts, and he says the following: "I wound up meeting up with Mike Morabito, inside the pile, and we were searching **voids**, and areas that we thought we could find people, or our fellow firemen, or whoever, in the debris."  At the word "voids," the documentary editor chose to show "Horizontal Void 1."  An exemplary screen image is below.  Relyea Dec. Ex. 15; Parness Cert. ¶ 11 & Ex. 11.



*9/11: Relics from the Wreckage*

371.    *9/11: Relics from the Wreckage* (DEF-VIDEO 0002) (Relyea Dec. Ex. 18) used six separate Fioranelli segments (one of them twice).  Relyea Dec. Ex. 18; Parness Cert. ¶ 12.

372.    That 30-minute film was about the 9-11 museum, and about the relics that had been recovered from the Ground Zero site.  In that film, the narrator said "The rescue and recovery efforts **at ground zero involved thousands of people working day** and night for nine months."  While he says the bolded words the screen is occupied by a portion of "Workers 1," where Fioranelli zoomed outward in a manner that showed how many people were working.  An exemplary screen image is below.  Relyea Dec. Ex. 18; Parness Cert. ¶ 12 & Ex. 12.



373.    Later in the documentary, the narrator says "After the collapse of the towers, the

first priority was to rescue those who may have survived, and recover the deceased.  This effort

involved hundreds of workers, firefighters, iron workers, engineers, boilermakers, carpenters,

masons, electricians, plumbers, riggers and truckers."  As he says those words, the screen is

filled with a succession of eight video segments, five of which are Fioranelli's.  Exemplary

screen images are below.  Relyea Dec. Ex. 18; Parness Cert. ¶ 13 & Ex. 13.





*Seven Signs of the Apocalypse*

374.    *Seven Signs of the Apocalypse* (DEF-VIDEO 0004) (Relyea Dec. Ex. 12) is not about the September 11 attacks at all, but rather about the biblical prophecies about the end of days, and whether the signs of the coming of the Apocalypse can be seen in the modern world. Relyea Dec. Ex. 12; Parness Cert. ¶ 14.

375.     Toward the end of the film, the interviewee says "I think what God is specifically saying, he's saying to the rebellious planet earth, to the Antichrist and his forces, **you've martyred my people, you've spilled their blood**, you've killed millions of people that believe in God by taking their blood."  As he says the bolded words above, the editor chose to show two video segments – Fioranelli's "Ambulance," and a man being wheeled away on a stretcher. Exemplary screen images are below.  Relyea Dec. Ex. 12; Parness Cert. ¶ 14 & Ex. 14.





376.    The speaker does not mention 9-11 at all.  Relyea Dec. Ex. 12; Parness Cert. ¶ 14.

*The Miracle of Stairway B*

377.    In *The Miracle of Stairway B* (DEF-VIDEO 0015) (Relyea Dec. Ex. 8), about the rescue of a group of firefighters trapped in the rubble, the editors repeatedly used Fioranelli footage to illustrate the narrative, including – notably – Fioranelli footage that was <u>not</u> on the CBS Reels, but that CBS must have provided them in some other manner.  Relyea Dec. Ex. 8; Parness Cert. ¶ 15.

378.    First, during an interview with one of the firefighter's wives, she says "**It was a relief in some ways to hear that he was alive and that he was trapped**, but there was many stories of guys being trapped and not coming out."  As she recited the bolded words, the editors chose "Vertical Void" and "Hoizontal Void" segments to express her ideas and illustrate what she was feeling, in hearing that her husband was trapped.  Exemplar screen images are below. Relyea Dec. Ex. 8; Parness Cert. ¶ 15 & Ex. 15.



DEF-VIDEO 0015 - The Miracle of Stairwell B



DEF-VIDEO 0015 - The Miracle of Stairwell B

379.    Less than two minutes later, the editors again went to Fioranelli's footage to illustrate the words of the narrator and of one of the firefighters: "Narrator: Glenn Rohan and his Ladder 43 crew were one of the first rescue teams sent out to try and find the Stairway B survivors.  Interviewee: We're walking across this debris field, and it's a pretty hazardous area to be."  For this, they used one of Fioranelli's long tracking shots, that beings with a group of firefighters approaching the void ("Horizontal Void 1,") but then continues to show the debris field, and a second group of firefighter standing atop the pile.  Relyea Dec. Ex. 8; Parness Cert. ¶ 16 & Ex. 16.

380.    The segment is a full 16 seconds long.  Exemplar screen images are below. Relyea Dec. Ex. 8; Parness Cert. ¶ 17 & Ex. 17.









381.    Less than 30 seconds later, the editors used Fioranelli's footage for a third time. Relyea Dec. Ex. 8; Parness Cert. ¶ 17.

382.    The narrator says "**the next thing that the survivors remember is that down in the depths of Stairway B**, the dust lifted and it was as if another miracle had happened," and as he says the bolded words, the editors chose another long Fioranelli tracking shot, the second segment <u>not</u> found on the CBS Reels.  Relyea Dec. Ex. 8; Parness Cert. ¶ 17 & Ex. 17.

383.    This five second segment begins by focusing on a cross-shaped piece of wreckage, then tracking to the right across the debris field, to settle on a firefighter trying to make his way into the wreckage ("Climbing Column").  Exemplar screen images are below. Relyea Dec. Ex. 8; Parness Cert. ¶ 17 & Ex. 17.







*World Trade Center & World Trade Center Featurette*

384.    *World Trade Center* and its companion "Making Of" DVD *World Trade Center* (DEF-VIDEO 0022) (Relyea Dec. Exs. 6-7) provide direct insights into the substantive decision-making that went in to the selection of Fioranelli's footage.  Relyea Dec. Exs. 6-7; Parness Cert. ¶ 19.

385.    That film uses a single segment of Fioranelli footage, depicting a group of firefighters walking toward the camera ("Firefighters").  Relyea Dec. Exs. 6-7; Parness Cert. ¶ 19 & Ex. 18.

386.    *World Trade Center* was a major motion picture directed by Oliver Stone and starring Nicholas Cage, depicting the rescue of a group of firefighters from the rubble.  Relyea Dec. Exs. 6-7; Parness Cert. ¶ 19.

387.    The Fioranelli footage appears on a television set in the kitchen of one of the trapped firefighters' wives.  Relyea Dec. Exs. 6-7; Parness Cert. ¶ 19.

388.     During the scene, the television is shown several times in the background, but only once in close-up, when the Fioranelli footage, and another segment of non-Fioranelli footage, are shown.  Exemplar screen images are below.  Relyea Dec. Exs. 6-7; Parness Cert. ¶ 19 & Ex. 18.





389.    Oliver Stone himself explained the decision-making process that went into using

Fioranelli's footage in this scene:

> You don't want to repeat all the documentary footage that's been
> out there, although it was very helpful to us to us to recreate.  You
> don't want to repeat it.  This is a dramatization, with actors.  You
> want to keep it as real as possible.  At the same time, if you go to
> that footage it seems like it's a *deja vu* for a lot of people.  So we
> pretty much restricted that footage to television playback, because
> you have to keep in mind that the wives know the story as a
> parallel story through television.  So, taking that into account, you
> have to show a certain amount of basic reference point stuff.

Relyea Dec. Ex. 7; Parness Cert. ¶ 20.

390.    Mr. Stone's explanation is consistent with what one sees in the film – there are no

images of the airplanes hitting the towers, no images of the towers collapsing, and limited real-

world footage, shown only on television screens, to illustrate what he calls the "parallel story" of

what the wives of the firefighters were experiencing.  Relyea Dec. Exs. 6-7; Parness Cert. ¶ 21.

391.    Indeed, there are only 13 seconds of actual 9-11 footage in the entire film, of which two seconds are Fioranelli's "Firefighters."   Relyea Dec. Exs. 6-7; Parness Cert. ¶¶ 5, 21.

392.    As Mr. Stone says, the makers of *World Trade Center* <u>could have</u> used "all of the documentary footage that's been out there," but they chose to use the bare minimum they needed to tell their story, of which Mr. Fioranelli's particular 2 seconds of copyrighted expression were plainly critical to them.  Relyea Dec. Exs. 7; Parness Cert. ¶ 21.

*How It Was: Voices of 9/11*

393.    *How It Was: Voices of 9/11* (DEF-VIDEO 0025) (Relyea Dec. Ex. 10) is another documentary about the 9/11 attacks.  Relyea Dec. Ex. 10; Parness Cert. ¶ 22.

394.    In the course of 30 seconds, the film uses seven segments in close succession, three of which are Fioranelli's.  Exemplar screen images are below.  Relyea Dec. Ex. 10; Parness Cert. ¶ 22 & Ex. 19.


**"Firefighters"**



"Workers 2"

"Silhouette"

395.    The first two images play while ominous music plays in the background.  The next two non-Fioranelli images play over a voicemail message, and the last three images (two of which are Fioranelli's) play during the bolded language recited by the narrator: "The tide of phone calls sweeping the nation continued **even after the towers fell.  But instead of bearing news**, these callers anxiously listened for a familiar voice."  Relyea Dec. Ex. 10; Parness Cert. ¶ 22.

396.    In particular, the editors selected "Workers 2" to accompany "even after the towers fell," presumably to illustrate the destruction, and "Silhouette" to accompany "instead of bearing news," presumably to illustrate the frustration felt by the lone firefighter looking for survivors.  Relyea Dec. Ex. 10; Parness Cert. ¶ 22.

*9/11: Day That Changed the World*

397.    *9/11: Day That Changed the World* (DEF-VIDEO 0015) (Relyea Dec. Ex. 13) used 4 infringing segments, and the editors clearly selected Fioranelli's copyrighted expression to illustrate the ideas they were conveying.  Relyea Dec. Ex. 13; Parness Cert. ¶ 23.

398.    The film seeks to detail the events of September 11th, switching between New York, Washington, Pennsylvania and the progress of President Bush around the country.  Relyea Dec. Ex. 13; Parness Cert. ¶ 23.

399.    Over the course of approximately 30 seconds, the film uses four segments of Fioranelli footage.  Relyea Dec. Ex. 13; Parness Cert. ¶ 23.

400.    First, as New York's fire commissioner in interview says "the devastation was overwhelming," the film editor selected one of Fioranelli's most iconic segments, "Doll," using a rescuer's emotional reaction to finding a child's doll in the wreckage to convey the idea of overwhelming devastation.  An exemplar screen image is below.  Relyea Dec. Ex. 13; Parness Cert. ¶ 23 & Ex. 20.



401.    As the fire commissioner  continued, he said "And if there were people that were going to be rescued, **you couldn't see them, and you knew it would be a while to get to them** because everything was so heavy"  As he spoke the bolded words, the screen was filled with "Workers 1".  An exemplar screen image is below.  Relyea Dec. Ex. 13; Parness Cert. ¶ 24 & Ex. 21.



402.    A few seconds later, another interviewee explains "even when the firemen showed up, they were throwing water on the fire, **but they couldn't move all this rubble and this steel**," and as he spoke the bolded words, the screen is filled with "Horizontal Void 1," followed by "Vertical Void".  An exemplar screen image is below.  Relyea Dec. Ex. 13; Parness Cert. ¶ 25 & Ex. 22.



DEF-VIDEO 0015 - 9-11 The Day That Changed The World



DEF-VIDEO 0015 - 9-11 The Day That Changed The World

*The Untold History of the United States*

403.    *The Untold History of the United States* (DEF-VIDEO 0015) (Relyea Dec. Ex. 17) used 3 infringing Fioranelli segments.  Relyea Dec. Ex. 17; Parness Cert. ¶ 26.

404.    *Untold History* was an Oliver Stone documentary about the United States.  Relyea Dec. Ex. 17; Parness Cert. ¶ 26.

405.    The episode at issue in this case reviewed the late 80s, the 90s and the early 2000s.  Relyea Dec. Ex. 17; Parness Cert. ¶ 26.

406.    Toward the end of the episode, Stone narrates a discussion of the September 11 attacks, showing footage of the planes hitting the towers, the towers in flames, and the towers' collapse, continuing with his own editorial commentary: "And now, to some very powerful American leaders, **it was as if they, the outliers of empire, these terrorists, had dropped Hiroshima on us**, at the very least, Pearl Harbor."  As Stone recited the bolded language, the episode showed three Fioranelli clips in succession – Silhouette, Doll and Workers 1.  Exemplar screen images are below.  Relyea Dec. Ex. 17; Parness Cert. ¶ 26 & Ex. 23.







407.    On June 26, 2006, Defendant BBC licensed the right to Defendant Testimony to use video footage, described as follows, for use in *The Miracle of Stairway B*:

> CBS 9/11 COMPILATION
> CBS [895765] FIREFIGHTERS
> CBS [895767] FIREFIGHTERS

Parness Cert. ¶ 18 & Ex. 3.

408.    The document indicates a $540 license fee, $150 in technical costs, and $25 in freight and handling costs.  The document further states:

> Subject to the Special Clauses below, the License Fee is a minimum fee….
>
> LICENSE FEE SHALL BE 34USD/18GBP PER SECOND OR PART THEREOF. THERE IS A 5 SECOND MINIMUM PER CUT AND A 30 SECOND MINIMUM PER CONTRACT.

Parness Cert. ¶ 18 & Ex. 3.

409.    Defendant BBC licensed footage from three of the CBS Reels and from "CBS Evening News" to Defendant JVCT Productions for use in "CONSPIRACY THEORY WITH JESSE VENTURA '9/11'", which appears to be a different episode of the series that included the Infringing Film *Conspiracy Theory: Death Ray*.  The contract states "LICENSE FEE IS $38.25 PER SECOND FOR THE USE OF UP TO 114 SECONDS.  THIS FEE REFLECTS A 15% DISCOUNT."  The contract attaches a two-page exhibit where each segment is broken out by its duration in seconds, with a description of the segment, and the price, calculated at $45 per second (before the discount).  The license fee is $4,360.50 for 114 seconds of footage, plus $95 for "technical costs."  Parness Cert. ¶ 27 & Ex. 4.

410.    In Defendants' Responses to Plaintiff's First Set of Requests of Documents and Plaintiff's First Set of Interrogatories, dated May 28, 2017,  Defendants interposed the following objection to Document Requests 1-11, 13, 21-22 and 26, and Interrogatories 1-7 and 9: "Pursuant to the Court's April 12, 2017 order bifurcating discovery (the 'Bifurcation Order'), Defendants further object to this request as premature to the extent it purports to require them to provide information or documents that are relevant only to damages."  Parness Cert. ¶ 28 & Ex. 5 (using the defined term after the first objection).

411.    As to the CBS Reels, other than in connection with the 15 Infringing Films, there is no evidence in the record as to when the film was shown, distributed, sold or licensed after its initial release.  Parness Cert. ¶ 29.

412.    There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with the distribution of the CBS Reels.  Parness Cert. ¶ 29.

413.    As to each of the 15 Infringing Films, there is no evidence in the record as to when the film was shown, distributed, sold or licensed after its initial release.  Parness Cert. ¶ 30.

414.    There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with each of the 15 Infringing Films.  Parness Cert. ¶ 30.

415.    All of the footage on the Fioranelli Footage (Relyea Dec. Ex. 1) (DEF-VIDEO 0016) is marked "NOT FOR BROADCAST" in the manner shown below.  Below are exemplary screen images.  Relyea Dec. Ex. 1; Parness Cert. ¶ 31 & Ex. 24.

























416.    Below are exemplary still images from *9/11: Day that Changed the World* (DEF-VIDEO 0015).  Relyea Dec. Ex. 13; Parness Cert. ¶ 32 & Ex. 25.



DEF-VIDEO 0015 - 9-11 The Day That Changed The World

00:57:42.541



DEF-VIDEO 0015 - 9-11 The Day That Changed The World

01:06:02.083







417.    On February 1, 2002, CBS and BBC entered into an agreement that granted BBC rights to the entirety of the "CBS News Archive,"  defined as "CBS's archive presently comprising audio-visual footage of news events…as supplemented during the Term," and the "CBS Sequences," defined as "Sequences derived from or included in the CBS News Archive in which CBS now has or shall during the Term own or acquire the right to exploit Library Rights, provided each such Sequence is at least seven (7) days old."  Parness Cert. ¶ 34 & Ex. 6 at DEF000065_U & DEF0070_U.

418.    In each year of their agreement, BBC agreed to pay CBS an amount calculated as a function of a dollar-value guarantee and a percentage-based profit share of BBC's net income. Parness Cert. ¶ 34 & Ex. 6 at DEF000065_U, DEF000066_U, DEF000068_U & DEF000077_U.

419.    BBC further agreed to "diligently in accordance with first class business practices exploit the Library Rights so as to maximise Gross Revenues from exploitation of the CBS Sequences."  Parness Cert. ¶ 34 & Ex. 6 at DEF000075_U.

420.    On December 1, 2006, CBS and BBC entered into an agreement through which CBS extended the rights it granted to BBC in the 2002 CBS-BBC agreement.  Parness Cert. ¶ 34 & Ex. 6 at DEF000093_U & DEF00095_U.

421.    On December 23, 2013, CBS and T3Media entered into a letter agreement that appeared to replace T3Media as the exclusive distributor of the CBS News Archive and CBS News Sequences.  Parness Cert. ¶ 34 & Ex. 6 at DEF000129_U.

Dated: New York, New York
       July 30, 2019

                                        PARNESS LAW FIRM, PLLC

                                        By:_____/s/ Hillel I. Parness_____
                                        Hillel I. Parness
                                        136 Madison Ave., 6th Floor
                                        New York, New York  10016
                                        (212) 447-5299
                                        hip@hiplaw.com
                                        *Attorneys for Anthony Fioranelli*