USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _7/28/2021_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------X
                          :

ANTHONY FIORANELLI,               :
                          :

                 Plaintiff,   :

                          :

      - against -        :

                          :

CBS BROADCASTING INC., BBC   :
WORLDWIDE AMERICAS, INC., T3  :
MEDIA, INC., TESTIMONY     :
FILMS, PARAMOUNT PICTURES   :
CORPORATION, MORNINGSTAR   :
ENTERTAINMENT, INC., CREATIVE :
DIFFERENCES, LLC, JVCPRODUCTIONS, :
INC., IPSE DIXIT, INC., and A&E  :
TELEVISION NETWORKS, LLC,   :
                          :

             Defendants.  :
                          :

-----------------------------------------------------------X

15-CV-0952 (VSB)

**OPINION & ORDER**

<u>Appearances</u>:

Hillel Ira Parness
Parness Law Firm, PLLC
New York, NY
*Counsel for Plaintiff*

Elizabeth Seidlin-Bernstein
Ballard Spahr LLP (PA)
Philadelphia, PA
*Counsel for Defendants*

I.  Factual Background .................................................................................... 2

   A.  Threshold Issues ................................................................................... 3

      1.  Motion *In Limine* ......................................................................... 3

      2.  Certifications ................................................................................. 3

      3.  Rule 56.1 Statements ................................................................... 3

   B.  Plaintiff's Profession .......................................................................... 4

   C.  The Copyrighted Work ....................................................................... 5

   D.  CBS Settlement and Subsequent Distribution ................................... 6

   E.  Allegedly Infringing Works ............................................................... 9

      1.  The CBS 9/11 Newsreels ............................................................. 9

      2.  *Rush to War* ................................................................................ 11

      3.  *Celsius 41.11* .............................................................................. 12

      4.  *World Trade Center* .................................................................... 12

      5.  *World Trade Center Featurette* ................................................... 13

      6.  *The Miracle of Stairway B* ......................................................... 13

      7.  *Crime Scene 9/11* ....................................................................... 14

      8.  *How It Was:  Voices of 9/11* ....................................................... 15

      9.  *ZERO:  An Investigation into 9/11* ............................................. 15

      10.  *Seven Signs of the Apocalypse* .................................................. 16

      11.  *9/11:  Day That Changed the World* ........................................... 17

12. *The Conspiracy Files:  9/11 10 Years On* ...................................................... 18

13. *The Miracle Survivor* ................................................................................ 18

14. *Conspiracy Theory:  Death Ray* ............................................................... 19

15. *The Untold History of the United States* ................................................... 19

16. *9/11 Relics from the Wreckage* ................................................................. 20

F.   Plaintiff's Other Uses of the 9/11 Material ....................................... 20

II.   Procedural History ........................................................................... 21

III.   Legal Standard ................................................................................. 22

IV.   Discussion ......................................................................................... 25

A.   Copyright Infringement ................................................................... 25

1.   *De Minimis Use* ......................................................................... 25

a.   Applicable Law ................................................................. 25

b.   Application ........................................................................ 28

i.   Quantitative Component ............................................. 28

ii.   Qualitative Component ............................................... 34

2.   *Fair Use* ..................................................................................... 35

a.   Applicable law.................................................................. 36

i.   Purpose and Character of the Use ............................. 37

ii.   Nature of the Copyrighted Work ............................... 38

iii.   Amount and Substantiality of Use ............................. 39

iv.   Effect on Potential Market for Copyrighted Work ................... 39

     b.   Application ................................................................................. 40

        i.   Purpose and Character of the Use ............................................. 40

           1)   Whether the Use Was Transformative .................................... 40

           2)   Commercial Use..................................................................... 60

           3)   Bad Faith............................................................................... 61

        ii.   Nature of the Copyrighted Work ............................................. 62

        iii.   Amount and Substantiality of Use ........................................... 64

        iv.   Effect on Potential Market for Copyrighted Work ................... 69

        v.   Balancing of the Four Fair Use Factors .................................. 71

   3.   *Statute of Limitations* ...................................................................... 72

     a.   Applicable Law ............................................................................ 72

     b.   Application ................................................................................... 73

   4.   Plaintiff's Cross Motion for Partial Summary Judgment ................ 77

 B.   Copyright Inducement................................................................................ 79

     a.   Applicable Law ............................................................................ 79

     b.   Application ................................................................................... 80

 C.   Breach of Contract ..................................................................................... 82

     a.   Applicable Law ............................................................................ 82

     b.   Application ................................................................................... 84

V.   Conclusion ........................................................................................................ 87

<u>VERNON S. BRODERICK, United States District Judge</u>:

Plaintiff Anthony Fioranelli ("Plaintiff") brings this action against Defendants CBS Broadcasting, Inc., BBC Worldwide Americas, Inc., T3 Media Inc., Testimony Films, Paramount Pictures Corporation, Morningstar Entertainment, Inc., Creative Differences, LLC, JVCT Productions, Inc., Ipse Dixit, Inc., and A&E Televisions Networks, LLC (collectively "Defendants"), asserting claims of copyright infringement, copyright inducement, and breach of contract based on Defendants' uses of Plaintiff's video footage from the World Trade Center site following the attacks of September 11, 2001 ("9/11 Material"). Now before me are (1) Defendants' motion *in limine* to exclude evidence, testimony, or argument concerning expert opinions; (2) Plaintiff's request to submit corrected certifications of Anthony Fioranelli and Hillel Parness; (3) Defendants' letter motion opposing that request; (4) Defendants' motion for summary judgment seeking dismissal of all of Plaintiff's claims; and (5) Plaintiff's motion for summary judgment on his copyright infringement claim.

Defendants' motion *in limine* to exclude evidence, testimony, or argument concerning expert opinions is DENIED AS MOOT. Plaintiff's request to submit corrected certifications of Anthony Fioranelli and Hillel Parness is GRANTED, and Defendants' letter motion opposing that request is DENIED. Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Because I find that Defendant Paramount Pictures Corporation's uses of Plaintiff's 9/11 Material in *World Trade Center* and *World Trade Center Featurette* are fair, Defendant Paramount Pictures Corporation's motion to dismiss Plaintiff's copyright infringement claim is GRANTED and that claim is dismissed. I find that there are issues of fact relating to the purposes of Defendants' uses in *ZERO*, *Conspiracy Files*, *Death Ray*, *Rush to War*, *Celsius*, *Untold History*, and *Seven Signs*; therefore, Defendants' motion for summary

1

judgment dismissing Plaintiff's copyright infringement claims related to those films is DENIED. Defendants' motion for summary judgment dismissing Plaintiff's copyright inducement claim is GRANTED. Defendants' motion for summary judgment dismissing Plaintiff's breach of contract claim is GRANTED.

Plaintiff's motion for summary judgment on his copyright infringement claim is GRANTED IN PART and DENIED IN PART. Because I find that Defendants' uses in *Miracle Survivor*, *Crime Scene 9/11*, *DTCW*, *Stairway B, Relics*, *How It Was*, and the CBS 9/11 Newsreels are not *de minimis*, are not fair, and that the record demonstrates Defendants' liability for copyright infringement, Plaintiff's motion is GRANTED as to these works. Plaintiff's motion is DENIED as to the remaining works.

## I.    **Factual Background**

Plaintiff Anthony Fioranelli brings this action against Defendants CBS Broadcasting, Inc. ("CBS"), BBC Studios America, Inc. ("BBC"), T3 Media, Inc. ("T3")—now known as ("n/k/a") Veritone, Inc. ("Veritone")—Testimony Films ("Testimony"), Paramount Pictures Corporation ("Paramount"), Morningstar Entertainment, Inc. ("Morningstar"), Creative Differences, LLC ("Creative Differences"), JVCT Productions, Inc. ("JVCT"), Ipse Dixit, Inc. ("Ipse Dixit"), and A&E Televisions Networks, LLC ("A&E").[1]  (Sec. Am. Compl.)[2]  He brings a copyright infringement claim against all Defendants, (Count I), a claim for inducement to infringe federal registered copyrights against Defendants CBS, BBC, and Veritone, (Count II), and a breach of contract claim against CBS, (Count III).  (*Id.*)

---

[1] It is my understanding that BBC Studios Americas, Inc. was formerly BBC Worldwide Americas, Inc., and Veritone, Inc. was formerly T3 Media, Inc.  (*See* Doc. 175, Defs. Rule 56.1 Statement).

[2] "Sec. Am. Compl." refers to the Amended Complaint And Jury Demand ("Second Amended Complaint") filed by Plaintiff on February 8, 2017.  (Doc. 72.)

## A. *Threshold Issues*

### 1. Motion *in Limine*

Defendants filed a motion *in limine* to preclude Plaintiff from offering an expert opinion. (Docs. 150–51.)  Because Plaintiff does not offer an expert opinion in support of his cross-motion for summary judgment and opposition to Defendants' motion, I deny Defendants' motion *in limine* as moot.

### 2. Certifications

Defendants also request that I do not consider Plaintiff's second corrected certifications of Plaintiff Anthony Fioranelli and Hillel Parness, (Docs. 176-1, 176-2), which were filed after Defendants' reply.  (Doc. 177.)  These second corrected certifications differ from the previously-filed corrected certifications only in that the certification language at the end of the documents is changed to comply with 28 U.S.C. § 1746.  (*Compare* Docs. 166, 167 *with* Docs. 176-1, 176-2.) Defendants' request is denied.  I will consider the second corrected certifications of Plaintiff Fioranelli and Parness in reaching decisions with regard to the motions before me.[3]

### 3. Rule 56.1 Statements

The parties purport to dispute many material facts.  A majority of these disputes are irrelevant to the issues before me.  Additionally, Plaintiff consistently fails to identify specific facts to dispute the facts presented by Defendants as required by Local Rule 56.1(c), but instead makes arguments about the implications of those facts.  Plaintiff also uses his response as an opportunity to improperly add additional facts.  Defendants, on the other hand, unnecessarily devote a portion of their papers to identify minor, non-material use by Plaintiff of the citation

---

[3] Much of Defendants' Reply Statement of Material Facts and Response to Plaintiff's Counterstatement of Material Facts is based on the assertion that these certifications are not properly executed, and therefore cannot be relied on. (*See* Defs. Rule 56.1 Reply.)  Based on my determination that I will consider these certifications, I overrule these objections.

"*id.*" These sorts of objections are unproductive and are not in the spirit of Rule 56.1. *See Holtz v. Rockefeller & Co.*, Inc., 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties.").

The facts recited below are drawn from Defendants' Rule 56.1 Statement of Material Facts ("Defs. 56.1"), (Doc. 148), the Corrected Response and Counterstatement of Material Facts of Anthony Fioranelli Made Pursuant to Local Civil Rule 56.1(b) ("Pl. 56.1"), (Doc. 168), and Defendants' Reply Statement of Material Facts and Response to Plaintiff's Counterstatement of Material Facts ("Defs. 56.1 Reply"), (Doc. 175). The citations to these submissions incorporate by reference citations to the underlying evidentiary submissions. I also draw facts from other evidence in the record, including the certifications and declarations, and the Second Amended Complaint and exhibits. (*See* Fed. R. Civ. Pro. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record.")). In this section I recite facts that I find undisputed based on the parties' submissions unless otherwise indicated.

## B. *Plaintiff's Work as a Photojournalist*

Plaintiff Anthony Fioranelli is a professional photojournalist who captures both photographs and video footage. (Pl. 56.1 ¶ 142.) He is also the principal of Big Daddy Productions, later rebranded as Multi Media Network News LLC. (Defs. 56.1 ¶ 1; Pl. 56.1 ¶ 159.) Plaintiff licenses his work for use in spot news. (Pl. 56.1 ¶ 161.) Due to the fast-paced approach of spot news, there is no time for later editing, and Plaintiff had to learn how frame shots and edit them in real time. (*Id.* ¶¶ 168–70.) Often, the photographs and video that Plaintiff and his colleagues captured were time-sensitive, and would sometimes be broadcast within minutes of the filming. (*Id.* ¶ 172.) Plaintiff licensed his footage to the local New York

television stations. (*See id.* ¶ 175; Fioranelli Cert. ¶ 11, Ex. 4.)[4] When negotiating pricing for disaster footage, Plaintiff would negotiate deals based on the exclusivity and urgency of the footage. (Pl. 56.1 ¶ 186.) This would sometimes lead to a more substantial license fee depending on the nature of work. (*Id.* ¶ 188.) Plaintiff also licenses his photographs and video for use in entertainment or documentary. (*Id.* ¶ 195.)

## C. *The Copyrighted Work*

Following the World Trade Center attack on September 11, 2001, Plaintiff recorded video footage at the World Trade Center site ("Ground Zero") both on the day of the attack and over the course of the following days. (Defs. 56.1 ¶ 6.) Plaintiff was one of four reporters allowed into the site of the World Trade Center disaster. (Sec. Am. Compl. ¶ 18.)[5] He later compiled his footage into a photographic work for which he registered copyrights in 2014. (Sec. Am. Compl. Exs. 1, 2.)[6] Specifically, Plaintiff copyrighted both his own commercially available documentary of the events, as well as the raw footage that he took that day ("9/11 Material"). (*Id.* ¶ 19.) The 9/11 Material serves as a photographic memory of the events of 9/11 for posterity, and Plaintiff captured the 9/11 Material to record history and share it with the word. (Fioranelli Cert. ¶¶ 19–20; *see* Defs. 56.1 ¶ 11; Pl. 56.1 ¶ 209.)

---

[4] "Fioranelli Cert." refers to the second corrected certification of Anthony Fioranelli, filed on September 29, 2019. (Doc. 176-1.)

[5] In Plaintiff's Corrected Response and Counterstatement of Material Facts Pursuant to Local Civil Rule 56.1, he asserts that he "was one of the only videographers, if not the only videographer, on-site at Ground Zero immediately after the September 11 attacks and in the days that followed," (Pl. 56.1 ¶ 252), he also states that police told him no one was allowed to enter Ground Zero, but that he "bypassed the police barricade," (*id.* ¶ 217–18). Defendants dispute Plaintiff's statement that he was one of the only videographers at Ground Zero, based on his previous statement that he was one of four reporters allowed into the site. (Defs. 56.1 Reply.) I agree that Plaintiff's statement in his Second Amended Complaint undermines his assertion that he bypassed a police barricade, and was possibly one of the only videographers at Ground Zero immediately following the attack. Based on Plaintiff's Second Amended Complaint, he was one of four reporters allowed into Ground Zero immediately following the World Trade Center attack, (Sec. Am. Compl. ¶ 18), and this is a fact I find undisputed.

[6] Exhibits 1 and 2 are the certificates of registration issued by the Copyright Office for the 9/11 Material on September 9, 2014. (Docs. 53-1, 53-2.)

### D.    *CBS Settlement and Subsequent Distribution*

Immediately after capturing the 9/11 Material, Plaintiff informed local New York news stations that he had video footage of the disaster site, which he was interested in licensing for $1,000 per use, per day.  (Pl. 56.1 ¶¶ 229–30.)  Plaintiff then provided CBS with copies of some or all of the 9/11 Material.[7]  CBS agreed to pay Plaintiff $1,000 per use for any portion of the 9/11 Material.  (Pl. 56.1 ¶ 238; Fioranelli Cert. ¶ 28.)[8]  The 9/11 Material Plaintiff provided to CBS included a combined total of 2 hours, 42 minutes, and 56 seconds of footage.  (Defs. 56.1 ¶ 9; Relyea Decl. ¶ 6, Ex. 1.)[9]  All of the 9/11 Material that Plaintiff provided to CBS was marked "NOT FOR BRODAST" in large white letters.  (Pl. 56.1 ¶ 415.)

On March 7, 2002, Plaintiff and CBS entered into a settlement agreement to resolve a lawsuit filed by Plaintiff in New York County Civil Court related to the 9/11 Material.[10]  As part

---

[7] The parties dispute whether Plaintiff provided the 9/11 Material to CBS in the form of five Betacam SX videocassettes.  (*See* Defs. 56.1 Reply ¶ 7.)  Defendants state that "Fioranelli provided CBS for CBS's use five Betacam SX videocassettes containing the footage he shot at the World Trade Center site following the attack on September 11, 2001."  (*Id.*)  Plaintiff, however, asserts that he has never owned a Betacam SX camera and never provided CBS with videocassettes of any kind; instead, he states that he plugged his camcorder into CBS's dubbing system and copied his footage that way.  (*Id.* ¶¶ 7, 240–42.)  I do not find resolution of this factual dispute necessary.  Essential to this case, which no party disputes, is that Plaintiff did provide some or all of his 9/11 Material to CBS for its use.  Additionally, the parties agree that Exhibit 1 to Ryan Relyea's Declaration, (Doc. 147), comprises Plaintiff's 9/11 Material, although Fioranelli states he does not know if this a complete copy of the footage he provided, (Defs. 56.1 Reply ¶ 7; Fioranelli Cert. ¶ 34).  Because Exhibit 1 to the Relyea Declaration is the only evidence in the record of the footage supplied by Fioranelli to CBS, I take Relyea Decl. Ex. 1 to be a complete copy of the 9/11 Material provided by Fioranelli to CBS in 2001.  Additionally, it is unclear whether the material provided to CBS is an identical copy of the material for which Plaintiff later obtained a copyright.  Because the Second Amended Complaint suggests that it is, and the parties refer to the material provided to CBS and the copyrighted work interchangeably, I will do the same.

[8] This statement attributed to CBS would likely not be hearsay, as it is a statement made by an opposing party.  *See* Fed. R. Evid. 801(d)(2).

[9] "Relyea Decl." refers to the Declaration of Ryan Relyea submitted in support of Defendants' motion for summary judgment, filed on June 5, 2019.  (Doc. 147.)  Exhibit 1 to the Relyea Declaration is the 9/11 Material that Plaintiff provided to CBS.  (Relyea Decl. ¶ 5.)

[10] The parties dispute whether this lawsuit was related to CBS's "unauthorized distribution" of the 9/11 Material or CBS's failure to pay Plaintiff for its use.  (*See* Pl. 56.1 ¶¶ 15–17.)  Based on the complaint filed in this action, which Plaintiff cites to in his response, Plaintiff alleged that he learned that in addition to CBS using the 9/11 Material in CBS's early news, as had been agreed, CBS also used it in network and local news.  (Fioranelli Cert. Ex. 10 ¶¶ 4–5.)  Plaintiff then requested payment, and entered into a verbal agreement for such payment with CBS.  (*Id.* ¶¶ 6–8.)  Plaintiff alleges that he subsequently billed CBS for these uses, but they failed to pay, and Plaintiff then sought monetary damages.  (*Id.* ¶¶ 9–16.)  I will base my subsequent findings on the underlying complaint in this New

of that settlement Plaintiff provided a limited, nonexclusive license to CBS to use his work ("License Agreement"). (Defs. 56.1 ¶¶ 17–18; Fioranelli Cert. Ex. 11.)[11] Specifically, the License Agreement provided, in relevant part, that

> Fioranelli hereby grants to CBS, effective as of the date of this Agreement, a non-exclusive, irrevocable, perpetual worldwide right and license to use the Footage in all regularly-scheduled and breaking news programming and all news magazine programs (such as, without limitation, 60 MINUTES and 48 HOURS), and in the advertising, publicity and promotions therefor, produced by CBS owned television stations and CBS News, in all media now known or hereafter developed, except as provided herein. It is understood and agreed by and between the parties that the right and license granted herein does not include authorization to use the Footage in CBS Entertainment Division programming, including docudramas, nor in CBS News documentary specials. . . . It is understood and agreed by and between the parties that the right and license granted herein does not include authorization to use the Footage in programs produced by CBS News Productions for third party clients; provided however, that in the event that despite commercially reasonable efforts to exclude the Footage from such programs, Footage is included in such programs, CBS shall pay Fioranelli (or his heirs, executors, assigns, agents, affiliated companies, successors, or successors in interest) $3000 per minute (or part thereof) for each minute used within the program, for rights in all media, now known or hereafter developed, in perpetuity. Within twenty (20) days of the initial broadcast of any program produced by CBS News Productions devoted to the subjects of the attacks on the World Trade Center or the events of September 11, 2001, CBS shall provide to Fioranelli a VHS time-coded copy of such program.

(*Id.* ¶ 4(a), (b).)

In addition to providing coverage of the 9/11 attack and its aftermath on the CBS Network, CBS made some of its 9/11 coverage available for use by others. (Defs. 56.1 ¶ 22.) Around 2002, CBS created multiple newsreels suitable for licensing to others, which contained video footage created by CBS relating to the 9/11 attack and its aftermath (the "CBS 9/11 Newsreels"). (*Id.* ¶ 23.) The CBS 9/11 Newsreels contained a wide variety of footage related to the 9/11 attack that was suitable for use as filler, background, and building block elements for

---

York County Civil Court action.

[11] Exhibit 11 is the settlement agreement entered into between Plaintiff and CBS on March 7, 2002. (Doc. 166-11.)

other video productions.  (*Id.* ¶¶ 23–24.)

In 2002, CBS and BBC entered an agreement, under which CBS granted BBC the right to sublicense to third parties stock video footage from CBS's news archives, which included the CBS 9/11 Newsreels.  (*Id.* ¶¶ 33, 35.)  In 2006, CBS and BBC entered into another agreement to the same effect.  (*Id.* ¶ 36.)  Subsequently, CBS and T3 (n/k/a Veritone) entered into an agreement under which CBS granted T3 the right to sublicense to third parties stock video footage from CBS's news archives, which included the CBS 9/11 Newsreels.  (*Id.* ¶¶ 37–38.)[12]

In 2014, CBS became aware that some of the 9/11 Material had been included on two of the CBS 9/11 Newsreels.  (Defs. 56.1 ¶ 25.)[13]  In February 2014, Plaintiff was watching the film *9/11: Day that Changed the World*, a documentary that originally aired on the Smithsonian Channel, and recognized portions of the 9/11 Material in the film.  (Pl. 56.1 ¶ 314.)  Fioranelli began making inquiry and investigating how the producer of the film obtained the 9/11 Material, and later learned that the producer had licensed the footage from Defendant BBC, who had in turn licensed it from Defendant CBS.  (*See id.* ¶¶ 316–19.)  On October 16, 2014, CBS wrote to Fioranelli's lawyer and stated that based on information provided by BBC and T3, "CBS News believes a total of fifteen licenses in the aggregate had been granted by BBC Worldwide Limited and T3 Media, Inc., that included Big Daddy Material covering the period 2004 through 2013."

_____

[12] Plaintiff disputes the fact that the material that CBS authorized T3 to sublicense to others was the CBS 9/11 Newsreels because there is no evidence in the record to support what footage CBS provided to T3.  (Pl. 56.1 ¶ 38).  Plaintiff, however, cites to no facts that dispute the fact that the material provided included the CBS 9/11 Newsreels. On the other hand, CBS relies on a declaration from Joshua Lukaris, the Vice President of Business Affairs for CBS News Inc. to support this fact.  (*See* Lukaris Decl. ¶ 17, Doc. 146.)

[13] Plaintiff disputes this fact on multiple grounds.  (*See* Pl. 56.1 ¶ 25.)  However, as Defendants point out, Plaintiff does not set forth any specific facts to dispute these facts, as required by Local Rule 56.1(c); instead, he argues about the implication of these facts.  (*See* Defs. 56.1 Reply ¶ 25.)  Additionally, I find it unnecessary at this this juncture to resolve whether the inclusion of the 9/11 Material on the CBS 9/11 Newsreels was "inadvertent," (*see* Defs. 56.1 ¶ 25), but note that there is conflicting evidence on this point.

(*Id* ¶ 321; Fioranelli Cert. Ex. 17.)[14]

### E. *Allegedly Infringing Works*

Plaintiff alleges that, "in about 2005-2006, in violation of the contract between Plaintiff and CBS, . . . CBS began an extensive program of sublicensing Plaintiff's works." (Defs. 56.1 ¶ 39; Sec. Am. Compl. ¶ 24.)

In fourteen of the sixteen allegedly infringing works, when the 9/11 Material is depicted it takes up the entire screen. (*See* Relyea Decl. Exs. 2, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18; *see also* Defs. 56.1 Reply ¶ 361.)[15] I describe each of the infringing works below.

#### 1. The CBS 9/11 Newsreels

Two of the CBS 9/11 Newsreels contain portions of the 9/11 Material (hereafter, these two newsreels are referred to collectively as the "CBS 9/11 Newsreels" or "Newsreels" and individually as "CBS 9/11 Newsreel"). (Relyea Decl. Exs. 2, 3; Parness Cert. ¶ 2.)[16] The first CBS 9/11 Newsreel, approximately 76 minutes long, contains four clips of 9/11 Material for a total time of approximately 8.333 seconds. (Defs. 56.1 ¶ 26.) The second CBS 9/11 Newsreel, just under 74 minutes long, contains eleven clips of 9/11 Material, some of it duplicative of the

---

[14] The statements made by CBS are arguably not hearsay, as they are statements made by an opposing party. *See* Fed. R. Evid. 801(d)(2). CBS's reference to Big Daddy material appears to be a reference to the 9/11 Material.

[15] The cited exhibits are copies of the allegedly infringing work, other than *World Trade Center* and *World Trade Center Featurette*, that were provided to the Court. I have reviewed these works, and verified that the 9/11 Material does in fact take up the entire screen when shown in these allegedly infringing works.

[16] Exhibits 2 and 3 to the Relyea Declaration are the two CBS 9/11 Newsreels that contained the 9/11 Material.

first Newsreel, totaling approximately 33.433 seconds. (*Id.* ¶ 29.) Eleven different clips of the

9/11 Material appear in the CBS 9/11 Newsreels. (Pl. 56.1 ¶ 326.) Still exemplars are below:





(*Id.* ¶ 328.)  At least ten of these clips also appear in the allegedly infringing works.  (*Id.* ¶ 329.)

### 2. *Rush to War*

In September 2004, BBC licensed footage from the CBS 9/11 Newsreels to non-party RTW Productions, LLC, the producer of *Rush to War*.  (Defs. 56.1 ¶ 41.)  *Rush to War* is an 86-minute political documentary about the motivations for the Iraq War and American foreign policy after 9/11 that was released to the public in 2007.  (*Id.* ¶¶ 40, 44.)  The 9/11 Material appears in the film for approximately 1.459 seconds.  (*Id.* ¶ 42.)  The clip of the 9/11 Material used shows a rescue worker holding a doll and appears early in the film as part of a montage of footage from the 9/11 attack and its aftermath, set to instrumental music and prefaced by the narration:  "It was a day no one will ever forget.  Why did nineteen young men from another part of the world want to kill themselves and so many others?"  (*Id.* ¶ 43.)

### 3. *Celsius 41.11*

In October 2004, BBC licensed footage from the CBS 9/11 Newsreels to non-party Adams County Productions LLC, the producer of *Celsius 41.11* ("*Celsius*"). (*Id.* ¶ 47.) *Celsius* is a 71-minute political documentary produced as a conservative response to Michael Moore's film Fahrenheit 9/11, and was released to the public in 2004. (*Id.* ¶¶ 46, 52.) The 9/11 Material appears in the film for approximately 1.166 seconds.[17] (*Id.* ¶ 48.) The clip of the 9/11 Material used in *Celsius* appears during a montage of footage from Pearl Harbor and 9/11, juxtaposed with audio and video from President George W. Bush's September 20, 2001 speech to a joint session of Congress following the terrorist attack. (*Id.* ¶ 49.) The clip of the 9/11 Material shows a firefighter in silhouette at Ground Zero and appears during the words "on thousands" in the following statement by President Bush: "Americans have known surprise attacks, but never before on thousands of civilians." (*Id.* ¶ 50.) The sequence showing the footage is presented as part of a rebuttal to the view held among some of the President's detractors that "Bush didn't do enough to stop 9/11." (*Id.* ¶ 51.)

### 4. *World Trade Center*

In January 2006, BBC licensed footage from the CBS 9/11 Newsreels to Paramount, the producer of *World Trade Center* ("*WTC*"). (*Id.* ¶ 55.) *WTC* is a 129-minute docudrama telling the true story of two Port Authority police officers who were trapped in the rubble at Ground Zero, and was released to the public in 2006. (*Id.* ¶¶ 54, 59.) The 9/11 Material appears in the film for approximately two seconds. (Defs. 56.1 Reply ¶ 56) (accepting Plaintiff's assertion that

---

[17] Plaintiff consistently disputes the lengths of the clips provided by Defendants, many times without citing timecodes, and at times, to his own detriment. The differences in the times provided, usually less than a second long, are immaterial to my determination of the pending motions. I therefore cite to the lengths provided by Defendants, unless Defendants agree to the durations stated by Plaintiff, or Plaintiff in fact provides citations to time codes.

the 9/11 Material is shown for 2 seconds, not 2.084 seconds).  The clip of the 9/11 Material used in *WTC* appears in a scene depicting family members of one missing police officer gathered in a kitchen, watching the news on a small television set.  (Defs. 56.1 ¶ 57.)  The clip of the Material shows a group of firefighters walking at Ground Zero and is one of several clips used in what is portrayed as a news report, superimposed with a chyron that reads, "Breaking News/America Under Attack/Terrorists Crash Hijacked Airliners Into World Trade Center, Pentagon."  (*Id.*)  In the scene, the family members react emotionally to the news that hundreds of emergency responders are missing and feared lost.  (*Id.* ¶ 58.)

### 5.  *World Trade Center Featurette*

The *World Trade Center* DVD also includes a 53-minute "making of" documentary ("*Featurette*").  (*Id.* ¶ 61.)  *Featurette* includes the same 9/11 Material that appears in *World Trade Center.*  (*Id.* ¶ 62.)  In the sequence in which the clip of the footage appears, filmmaker Oliver Stone explains that he chose to restrict the use of real 9/11 footage in the movie "to television playback, because you have to keep in mind that the wives know the story as a parallel story through television.  So, taking that into account, you have to show a certain amount of basic reference point stuff."  (*Id.* ¶ 63.)

### 6.  *The Miracle of Stairway B*

In June 2006, BBC licensed footage from the CBS 9/11 Newsreels to Testimony, the producer of *The Miracle of Stairway B* ("*Stairway B*").  (*Id.* ¶ 67.)  *Stairway B* is a 48-minute documentary telling the story of a group of firefighters and civilians who miraculously survived the collapse of the North Tower of the World Trade Center on 9/11, and was released to the public in 2006.  (*Id.* ¶¶ 66, 74.)  *Stairway B* includes two clips of 9/11 Material taken from the CBS 9/11 Newsreels.  (*Id.* ¶ 68.)  These clips appear for approximately 5 seconds.  (Defs. 56.1

Reply ¶ 68.)  In *Stairway B*, after the narrator says, "News that the firemen of Ladder 6 had survived the collapse of the North Tower got through to [Jay Jonas's] wife, Judy, but she was told they were still trapped," the two clips of the 9/11 Material showing firefighters digging in the rubble at Ground Zero play in succession as Judy Jonas recounts, "It was a relief in some ways to hear that he was alive and that he was trapped, but there was many stories of guys being trapped and not coming out."  (Defs. 56.1 ¶ 69.)

On June 9, 2019, Plaintiff identified two additional clips of the 9/11 Material that appear in *Stairway B*, which total 20.9 seconds.  (*Id.* ¶ 71.)[18]  The first additional clip appears as the narrator explains that "Glenn Rohan and his Ladder 43 crew were one of the first rescue teams sent out to try and find the Stairway B survivors" and then Rohan describes his experience looking for the missing firefighters and concern that his team would be safe in the hazardous situation.  (Defs. 56.1 ¶ 72.)  The second additional clip appears after an interview with Josephine Harris, one of the civilians trapped in the rubble describing her feelings waiting to be rescued, shown as the narrator says that "the next thing that the survivors remember is that down in the depths of Stairway B, the dust lifted and it was as if another miracle had happened."  (*Id.* ¶ 73.)  In total, 26.3 seconds of the 9/11 Material appear in *Stairway B*.  (*Id.* ¶ 75)

### 7.  *Crime Scene 9/11*

No later than September 1, 2007, BBC licensed footage from the CBS 9/11 Newsreels to Testimony, the producer of *Crime Scene 9/11*.  (*Id.* ¶ 77.)  *Crime Scene 9/11* is a 46-minute historical documentary telling the story of the recovery and identification effort at Ground Zero from the perspective of first responders, construction workers, volunteers, and

---

[18] Although the parties appear to dispute whether or not these clips were on the CBS Newsreels, (*see* Defs. 56.1 Reply ¶ 330), I need not resolve this dispute to decide the instant motions.

others who contributed to the effort, and was released to the public in 2007.  (Defs. 56.1 Reply ¶ 76; Defs. 56.1 ¶ 81.)  The 9/11 Material appears in the film for approximately 8.92 seconds.  (*Id.* Defs. 56.1 ¶ 78.)  The two clips of the footage used in *Crime Scene 9/11*, depicting firefighters digging in the rubble, appear as part of a montage of footage from Ground Zero as the narrator states, "The frantic efforts to search for survivors continued throughout the day of 9/11, while families waited at home desperate for news of missing loved ones.  But amidst the chaos of the crime scene, rumor and false hope were rife."  (*Id.* ¶ 79.)

### 8.  *How It Was:  Voices of 9/11*

In October 2007, BBC licensed footage from the CBS 9/11 Newsreels to Creative Differences, the producer of *How It Was: Voices of 9/11* ("*How It Was*").  (*Id.* ¶ 84.)  *How It Was* is a 53-minute documentary from the perspective of radio dispatchers who worked on that day, and was released to the public in 2007.  (*Id.* ¶¶ 83, 88.)  *How It Was* includes five clips of the 9/11 Material, totaling approximately 9 seconds.  (Defs. 56.1 Reply ¶ 85.)  The five clips of the 9/11 Material that appear in *How It Was* show the search-and-rescue efforts at Ground Zero and are interspersed in a montage of footage from Ground Zero, set to music and snippets of voicemails from ordinary people to their loved ones, as the narrator states, "The tide of phone calls sweeping the nation continued even after the towers fell.  But instead of bearing news, these callers anxiously listened for a familiar voice."  (Defs. 56.1 ¶ 86.)

### 9.  *ZERO:  An Investigation into 9/11*

In October 2007, BBC licensed footage from the CBS 9/11 Newsreels to non-party Telemaco, the producer of *ZERO:  An Investigation into 9/11* ("*ZERO*").  (*Id.* ¶ 91.)  *ZERO* is a 123-minute documentary seeking to challenge the official version of the events surrounding 9/11, and was released to the public in 2007.  (*Id.* ¶¶ 90, 95.)  *ZERO* uses a one-second clip of

the 9/11 Material.  (Defs. 56.1 Reply ¶ 92.)  The clip depicts a firefighter sitting in the rubble at Ground Zero and is part of a sequence of slow-motion footage from Ground Zero, set to music, that follows a firefighter's description of his escape from the North Tower collapse.  (Defs. 56.1 ¶ 93.)  The documentary then proceeds to cast doubt on "the official justification for the inexplicable collapse of the Twin Towers" through interviews with a number of conspiracy theorists.  (*Id.* ¶ 94.)

### 10.  *Seven Signs of the Apocalypse*

In December 2008, BBC licensed footage from the CBS 9/11 Newsreels to MorningStar, the producer of *Seven Signs of the Apocalypse*, ("*Seven Signs*"), and A&E, the distributor of *Seven Signs.*  (*Id.* ¶ 98.)  *Seven Signs* is a 92-minute television program exploring a possible connection between modern-day world events and biblical prophecies of the apocalypse, and was released to the public in 2008.  (*Id.* ¶¶ 97, 101.)  *Seven Signs* uses a one-second clip of the 9/11 Material.  (*Id.* ¶ 99.)  The clip of the 9/11 Material that appears in *Seven Signs* depicts an ambulance being lifted out of the rubble at Ground Zero and is shown in a segment on the prophesy of the seas and rivers turning to blood from the Book of Revelation.  (*See id.* ¶ 100.) The clip of the footage is part of a montage of video footage and images—including a painting of Satan whispering in Jesus's ear, archival footage of Hitler, and a missile strike—that accompanies the following commentary by a biblical scholar:  "I think what God is specifically saying, he's saying to the rebellious planet earth, to the Antichrist and his forces, you've martyred my people, you've spilled their blood, you've killed millions of people that believe in God by taking their blood."  (*Id.*)  The clip of the 9/11 Material appears just as the scholar says the word "martyred," then immediately fades into the next clip of a man being carried on a stretcher.  (*Id.*)

## 11. *9/11: Day That Changed the World*

In September 2011, BBC licensed footage from the CBS 9/11 Newsreels to non-party Brook Lapping Productions Ltd. ("BLP"), the producer of *9/11: Day that Changed the World* ("*DTCW*"). (*Id.* ¶ 104.) *DTCW* is a historical documentary that seeks to detail the events of September 11th, switching between New York, Washington, Pennsylvania and the progress of President Bush around the country, and was released to the public in 2011. (*Id.* ¶¶ 103, 110; Pl. 56.1 ¶ 398.) *DTCW* uses five clips of the 9/11 Material, totaling 15 seconds. (Defs. 56.1 Reply ¶ 105.)

The five clips of the 9/11 Material that appear in *DTCW* "illustrate talking-head interviews" with New York City Deputy Mayor Rudy Washington and Fire Commissioner Thomas Von Essen about their experiences on the day of the attack. (Defs. 56.1 ¶ 106.) In the first interview, Washington recounts, "A block away, I could see one fireman digging with his hands, and I look down and it's lights, and I realized, I'm standing on top of a fire truck." (*Id.*) After the word "hands," the camera cuts to a clip of the Footage showing a firefighter in silhouette at Ground Zero. (*Id.*) Later, two clips of the 9/11 Material totaling about six seconds play as Von Essen recalls, "The devastation was overwhelming, and if there were people that were going to be rescued, you couldn't see them, and you knew it would be a while that you could get to them because everything was so heavy." (*Id.* ¶ 107.) One clip, showing a rescue worker holding a doll, plays as Von Essen says the word "overwhelming." (*Id.*) The other clip, showing a "bucket brigade" working to clear the rubble, plays as Essen says, "you knew it would be a while that you could get to them." (*Id.*) The fourth and fifth clips of the 9/11 Material, totaling nine seconds, show firefighters climbing into rubble at Ground Zero are shown as Washington explains, "[E]ven when the firemen showed up, they were throwing water on the

fire, but they couldn't move all this rubble and this steel.  By mid-day, I knew saving people was going to be fairly limited."  (*Id.* ¶ 108.)

### 12.  *The Conspiracy Files:  9/11 10 Years On*

No later than February 1, 2012, BBC, the producer of *The Conspiracy Files:  9/11 10 Years On*, ("*Conspiracy Files*"), obtained a license to use footage from the CBS 9/11 Newsreels in that program.  (*Id.* ¶ 113.)  *Conspiracy Files* is a one-hour television program for BBC Two exploring and debunking various conspiracy theories about 9/11, and was released to the public in 2011.  (*Id.* ¶¶ 112, 116.)  *Conspiracy Files* uses a 1.625 second clip of the 9/11 Material.  (*Id.* ¶ 114.)  The clip of the 9/11 Material used in *Conspiracy Files* appears in a segment debunking a conspiracy theory about explosives causing the collapse of World Trade Center 7, in which Carnegie Mellon University Professor Richard Fruehan explains, "They concluded that it was a highly energetic material, and on a kilogram basis, it is less—it gives off less energy than burning paper."  (*Id.* ¶ 115.)  The clip of the 9/11 Material, showing a firefighter in silhouette at Ground Zero, appears with the words "energetic material."  (*Id.*)

### 13.  *The Miracle Survivor*

In September 2012, BBC licensed footage from the CBS 9/11 Newsreels to Testimony, the producer of *The Miracle Survivor* ("*Miracle Survivor*").  (*Id.* ¶ 119.)  *Miracle Survivor* is a 48-minute documentary investigating the story of a man who claimed he miraculously survived the World Trade Center attack by "surfing" down from the 86th floor as the tower collapsed. (*Id.* ¶ 118.)  *Miracle Survivor* uses an approximately 2.97 second clip of 9/11 material.  (*Id.* ¶ 120.)  The clip of the 9/11 Material used in *Miracle Survivor* shows a firefighter digging in the rubble at Ground Zero and accompanies firefighter Mike Lyons' commentary:  "And we were searching voids and areas that we thought we could find people or our fellow firemen, or

whoever, in the debris." (*Id.* ¶ 121.)

### 14. *Conspiracy Theory: Death Ray*

In September 2012, T3 (n/k/a Veritone) licensed footage from the CBS 9/11 Newsreels to JVCT, producer of *Conspiracy Theory: Death Ray* ("*Death Ray*"). (*Id.* ¶ 127.) *Death Ray* is a 44-minute episode of the television series hosted by Jesse Ventura exploring a conspiracy about a deadly secret weapon. (*Id.* ¶ 123.) *Death Ray* uses two clips of the 9/11 Material, totaling three seconds. (Defs. 56.1 Reply ¶ 125.) The two clips of the 9/11 Material "show a firefighter in silhouette at Ground Zero and a bucket brigade working to clear the rubble and are used as part of a preview for an upcoming segment of the program featuring 9/11 conspiracy theorist Judy Wood, in which the narrator announces, "Coming up on 'Conspiracy Theory': The death ray investigation leads to the most devastating attack on American soil." (Defs. 56.1 ¶ 126.)

### 15. *The Untold History of the United States*

In December 2012, T3 (n/k/a Veritone) licensed footage from the CBS 9/11 Newsreels to Ipse Dixit, producer of The Untold History of the United States ("*Untold History*"). (*Id.* ¶ 130.) *Untold History* is a ten-part documentary series by Oliver Stone about United States history. (*See* Pl. 56.1 ¶ 404.)[19] The allegedly infringing episode of *Untold History* reviews the late 80s, the 90s, and the early 2000s. (*Id.* ¶ 405.)

*Untold History* uses three clips of the 9/11 Material, in the 58-minute episode 9 of the series, for a total time of approximately 6 seconds. (Defs. 56.1 Reply ¶ 131.) The three clips of the 9/11 Material—which show a firefighter in silhouette, a rescue worker holding a doll, and a bucket brigade working to clear the rubble—appear in succession toward the end of the 58-

---

[19] The parties dispute whether *Untold History* focuses on "under-reported aspects of American history." (Defs. 56.1 Reply ¶ 129.) Resolving this is not necessary or relevant to my resolution of these motions; rather I find that the series focuses on United States history.

minute episode, during a discussion of the effect of the 9/11 attack on the American people and their leaders. (Defs. 56.1 ¶ 132.) Stone narrates, "And now, to some very powerful American leaders, it was as if they, the outliers of empire, these terrorists, had dropped Hiroshima on us, at the very least, Pearl Harbor." (*Id.*) In the sequence, the 9/11 Material is juxtaposed with archival footage from World War II. (*Id.*)

### 16. *9/11 Relics from the Wreckage*

In September 2013, T3 licensed footage from the CBS 9/11 Newsreels to A&E, producer of *9/11: Relics from the Wreckage*, ("*Relics*"). (*Id.* ¶ 136.) *Relics* is a "30-minute documentary for the HISTORY network about the National 9/11 Memorial & Museum and its artifacts hosted by its president, Joe Daniels." (*Id.* ¶ 135.) *Relics* uses seven clips of the 9/11 Material, totaling approximately 17.3 seconds. (*Id.* ¶ 137.) One three-second clip of the 9/11 Material appears in *Relics* and depicts a bucket brigade working to clear the rubble appears as part of a montage of Ground Zero footage, as Daniels narrates, "The rescue and recovery efforts at Ground Zero involved thousands of people working day and night for nine months." (*Id.* ¶ 138.) Multiple clips of the same portion of the 9/11 Material also appear in another montage later in the documentary, along with clips of the 9/11 Material showing firefighters digging in the rubble and an ambulance being lifted out of the rubble, as Daniels narrates, "After the collapse of the towers, the first priority was to rescue those who may have survived and recover the deceased. This effort involved hundreds of workers—firefighters, iron workers, engineers, boilermakers, carpenters, masons, electricians, plumbers, riggers, and truckers." (*Id*. ¶ 139.)

### F.    Plaintiff's Other Uses of the 9/11 Material

In September 2001, Plaintiff reached an agreement with WWOR-TV Channel 9 ("WOR") for use of the 9/11 Material. (Pl. 56.1 ¶ 284.) Plaintiff also negotiated preliminary

agreements with HBO and ABC, although neither ended up using the 9/11 Material. (*Id.* ¶¶ 286–89.) Plaintiff tried to create and sell two documentaries using the 9/11 Material, neither of which came to fruition. (*See id.* ¶¶ 290–96.)

## II.    **Procedural History**

Plaintiff filed a complaint in this matter on February 9, 2015, (Doc. 1), and an amended complaint ("Amended Complaint"), (Doc. 53), on August 28, 2015. Defendants subsequently filed a motion to dismiss the Amended Complaint. (Doc. 58.) On January 19, 2017, I granted Defendants' motion to dismiss in part and denied it in part. (Doc. 71.) I found that Plaintiff had adequately plead copyright infringement claims against all Defendants, and denied Defendants' motion to dismiss the copyright infringement claim. (*Id.* at 7–10.) I dismissed Plaintiff's claims for copyright inducement against Brook Lapping Productions Ltd., Testimony, RTW Productions, LLC, Paramount, Morningstar, Creative Differences, Adams County Productions LLC, Telemaco SRL, JVCT, Ipse Dixit, Firecracker Films, LLC, and A&E. (*Id.* at 10–11.) I dismissed Plaintiff's Lanham Act claim, and Plaintiff's state law claims other than for breach of contract. (*Id.* at 14.) As to the breach of contract claim, I noted that because Defendants did not move to dismiss Plaintiff's breach of contract claim, they conceded that Plaintiff could "pursue a claim for breach of contract against CBS for any uses of the 9/11 Material that violated the terms of the Licensing Agreement." (*Id.* at 9 n.9.) Finally, I found that Plaintiff was not entitled to statutory damages or attorney's fees for his Copyright claims under 17 U.S.C. §§ 504–05. (*Id.* at 18.)

Plaintiff subsequently filed a Second Amended Complaint. (Doc. 72.) On April 12, 2017, I bifurcated liability discovery from damages discovery. (Hrg. Tr. 10:17-19.)[20] On June 5,

---

[20] "Hrg. Tr." refers to the transcript from the hearing that I held on April 12, 2017. (Doc. 84.)

2019, Defendants filed a motion for summary judgment, (Docs. 144–45), two declarations in support of its motion, (Docs. 146–47), a Rule 56.1 statement, (Doc. 148), and a motion *in limine* to preclude expert opinion, (Doc. 150). On July 24, 2019, Plaintiff filed an opposition to Defendants' summary judgment motion and a cross motion for partial summary judgment on the copyright infringement claims, (Docs. 159, 163), declarations from Plaintiff Anthony Fioranelli and Hillel Parness in support of the motion, (Docs. 160, 161), and a counterstatement to Defendants' Rule 56.1 Statement, (Doc. 162). On July 30, 2019, Plaintiff filed corrected versions of the certifications of Fioranelli and Parness, as well as a corrected version of Plaintiff's counterstatement to Defendants' Rule 56.1 Statement. (Docs. 166–68.) Defendants moved to strike Plaintiff's cross-motion, (Doc. 170), which I denied, (Doc. 172). On September 27, 2019, Defendants submitted their reply to Plaintiff's opposition and cross-motion for partial summary judgment, (Doc. 174), and a reply to Plaintiff's Counter Statement to Defendant's Rule 56.1 Statement, (Doc. 175). On September 29, 2019, Plaintiff requested to file corrected versions of the Fioranelli and Parness certifications because Plaintiff had included different formulations than what is found in 28 U.S.C. § 1746. (Doc. 176.) Plaintiff attached the revised certifications. (Doc. 176-1, 176-2.) Defendants opposed this request. (Doc. 177.)

Plaintiff's claims before me are for copyright infringement against all Defendants, inducement to infringe copyright against Defendants CBS, BBC, and T3, and breach of contract against Defendant CBS.

### III. <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see also* Fed. R. Civ. P.

56(a). "[T]he dispute about a material fact is 'genuine[]' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in his favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000). To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In considering a summary judgment motion, a court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citation and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587. "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party," summary judgment must be denied. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002). "'The principles governing admissibility of evidence do not change on a motion for summary judgment' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." *I.M. v. United States*, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting *Raskin v. Wyatt Company*, 125 F.3d 55, 66 (2d Cir. 1997)).

In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(2), (3); *see also* Fed. R. Civ. P. 56(c)(1)(a) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."); Local Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."). However, "where the movant 'fail[s] to fulfill its initial burden' of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, 'even if no opposing evidentiary matter is presented,' for the non-movant is not required to rebut an insufficient showing." *Giannullo v. City of N.Y.*, 322 F.3d 139, 140–41 (2d Cir. 2003) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158, 160 (1970)). "Moreover, in determining whether the moving party has met this burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement. It must be satisfied that the citation to evidence in the record supports the assertion." *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

IV.    **Discussion**

A.    ***Copyright Infringement***

"To prevail on a claim of copyright infringement, a plaintiff must demonstrate both (1) ownership of a valid copyright and (2) infringement of the copyright by the defendant." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 108–09 (2d Cir. 2001).  For purposes of their motion, Defendants do not seem to dispute that Plaintiff has a copyright over the 9/11 Material.  (*See* Defs.' Reply Mem. 5) (referring without challenge to Plaintiff's copyright registrations).[21] Rather, they argue that Plaintiff's copyright infringement claims must fail because (1) any infringement is *de minimis*; (2) any infringement is excusable under the fair use doctrine; and (3) all but four of the challenged uses are barred by the statute of limitations.  (*See* Defs.' Mem 6– 34.)[22]  In Plaintiff's opposition and cross motion, he argues that "Defendants admit to at least 33 separate instances of copyright infringement, and they cannot meet their burden to establish defenses sounding either in de minimis or fair use, and there are no disputed issues of material fact which – even if proven to support Defendants' position – would change that conclusion." (Pl.'s Mem. 39.)[23]

1.    ***De Minimis Use***

a.    Applicable Law

Copyright infringement requires a plaintiff to demonstrate both that:  "(1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial

---

[21] "Defs.' Reply Mem." refers to Defendants' Reply in Support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Partial Summary Judgment, filed on September 27, 2019.  (Doc. 174).

[22] "Defs.' Mem." Refers to Defendants' Memorandum of Law in Support of Defendants' Motion for Summary Judgment, filed on June 5, 2019.  (Doc. 145.)

[23] "Pl.'s Mem." refers to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and In Support of Plaintiff's Cross-Motion for Partial Summary Judgment, filed on July 24, 2019.  (Doc. 163.)

similarity exists between the defendant's work and the protectable elements of plaintiff's [work]." *Yurman Design, Inc.*, 262 F.3d at 110 (internal quotation marks omitted). In other words, plaintiff must prove "actual copying" of plaintiff's work and then show that such copying is legally actionable. *Jean v. Bug Music, Inc.*, No. 00 CIV 4022 (DC), 2002 WL 287786, at *4 (S.D.N.Y. Feb. 27, 2002); *Ringgold v. Black Entm't Television, Inc.*, 126 F.3d 70, 74 (2d Cir. 1997) (explaining that "'substantial similarity' is more properly used, after the fact of copying has been established, as the threshold for determining that the degree of similarity suffices to demonstrate actionable infringement").

"[W]here the unauthorized use of a copyrighted work is *de minimis*, no cause of action will lie for copyright infringement." *Sandoval v. New Line Cinema Corp.*, 147 F.3d 215, 217 (2d Cir. 1998); *see Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 242 (2d Cir. 1983) (observing that the *de minimis* rule "allow[s] the literal copying of a small and usually insignificant portion of the plaintiff's work"). To establish that the infringement is *de minimis*, "the alleged infringer must demonstrate that the copying of the protected material is so trivial 'as to fall below the quantitative threshold of substantial similarity.'" *Sandoval*, 147 F.3d at 217 (quoting *Ringgold*, 126 F.3d at 74).

Although "there are no bright-lines rules for what constitutes substantial similarity," *id.*, courts in this Circuit often look to whether "the copying is quantitatively and qualitatively sufficient to support the legal conclusion that infringement (actionable copying) has occurred," *see Ringgold*, 126 F.3d at 75; *Hirsch v. Complex Media, Inc.*, No. 18 CIV. 5488 (CM), 2018 WL 6985227, at *3 (S.D.N.Y. Dec. 10, 2018) ("The *de minimis* analysis asks whether the copying is both quantitatively and qualitatively sufficient to support the legal conclusion that infringement, *i.e.*, actionable copying, has occurred."). "The quantitative component generally concerns the

amount of the copyrighted work that is copied, a consideration that is especially pertinent to exact copying." *Ringgold*, 126 F.3d at 75. When a case involves visual works, "the quantitative component of substantial similarity also concerns the observability of the copied work—the length of time the copied work is observable in the allegedly infringing work and such factors as focus, lighting, camera angles, and prominence." *Id.*; *Twentieth Century Fox Film Corp. v. Marvel Enters., Inc.*, 155 F. Supp. 2d 1, 45 (S.D.N.Y. 2001), *aff'd in part and remanded*, 277 F.3d 253 (2d Cir. 2002); *Solid Oak Sketches, LLC v. 2K Games, Inc.*, 449 F. Supp. 3d 333, 344 (S.D.N.Y. 2020). "The qualitative component concerns the copying of expression, rather than ideas, a distinction that often turns on the level of abstraction at which the works are compared." *Ringgold*, 126 F.3d at 75. This "turns on whether 'an ordinary observer, unless he [or she] set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same.'" *Hirsch v. CBS Broad. Inc.*, No. 17 Civ. 1860 (PAE), 2017 WL 3393845, at *3 (S.D.N.Y. Aug. 4, 2017) (quoting *Yurman Design*, 262 F.3d at 111). When applying this test, courts ask whether "an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work." *Knitwaves, Inc. v. Lollytogs Ltd.*, 71 F.3d 996, 1002 (2d Cir. 1995) (internal quotation marks omitted); *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir. 1992); *Hirsch v. CBS*, 2017 WL 3393845, at *3; *see Ringgold*, 126 F.3d at 77 (applying "average lay observer" test when analyzing the qualitative component).

Because substantial similarity typically presents a close question of fact, "summary judgment has traditionally been frowned upon in copyright litigation." *Estate of Smith v. Cash Money Records, Inc.*, 253 F. Supp. 3d 737, 746 (S.D.N.Y. 2017), *aff'd sub nom. Estate of Smith v. Graham*, 799 F. App'x 36 (2d Cir. 2020). Summary judgment, however, may be granted on *de minimis* use grounds where "no reasonable trier of fact could find the works substantially

similar." *Solid Oak Sketches, LLC*, 449 F. Supp. at 333 (internal quotation marks omitted); *Estate of Smith*, 253 F. Supp. 3d at 746.

### b. Application

Here, there is no dispute that Defendants "actually copied" Plaintiff's works, as Defendant CBS admits that portions of the 9/11 Material were found on the CBS 9/11 Newsreels, which were then distributed to the remaining Defendants through licenses and sublicenses. (*See* Defs. 56.1 ¶¶ 23, 25, 33, 35–38.) For that reason, I focus on whether the copying meets the "threshold of substantial similarity." *Sandoval*, 147 F.3d at 217.

As an initial matter, Plaintiff argues that "Defendants' enunciation of the *de minimis* test is wrong" because Defendants focus solely on the quantitative component. (Pl.'s Mem. 15.) Defendants respond that "when the portion of the work used is miniscule, as are the uses in this case, that alone can decide the issue." (Defs.' Reply Mem. 4.) Because I find that the quantitative analysis does not alone decide the issue, I address both the quantitative and qualitative components in turn below.

#### i. *Quantitative Component*

As part of the quantitative analysis, I look to (1) "the amount of the copyrighted work that is copied," (2) "the observability of the copied work—the length of time the copied work is observable in the allegedly infringing work," and (3) factors such as "focus, lighting, camera angles, and prominence." *Ringgold*, 126 F.3d at 75.

Although the parties agree that the amount of work copied should be determined by a comparison between the portion copied and the 9/11 Material, Plaintiff's original work, [24] (*see*

---

[24] I again note that I use the 9/11 Material to reference both the material provided by Plaintiff to CBS and the work that was copyrighted, as the parties have not indicated any differences between the two.

Pl.'s Mem. 25; Defs.' Mem. 9), they dispute what actually constitutes Plaintiff's original work, (s*ee* Pl.'s Mem. 25–26; Defs.' Reply Mem. 4–5). Plaintiff argues that Defendants should have "measur[ed] the infringing segments against the source segments," not against the total amount of footage provided to CBS, which totaled 2 hours, 42 minutes, and 56 seconds of footage. (Pl.'s Mem. 25; *see* Defs. 56.1 ¶ 9.) Plaintiff, however, does not cite to any facts or evidence to demonstrate that he intended his work to be viewed as "segments." (*See* Pl.'s Mem. 25–26.) Indeed, there are various facts related to how Plaintiff treated the 9/11 Material that militate against Plaintiff's segment argument. For example, Plaintiff registered all of the 9/11 Material "together," (*id.* at 26; Sec. Am. Compl. ¶ 18, Exs. 1, 2), he also did not market this footage to CBS on a per-segment basis, (*see* Fioranelli Cert. ¶ 28) ("$1,000 per use for any portion of any day's footage."), and he attempted to create two documentaries using the 9/11 Material, (*see* Pl. 56.1 ¶¶ 290–96). Nor has Plaintiff cited legal authority that is analogous to the circumstances presented here. Instead, in support of his segment argument, Plaintiff relies on cases in the fair use context that concerned individually copyrighted journal articles written by different authors, *see Am. Geophysical Union v. Texaco Inc.*, 60 F.3d 913, 925–26 (2d Cir. 1994), and distinct lectures, policy statements, and course packets that were sometimes collected into larger volumes, *see Religious Tech. Ctr. v. Netcom On-Line Commc'n Servs., Inc.*, 923 F. Supp. 1231, 1247 (N.D. Cal. 1995). I agree with Defendants that these cases are both inapposite and unpersuasive. *See* (Defs.' Reply Mem. 5); *NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 481 (2d Cir. 2004) (rejecting argument that individual modules were separate denominators and observing that "[i]f plaintiffs' argument were accepted by courts . . . the third factor could depend ultimately on a plaintiff's cleverness in obtaining copyright protection for the smallest possible unit of what would otherwise be a series of such units intended as a unitary work").

Plaintiff also avers that "even if one were to consider the amount of Fioranelli footage on each of the infringing films, it is inappropriate to measure the Fioranelli footage against the entire films, but rather against comparable footage contained therein." (Pl.'s Mem. 26.) Plaintiff provides no support for this assertion, and if considered at all, it would be most appropriately considered when determining whether the copyrighted material is featured prominently. Therefore, in addressing the instant motions, I will consider the amount of work copied by measuring the allegedly infringing segments against the 2 hours, 42 minutes, and 56 seconds of the 9/11 Material.

In analyzing the qualitative component, I am primarily guided by two Second Circuit cases. In *Ringgold*, the Second Circuit considered whether the unauthorized use of a copyrighted poster in a television episode was *de minimis* when the poster was shown nine different times during the episode, for a total of 26.75 seconds. 126 F.3d at 76. In overturning the district court's grant of summary judgment for defendants, the Second Circuit explained that, "the principal four-to-five-second segment in which almost all of the poster is clearly visible, albeit in less than perfect focus, reenforced by the briefer segments in which smaller portions are visible, all totaling 26 to 27 seconds, are not *de minimis* copying." *Id.* at 77. The Second Circuit analogized to the regulation issued by the Librarian of Congress providing for royalties to be paid by public broadcasting entities for the use of published pictorial and visual works, and observed that under the regulation both a "featured" display—"a full-screen or substantially full screen display for more than three seconds"—and a "background" display—"[a]ny display less than full-screen or substantially full-screen, or full-screen for three seconds or less"—were entitled to royalties. *Id.* In *Sandoval*, however, the Second Circuit found that defendants' use of copyrighted photos in a movie was *de minimis* where "[t]he photographs [were] displayed in

poor lighting and at great distance," were "out of focus and displayed only briefly in eleven

different shots," and were "virtually unidentifiable." 147 F.3d at 218.

Applying *Ringgold,* courts in this District have found that even a brief display of a

copyrighted work, when prominently shown, can be actionable. *See, e.g.*, *Dyer v. V.P. Records

Retail Outlet, Inc.*, No. 05 Civ. 6583 (WHP), 2008 WL 2876494, at *4 (S.D.N.Y. July 24, 2008)

(denying summary judgment on *de minimis* grounds where offending images "t[ook] up most of

the screen," were "clearly observable" and "together t[ook] up almost three seconds"); *Twentieth

Century Fox Film Corp.*, 155 F. Supp. 2d at 46 (rejecting *de minimis* defense where clips were

each "of a short duration, of three seconds or less," but "appear[ed] prominently and [were]

plainly observable to the lay viewer"). In *Hirsch v. CBS*, the court refused to dismiss plaintiff's

complaint based on *de minimis* grounds where the infringing work, an episode of *48 Hours*,

"display[ed] a substantial proportion of the Photo in clear focus, and the Photo occupie[d] much,

although not all, of the screen." 2017 WL 3393845, at *5. Although the copied work was

observable for "roughly two seconds," the court observed that it was "not aware of any authority

that such a brief period alone defeats, as a matter of law, a finding of substantial similarity." *Id.*

The court found that a reasonable jury could find the works substantially similar. *Id; see also

Hirsch v. Complex Media*, 2018 WL 6985227, at *4 (denying motion to dismiss on *de minimis*

grounds where photograph was displayed for four seconds in infringing work "in its entirety"

and "the Photograph remained front and center of the Video screen throughout the period in

which it was shown").

I have reviewed the allegedly infringing works. It is indisputable that the amount of

copyrighted work copied is small when compared to the 9/11 Material as a whole. A small

portion of the 9/11 Material was copied onto the CBS 9/11 Newsreels, and subsequently, an even

smaller portion was copied in the remaining fifteen films.  (*See* Defs. 56.1 ¶¶ 29, 42, 48, 56, 62,

75, 78, 85, 92, 99, 105, 114, 120, 125, 131, 137.)  Similarly, "the length of time the copied work

is observable in the allegedly infringing work[s]" is brief.  *Ringgold*, 126 F.3d at 75.  At most,

the 9/11 Material is observable for approximately 43 seconds, (Defs. 56.1 ¶¶ 26, 29),[25] and at the

least, it is observable for one second, (*id.* ¶ 99).  Importantly, however, in fourteen of the sixteen

allegedly infringing works, the 9/11 Material takes up the entire screen.  (*See* Relyea Decl. Exs.

2, 3, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18; *see also* Defs. 56.1 Reply ¶ 361).  The 9/11

Material is not mere background footage.  The footage is "clearly observable," *Dyer*, 2008 WL

2876494, at *4, and is the focus of the film when shown.  Typically, the 9/11 Material is shown

in a succession of other videos or photographs with oral narration.  (*See, e.g.*, Relyea Decl. Exs.

2, 4, 5, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18.)  The parties dispute how much of the screen the

9/11 Material occupies in *World Trade Center* and in *Featurette*.  (*See* Defs. 56.1 Reply ¶¶ 361–

62.)  In *World Trade Center* and the *Featurette*, the 9/11 Material is shown on a television set in

the film with a news banner underneath it.  (*See* Relyea Decl. Ex. 6.)[26]  Although the footage

does not take up the entire screen, it is the focus of the film in that moment as the daughter alerts

the family to listen to what is being said on the television.  *(Id.)*  In both *World Trade Center* and

*Featurette*, I find that although the 9/11 Material is only shown briefly, it is the focal point when

shown.

I acknowledge that this case presents a close question, closer than in *Ringgold* and in

*Sandoval*, and bears some resemblance to *Hirsch v. CBS*.  Like in *Hirsch v. CBS*, the copied

---

[25] I reached this number by adding together the amount of time the 9/11 Material was featured in the first CBS 9/11 Newsreel to the amount of time it was featured in the second CBS 9/11 Newsreel.  I note that some of the footage in the reels are duplicative.

[26] Relyea Declaration Exhibit 6 is the copy of *World Trade Center* that was provided to the Court.

work, the 9/11 Material, was displayed for a matter of seconds, at most approximately 43 seconds, and in many instances only a few seconds, as part of a longer film or episode. Still, as the court found in *Hirsch v. CBS*, I find that the brevity of the footage does not defeat its qualitative nature—in each of the sixteen films, the 9/11 Material is "in clear focus" and occupies, in all but two films, the entirety of the screen. *See* 2017 WL 3393845, at *5 (observing that the court was "not aware of any authority that such a brief period alone defeats, as a matter of law, a finding of substantial similarity"). Based on this analysis, I find that that the observability and prominence of the 9/11 Material in the works at issue disfavors a finding of *de minimis* use. I join other courts in this District in recognizing that in certain instances, like here, even a brief display of copyrighted work, when conspicuously displayed, can be actionable. *See, e.g.*, *Hirsch v. Complex Media*, 2018 WL 6985227, at *4; *Hirsch v. CBS*, 2017 WL 3393845, at *5; *Dyer*, 2008 WL 2876494, at *4; *Twentieth Century Fox Film Corp.*, 155 F. Supp. 2d at 46; *see also Ringgold*, 126 F.3d at 77 (suggesting that a substantially full-screen display for less than three seconds would not be *de minimis*).

I find Defendants' purely mathematical argument unavailing, and that the cases relied on by Defendants present circumstances not present here. *See, e.g.*, *Newton v. Penguin/Berkley Pub. USA*, No. 13 Civ. 1283 CM, 2014 WL 505191, at *2 (S.D.N.Y. Jan. 28, 2014) (granting summary judgment for defendants where defendants' work quoted and "*properly attribute[d]*" two passages from plaintiff's work as part of a literary critique) (emphasis added); *TufAmerica, Inc. v. WB Music Corp.*, 67 F. Supp. 3d 590, 598 (S.D.N.Y. 2014) (granting defendant's motion to dismiss where the allegedly copied work, a sample of the word "oh," was "at best, barely perceptible in the allegedly infringing works"); *Bill Diodato Photography, LLC v. Kate Spade, LLC*, 388 F. Supp. 2d 382, 394 (S.D.N.Y. 2005) (finding that elements of photo that were

allegedly copied were "non-original, unprotectible elements").  *Gottlieb Dev. LLC v. Paramount Pictures Corp.*, relied on by Defendants, concerned the use of plaintiff's pinball machine in the background of a film.  In dismissing the complaint on *de minimis* grounds, the court observed that "the pinball machine is always in the background; it is never seen in the foreground.  It never appears by itself or in a close-up. . . .  It is almost always partially obscured" and that the copyrighted aspects of the machine "are never fully visible and are either out of focus or obscured."  590 F. Supp. 2d 625, 632 (S.D.N.Y. 2008).  Likewise, in *Gayle v. Home Box Office, Inc.*, the allegedly copied work, graffiti, was "at best, shown in the background at an oblique angle and in low, uneven light such that it is never fully visible, let alone legible," and the court observed that "the graffiti is hard enough to notice when the video is paused at the critical moment.  It is next to impossible to notice when viewing the episode in real time."  No. 17-CV-5867 (JMF), 2018 WL 2059657, at *3 (S.D.N.Y. May 1, 2018) (internal quotation marks and citation omitted).  Unlike both *Gottlieb* and *Gayle,* the 9/11 Material is never shown in the background and is never obscured, but instead is prominently featured in focus.

ii.     *Qualitative Component*

I now turn briefly to the qualitative component.  Defendants do not provide compelling citations to the record or arguments related to the qualitative component.  When Defendants do address the qualitative component, they reiterate the brevity of the depiction of the 9/11 Material within the works at issue, (*see* Defs.' Reply Mem. 6–7), or rely on cases with markedly different facts, (*see* Defs.' Mem. 8, 11–12 (citing *Jean v. Bug Music, Inc.*, No. 00 CIV 4022 (DC), 2002 WL 287786, at *7 (S.D.N.Y. Feb. 27, 2002) (musical composition); *Newton v. Diamond*, 388 F.3d 1189, 1195–96 (9th Cir. 2004) (same); *La. Contractors Licensing Serv., Inc. v. Am. Contractors Exam Servs., Inc.*, 13 F. Supp. 3d 547, 553 (M.D. La. 2014), *aff'd*, 594 F. App'x 243

(5th Cir. 2015) (multiple choice exam)).  Their failure to do so is a tacit admission that the qualitative component is clearly satisfied here.  The parties do not dispute that the allegedly infringing works include exact copies of the 9/11 Material.  (*See* Defs. 56.1 ¶¶ 23, 25, 33, 35–38.)[27]  "[A]n average lay observer would recognize the [infringing footage] as having been appropriated from the [9/11 Material]."  *Knitwaves*, 71 F.3d at 1002 (internal quotation marks omitted); *see Hirsch v. CBS*, 2017 WL 3393845, at *3 (finding the qualitative component satisfied where "[t]he image displayed . . . [was] an exact copy of the Photo, and even though a fair amount of the Photo [was] cropped out, the average lay observer would recognize it as a copy"); *Hirsch v. Complex Media*, 2018 WL 6985227, at *3 ("Certainly, there is no dispute as to the qualitative similarity between the two items:  the [infringing video] incorporates an exact screenshot of the [copyrighted work] and would be plainly recognizable to a lay observer.").[28]

I find the qualitative component satisfied.  Specifically, because the 9/11 Material is prominently shown in each of the films, and the films use exact copies of the 9/11 Material, I find that a reasonable trier of fact could find the works substantially similar, and therefore deny Defendants' motion for summary judgment on the grounds that the use is *de minimis*.

## 2.  *Fair Use*

Plaintiff has established the elements of copyright infringement to a degree sufficient to withstand Defendants' summary judgment motion.  I, however, must now determine whether Defendants' infringement was excusable as fair use.

---

[27] My use of the term "exact copies" excludes the fact that the allegedly infringing works do not include the watermark that was present in the original 9/11 Material.

[28] I note that this is not the case hypothesized by *Ringgold*, where "a visual work, though selected by production staff for thematic relevance, or at least for its decorative value, might ultimately be filmed at such a distance and so out of focus that a typical program viewer would not discern any decorative effect that the work of art contributes to the set."  126 F.3d at 77.

a. <u>Applicable law</u>

The Copyright Act grants a copyright owner the exclusive rights to authorize the reproduction, distribution, and preparation of derivatives of the owner's work. 17 U.S.C. § 106. These rights, however, are in "inevitable tension" with "the ability of authors, artists, and the rest of us to express them—or ourselves by reference to the works of others." *Blanch v. Koons*, 467 F.3d 244, 250 (2d Cir. 2006). The doctrine of fair use mediates between these two sets of interests and infuses copyright law with the necessary "breathing space." *Id.* at 250–51 (quoting *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 579 (1994)); *see Google LLC v. Oracle Am., Inc.*, 141 S. Ct. 1183, 1197 (2021) (fair use is a "flexible" concept, "that courts must apply it in light of the sometimes conflicting aims of copyright law, and that its application may well vary depending upon context"). Under this doctrine, "a defendant who otherwise would have violated one or more of these exclusive rights may avoid liability if [it] can establish that [it] made 'fair use' of the copyrighted material." *Swatch Grp. Mgmt. Servs. Ltd. v. Bloomberg L.P.*, 756 F.3d 73, 81 (2d Cir. 2014). "To evaluate whether a particular use qualifies as 'fair use,' [a court] must engage in 'an open-ended and context-sensitive inquiry'" that focuses on four non-exclusive factors set forth in the Copyright Act: (1) the purpose and character of the use, (2) the nature of the work, (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole, and (4) the effect of the use upon the potential market for or value of the copyrighted work. *Id.* (quoting *Blanch*, 467 F.3d at 251). The Copyright Act also provides examples of purposes for copying that would constitute fair use: criticism, comment, news reporting, teaching, scholarship, and research. 17 U.S.C. § 107. These examples, however, are "illustrative and not limitative," and the Court's "task is not to be simplified with bright-line rules." *Campbell*, 510 U.S. at 577 (citation omitted).

Fair use is an affirmative defense; therefore, a defendant accused of copyright infringement bears the burden of showing that its use of a work was fair. *Authors Guild v. Google, Inc*., 804 F.3d 202, 213 (2d Cir. 2015). The determination of fair use typically "is a mixed question of law and fact," however, this Circuit and courts within this District have "resolved fair use determinations at the summary judgment stage where there are no genuine issues of material fact." *Cariou v. Prince*, 714 F.3d 694, 704 (2d Cir. 2013) (internal quotation marks and alterations omitted); *see, e.g.*, *Otto v. Hearst Commc'ns, Inc.*, 345 F. Supp. 3d 412, 426–33 (S.D.N.Y. 2018).

### i. *Purpose and Character of the Use*

The first statutory factor, the purpose and character of the use, is the "heart of the fair use inquiry" in this Circuit. *On Davis v. The Gap, Inc.*, 246 F.3d 152, 174 (2d Cir. 2001), *as amended* (May 15, 2001). This inquiry may be guided by examples provided in the preamble to Section 107. *See Campbell*, 510 U.S. at 578–79; *TCA Television Corp. v. McCollum,* 839 F.3d 168, 179 (2d Cir. 2016) (observing that "the uses identified by Congress in the preamble to § 107—criticism, comment, news reporting, teaching, scholarship, and research—might be deemed most appropriate for a purpose or character finding indicative of fair use" (internal quotation marks omitted)). The focus of this factor is whether the use "merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is transformative." *Campbell*, 510 U.S. at 579 (internal citation and quotation marks omitted). "[A] transformative use is one that communicates something new and different from the original or expands its utility, thus serving copyright's overall objective of contributing to public knowledge." *Authors Guild v. Google*,

804 F.3d at 214. "[T]he critical inquiry is whether the new work uses the copyrighted material itself for a purpose, or imbues it with a character, different from that for which it was created." *McCollum*, 839 F.3d at 180. The task "is not to assess the artistic worth of the [artworks]; that is the domain of art historians, critics, collectors, and the museum-going public." *Andy Warhol Found. for the Visual Arts, Inc. v. Goldsmith*, 992 F.3d 99, 116 (2d Cir. 2021). "Rather, the question [the court] must answer is simply whether the law permits [the artist] to claim it as his own, and . . . to exploit it. . . without [the copyright holder's] permission." *Id.*

Additionally, as part of this factor, I consider whether the use is for commercial purposes or in bad faith. *See NXIVM*, 364 F.3d at 477–78; *Yang v. Mic Network, Inc.,* 405 F. Supp. 3d 537, 542 (S.D.N.Y. 2019), *reconsideration denied*, No. 18-CV-7628 (AJN), 2020 WL 6562403 (S.D.N.Y. Nov. 9, 2020); *Schwartzwald v. Oath Inc.*, No. 19-CV-9938 (RA), 2020 WL 5441291, at *3 (S.D.N.Y. Sept. 10, 2020). The importance of the commercial use factor "is determined on a sliding scale: the more transformative the work, the less important the commercial purpose." *N. Jersey Media Grp. Inc. v. Pirro*, 74 F. Supp. 3d 605, 618 (S.D.N.Y. 2015).

### ii.     *Nature of the Copyrighted Work*

The second statutory factor looks at the nature of the copyrighted work and its expressive content. *See* 17 U.S.C. § 107(2). This factor acknowledges "the fact that 'some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.'" *Swatch*, 756 F.3d at 87 (quoting *Campbell*, 510 U.S. at 586). In assessing this factor, "courts consider whether a work is creative versus factual, and unpublished versus published, with copyright protections applying more broadly to creative and unpublished works." *BWP Media USA, Inc. v. Gossip Cop Media, Inc.*, 196 F. Supp. 3d 395, 408 (S.D.N.Y. 2016) (citing *Harper & Row Publishers, Inc. v. Nation*

*Enterprises*, 471 U.S. 539, 563–64 (1985) and *Blanch*, 467 F.3d at 256).  Nevertheless, the Second Circuit has acknowledged that this factor "has rarely played a significant role in the determination of a fair use dispute."  *Authors Guild v. Google*, 804 F.3d at 220.

### iii.     *Amount and Substantiality of Use*

The third statutory factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  This factor compares the portion of the use with the copyrighted work as a whole, with the goal of determining if the amount copied is "reasonable in relation to the purpose of the copying."  *Campbell*, 510 U.S. at 586.  The court considers "not only the quantity of the materials taken but also 'their quality and importance' to the original work."  *Cariou*, 714 F.3d at 710 (quoting *id*. at 587).  "The crux of the inquiry is whether 'no more was taken than necessary.'"  *Pirro*, 74 F. Supp. 3d at 620–21 (quoting *Authors Guild, Inc. v. HathiTrust*, 755 F.3d 87, 98 (2d Cir. 2014)).

### iv.     *Effect on Potential Market for Copyrighted Work*

The fourth factor evaluates "the effect of the use upon the potential market for or value of the copyrighted work."  17 U.S.C. § 107(4); *Google LLC*, 141 S. Ct. at 1206.  Courts consider "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original."  *Fox News Network, LLC v. TVEyes*, Inc., 883 F.3d 169, 179 (2d Cir. 2018) (internal quotation marks omitted).  This factor "is 'undoubtedly the single most important element of fair use.'"  *Id.* (quoting *Harper & Row*, 471 U.S. at 566).

b. <u>Application</u>

I will consider each of the four factors in turn, grouping the films together to the extent possible. *See, e.g.*, *Barcroft Media, Ltd. v. Coed Media Grp., LLC*, 297 F. Supp. 3d 339, 351 (S.D.N.Y. 2017) (examining images in groups where practicable); *Cariou*, 714 F.3d at 706–10 (analyzing twenty-five artworks together, and separating out five works for more individualized analysis). In conducting my analysis, I rely on the parties' descriptions of the allegedly infringing works, described above. (*Supra* Section I.E.)

i. *Purpose and Character of the Use*

1) Whether the Use Was Transformative

Generally, Defendants rely on the news reporting and commentary use enumerated in § 107 to support their fair use defense. (*See* Defs.' Mem. 16–33; Defs.' Reply 7). Plaintiff avers that none of Defendants' uses were transformative "because they all used Fioranelli's footage for the same commercial purpose for which he captured it." (Pl.'s Mem. 32.) Plaintiff states the 9/11 Material "serves as a photographic memory of the events of 9/11 for posterity," and that he captured the 9/11 Material "to record history and share it with the word." (Fioranelli Cert. ¶¶ 19–20.) Additionally, he avers that he "recorded his footage in order to preserve the historical event and license it for local news, national news and/or feature use." (Pl.'s Mem. 31.)

Although the fair use examination is case specific, I am guided by opinions within the Second Circuit, which serve as a useful aid in determining whether a secondary use is transformative. In *Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 607 (2d Cir. 2006), the Second Circuit affirmed the district court's finding of fair use where a publisher reproduced plaintiff's copyrighted Grateful Dead event posters and tickets in a coffee table book of images. In finding the publisher's use transformative, the Second Circuit noted the differing

purposes of the images:

> Originally, each of [plaintiff]'s images fulfilled the dual purposes of artistic expression and promotion. The posters were apparently widely distributed to generate public interest in the Grateful Dead and to convey information to a large number [of] people about the band's forthcoming concerts. In contrast, [the publisher] used each of [plaintiff]'s images as historical artifacts to document and represent the actual occurrence of Grateful Dead concert events featured on *Illustrated Trip*'s timeline.

*Id.* at 609. In further support of its conclusion, the Second Circuit relied on the fact that the images were reproduced in a smaller size, were combined with "a prominent timeline, textual material, and original graphical artwork, to create a collage of text and images on each page of the book," and that the images appeared on only seven pages of the 480-page book. *Id.* at 611.

The Second Circuit, in *Blanch*, affirmed the district court's ruling that artist Jeff Koon's use of a photograph by Andrea Blanch, *Silk Sandals by Gucci*, in a painting was fair use. 467 F.3d at 247. *Silk Sandals* initially appeared in *Allure* magazine and "depict[ed] a woman's lower legs and feet, adorned with bronze nail polish and glittery Gucci sandals, resting on a man's lap in what appears to be a first-class airplane cabin." *Id.* at 248. Without permission, Koons scanned *Silk Sandals* and incorporated the legs and feet portion of the photograph into a painting depicting legs. *Id.* The Second Circuit concluded that Koons's use was transformative. The court noted that Blanch did not deny that Koons's purpose in using the image was "sharply different from Blanch's goals in creating it," and observed:

> The [transformative use] test almost perfectly describes Koons's adaptation of "Silk Sandals": the use of a fashion photograph created for publication in a glossy American "lifestyles" magazine—with changes of its colors, the background against which it is portrayed, the medium, the size of the objects pictured, the objects' details and, crucially, their entirely different purpose and meaning—as part of a massive painting commissioned for exhibition in a German art-gallery space. We therefore conclude that the use in question was transformative.

*Id.* at 253.

*Cariou*, 714 F.3d at 699, similarly concerned the secondary use of photographic work. Patrick Cariou, a professional photographer, took a series of portraits and landscape photographs over the course of six years when he lived and worked among Rastafarians in Jamaica. *Id.* He published a book containing the photographs. *Id.* Richard Prince, another artist, subsequently altered and incorporated photographs from Cariou's book into numerous paintings and collages, some of which "almost entirely obscured" Cariou's work. *Id.* at 699–700. In finding twenty-five of Prince's artworks transformative because they gave the photographs "a new expression, and employ[ed] new aesthetics," the court observed:

> Prince's artworks manifest an entirely different aesthetic from Cariou's photographs. Where Cariou's serene and deliberately composed portraits and landscape photographs depict the natural beauty of Rastafarians and their surrounding environs, Prince's crude and jarring works, on the other hand, are hectic and provocative. Cariou's black-and-white photographs were printed in a 9 1/2″ x 12″ book. Prince has created collages on canvas that incorporate color, feature distorted human and other forms and settings, and measure between ten and nearly a hundred times the size of the photographs. Prince's composition, presentation, scale, color palette, and media are fundamentally different and new compared to the photographs, as is the expressive nature of Prince's work.

*Id.* at 706. The court distinguished this type of use from cases where "[a] secondary work . . . modif[ies] the original without being transformative. For instance, a derivative work that merely presents the same material but in a new form, such as a book of synopses of televisions shows, is not transformative." *Id* at 708. The court, however, found that five of the artworks presented closer questions because they did not "sufficiently differ" from Cariou's photographs. In remanding to the district court for a determination as to fair use on these five pieces of art, the court explained that "[a]lthough the minimal alterations that Prince made in those instances moved the work in a different direction from Cariou's classical portraiture and landscape photos, we can not say with certainty at this point whether those artworks present a 'new expression, meaning, or message.'" *Id.* at 710–11 (quoting *Campbell*, 510 U.S. at 579).

In *Ringgold*, 126 F. 3d at 81, described *supra* Section IV.A.1, the Second Circuit reversed the district court's finding that defendants' use was fair. In finding that defendants' use of the quilt as decoration for the set was not transformative the Second Circuit explained, "[t]he defendants have used Ringgold's work for precisely a central purpose for which it was created—to be decorative. Even if the thematic significance of the poster and its relevance to the ROC episode are not discernible, the decorative effect is plainly evident." *Id.* at 79. The Second Circuit observed:

> In considering whether a visual work has been "supplant[ed]" by its use in a movie or a television program, care must be taken not to draw too close an analogy to copying of written works. When all or a substantial portion of text that contains protectable expression is included in another work, solely to convey the original text to the reader without adding any comment or criticism, the second work may be said to have supplanted the original because a reader of the second work has little reason to buy a copy of the original. Although some books and other writings are profitably reread, their basic market is the one-time reader. By contrast, visual works are created, and sold or licensed, usually for repetitive viewing. Thus, the fact that the episode of ROC does not supplant the need or desire of a television viewer to see and appreciate the poster (or the original) again and again does not mean that the defendants' use is of a "purpose and character" that favors fair use. Indeed, unauthorized displays of a visual work might often increase viewers' desire to see the work again. Nevertheless, where, as here, the purpose of the challenged use is, at a minimum, the same decorative purpose for which the poster is sold, the defendants' use has indeed "superseded the *objects*" of the original, and does not favor fair use.

*Id.* (internal citation omitted). The Second Circuit hypothesized instances in which a television program using a copyrighted visual work would likely be considered fair use: a TV program about the artist, which included shots of the artwork, and a news feature on the museum where the artwork is held that showed shots of the artwork. *Id.*

Recently, the Second Circuit again considered a visual artwork—a silkscreen portrait—and observed that:

> A common thread running through [Second Circuit visual art] cases is that, where a secondary work does not obviously comment on or relate back to the original or

use the original for a purpose other than that for which it was created, the bare assertion of a "higher or different artistic use," is insufficient to render a work transformative. Rather, the secondary work itself must reasonably be perceived as embodying an entirely distinct artistic purpose, one that conveys a "new meaning or message" entirely separate from its source material. While we cannot, nor do we attempt to, catalog all of the ways in which an artist may achieve that end, we note that the works that have done so thus far have themselves been distinct works of art that draw from numerous sources, rather than works that simply alter or recast a single work with a new aesthetic.

*Andy Warhol*, 992 F.3d at 113 (internal citation omitted). The Second Circuit ultimately held that Andy Warhol's series of silkscreen portraits of a photograph taken of Prince by photographer Lynn Goldsmith was not transformative, explaining:

there can be no meaningful dispute that the overarching purpose and function of the two works at issue here is identical, not merely in the broad sense that they are created as works of visual art, but also in the narrow but essential sense that they are portraits of the same person. . . . Warhol created the series chiefly by removing certain elements from the Goldsmith Photograph, such as depth and contrast, and embellishing the flattened images with "loud, unnatural colors." Nonetheless, although we do not conclude that the Prince Series works are necessarily *derivative* works as a matter of law, they are much closer to presenting the same work in a different form, that form being a high-contrast screenprint, than they are to being works that make a transformative use of the original. Crucially, the Prince Series retains the essential elements of the Goldsmith Photograph without significantly adding to or altering those elements.

*Id.* at 114–15 (internal citations omitted.) The Second Circuit clarified that it was not holding "that the primary work must be 'barely recognizable' within the secondary work," but that "the secondary work's transformative purpose and character must, at a bare minimum, comprise something more than the imposition of another artist's style on the primary work such that the secondary work remains both recognizably deriving from, and retaining the essential elements of, its source material." *Id.* at 114.

In arguing that Defendants' uses are transformative, Defendants repeatedly assert that the allegedly infringing works "ha[ve] the characteristics of 'comment, criticism, scholarship and research' that easily tip the scale in favor of fair use under the first factor." (Defs.' Mem. 29 (quoting *Monster Commc'ns, Inc. v. Turner Broad. Sys., Inc.*, 935 F. Supp. 490, 493 (S.D.N.Y. 1996)); *see also id.* at 17, 31.) Defendants, however, seem to misunderstand the meaning of comment, criticism, and news reporting in the fair use context. "Display of a copyrighted image or video may be transformative where the use serves to illustrate criticism, commentary, or a news story *about that work*." *Barcroft*, 297 F. Supp. 3d at 352 (emphasis added) (rejecting fair use defense where "articles did not comment on, criticize, or report news *about the Images themselves*; instead, they used the Images as illustrative aids because they depicted the subjects described in its articles"). *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310 (S.D.N.Y. 2008), relied on by Defendants, further illustrates this point. In finding defendants' use of John Lennon's song "Imagine" transformative, the court noted that "the filmmakers paired the[] lyrics and the accompanying music to a sequence of images that provide a layered criticism and commentary of the song;" and therefore the movie used "the excerpt of 'Imagine' to criticize what the filmmakers see as the naïveté of John Lennon's views." *Id.* at 322–23.

Defendants' continued reliance on commentary, criticism, and news reporting merely parrots that language from the case law without providing the analysis of those same cases; therefore, their use rings hollow. In *BWP Media USA, Inc.*, 196 F. Supp. 3d at 406–07, the defendant similarly argued that its use was transformative news reporting. In rejecting that argument, the court observed:

> Defendant confuses the situation in which the *photograph* is the story, . . . and the scenario present here, in which the *contents* of the photograph are of some public interest. . . . Here, by contrast, the fact of the photograph is not of public interest; rather, it is the photograph's contents that are newsworthy. Newsworthy contents will rarely justify unlicensed reproduction; were it otherwise, photojournalists would be unable to license photos, and would effectively be out of a job.

*Id.* at 406 n.6. Although the content of the 9/11 Material is undoubtedly of public interest, "the fact of the [footage] is not of public interest." *See id.* Critically, the 9/11 Material is neither commented on nor critiqued in fifteen of the allegedly infringing works.

However, commentary or criticism is not the *sine qua non* to render a use transformative where "the two works ha[ve] different messages and purposes." *Swatch*, 756 F.3d at 85. Courts have held that it is not fair to "use [ ] an image solely to present the content of that image, in a commercial capacity, or to otherwise use it for the exact reason it was created." *BWP Media USA, Inc*., 196 F. Supp. 3d at 407. I have previously explained that "it is not fair use to republish a photograph of a celebrity or public figure intended to generically accompany an article about that person or to describe the event depicted in the photograph." *Walsh v. Townsquare Media, Inc.*, 464 F. Supp. 3d 570, 581 (S.D.N.Y. 2020) (collecting cases); *see, e.g.*, *Barcroft*, 297 F. Supp. 3d at 352; *BWP Media USA, Inc.*, 196 F. Supp. 3d at 407; *Otto*, 345 F. Supp. 3d at 428–29.

I find the original purpose of the 9/11 Material no different than the purposes of the uses in *Miracle Survivor*, *Crime Scene 9/11*, *DTCW*, *Stairway B*, *Relics*, *How it Was*, and the CBS 9/11 Newsreels. The 9/11 Material is included in those seven films to depict what the original work itself illustrates—what happened at Ground Zero on September 11, 2001, and over the course of the following days, including the recovery efforts.

In *Miracle Survivor*, a documentary investigating the story of a man who claimed he miraculously survived the World Trade Center attack by "surfing" down from the 86th floor as the tower collapsed, (Defs. 56.1 ¶ 118), a firefighter comments on searching the debris for

people, while 9/11 Material of a firefighter digging through the rubble is shown, (*id.* ¶ 121.)  I

find that the 9/11 Material is used "solely to present the content of that [footage]."  *BWP Media*

*USA, Inc*., 196 F. Supp. 3d at 407.

Defendants' use of the 9/11 Material in *Crime Scene 9/11*, a historical documentary

telling the story of the recovery and identification effort at Ground Zero from the perspective of

first responders, construction workers, volunteers, and others who contributed to the effort,

(Defs. 56.1 ¶ 76), presents the same issue.  The two clips of the 9/11 Material used in *Crime*

*Scene 9/11* depict firefighters digging in the rubble, and appear as part of a montage of footage

from Ground Zero as the narrator states, "The frantic efforts to search for survivors continued

throughout the day of 9/11, while families waited at home desperate for news of missing loved

ones.  But amidst the chaos of the crime scene, rumor and false hope were rife."  (*Id.* ¶ 79.)

Defendants argue that the use is transformative in its "'aim[] to educate the viewing

public' and 'add something of value rather than simply copying the copyrighted expression that

it documents.'"  (Defs.' Mem. 23. (quoting *Hofheinz v. AMC Productions*, *Inc.*, 147 F. Supp. 2d

127, 137 (E.D.N.Y. 2001)).  I find this argument unpersuasive.  First, Defendants have admitted

that that "Fioranelli's raw Footage of firefighters digging in the rubble documents the rescue

effort at Ground Zero generally."  (*Id.* at 22.)  The expressive purpose of the original use and the

secondary use are the same—to document 9/11 recovery efforts.  Second, courts in this district

have repeatedly held "it is not fair use to republish a photograph of a celebrity or public figure

intended to generically accompany an article about that person or to describe the event depicted

in the photograph."  *Walsh*, 464 F. Supp. 3d at 581 (collecting cases); *see, e.g.*, *Barcroft*, 297 F.

Supp. 3d at 352; *BWP Media USA*, *Inc.*, 196 F. Supp. 3d at 407; *Otto*, 345 F. Supp. 3d at 429.

Although the facts of these cases are not directly on point, as they typically concerned paparazzi

photos, I find their reasoning persuasive and dispositive. As the narrator in *Crime Scene 9/11* describes the search efforts, 9/11 Material of firefighters digging through rubble is shown on the screen. (Defs. 56.1 ¶ 79.) The 9/11 Material, is used to "generically accompany" narration "describ[ing] the event depicted in the [footage]." *Walsh*, 464 F. Supp. 3d at 581. *Crime Scene 9/11* simply "copi[es] the copyrighted expression that it documents." *Hofheinz v. AMC*, 147 F. Supp. 2d at 137.

*DTCW*, a historical documentary, uses the 9/11 Material to illustrate talking head interviews with the then New York City Deputy Mayor and Fire Commissioner about their experiences on the day of the attack. (Defs. 56.1 ¶¶ 103, 106.) Much like in *Crime Scene 9/11*, the 9/11 Material in *DTCW* is used to "generically accompany" narration "describ[ing] the event depicted in the [footage]." *Walsh*, 464 F. Supp. 3d at 581.

*Stairway B*, a documentary telling the story of a group of firefighters and civilians who survived the collapse of the North Tower of the World Trade Center on 9/11, uses multiple clips of the 9/11 Material to illustrate commentary by the narrator and speakers describing their experience. (*See* Defs. 56.1 ¶¶ 66, 69, 72, 73.) Defendants argue that these clips are used for a different purpose from Fioranelli's original purpose because "Fioranelli's raw Footage of firefighters digging in the rubble documents the rescue effort at Ground Zero generally," while *Stairway B* "uses that footage to tell the story of a specific group of people who lived through the collapse of the North Tower and to emphasize the unlikelihood of their survival." (Defs.' Mem. 22.) Defendants' argument asks me to draw a line between using the 9/11 Material to document the rescue efforts "generally" and using the 9/11 Material to document to the rescue efforts pertaining to a "specific group of people." (*See id.*) The rescue efforts generally necessarily include the efforts to rescue individuals and groups of people. As such, I find that the distinction

Defendants ask me to make is one without a difference, and is not the type of transformative use envisioned by *Campbell* or the Second Circuit. *Stairway B* uses the 9/11 Material, without alteration, to illustrate the 9/11 recovery efforts, a purpose essentially the same as the original.

*Relics*, a documentary for the HISTORY network about the National 9/11 Memorial & Museum and its artifacts, uses one clip of the 9/11 Material multiple times as part of montages that accompany the narrator describing the 9/11 recovery efforts. (*See* Defs. 56.1 ¶¶ 135, 138–39.) In arguing that the use is transformative, Defendants rely on *Bill Graham Archives*, analogizing the 9/11 Material to the concert posters and tickets, (Defs.' Mem. 32), which the Second Circuit found were used as "historical artifacts to document and represent the actual occurrence of Grateful Dead concert events," 448 F.3d at 609. I find this analogy inapt and unpersuasive. The 9/11 Material, as it is used here, is not akin to an "object[] in [a] museum" or a vintage concert poster, the original creation of which likely served some different purpose. (*See* Defs.' Mem. 32.) Here, Defendant states that the 9/11 Material is used to "enhance the viewer's understanding of the events of 9/11," (*id.*)—this is essentially the same purpose behind the original use—to document what happened on 9/11 and in the days that followed. This is not the sort of use hypothesized in *Ringgold*. There is no evidence that the 9/11 Material is held at the National 9/11 Memorial & Museum or that it contained the materials exhibited in the Museum, and therefore was not shown as part of *Relics*' description of exhibits within the Museum. *See Ringgold*, 126 F.3d at 79 (observing that a news feature on the museum where an artwork is held that showed shots of the artwork would likely be fair use).

*How It Was*, a 9/11 documentary from the perspective of radio dispatchers, includes five clips of the 9/11 Material showing the search-and-rescue efforts at Ground Zero, which are set to music and snippets of voicemails from ordinary people to their loved ones. (Defs. 56.1 ¶¶ 84–

86.)  Defendants argue that "[t]he incorporation of Fioranelli's Footage into a historical work recounting the events of 9/11 from the unique perspective of radio dispatchers is plainly transformative."  (Defs.' Mem. 24.)  Although *How It Was* provides a different perspective on 9/11, the use of 9/11 Material is no different than Fioranelli's original purpose in creating the work—to document the day of the attack and the following days.

The CBS 9/11 Newsreels were created "for licensing to others for their use, which contained video footage created by CBS relating to the 9/11 attack and its aftermath."  (Defs. 56.1 ¶ 23.)  The Newsreels contain video "suitable for use as filler, background, and building block elements for other video productions."  (*Id.*)  Defendants argues that the variety of footage on the Newsreels, relating to more aspects than just the aftermath at Ground Zero, makes the use transformative, because unlike Fioranelli's Footage, it paints a "a broader historical picture of 9/11."  (Defs.' Mem. 33.)  I find Defendants' argument unpersuasive.  Fioranelli intended to document the aftermath at Ground Zero, and then licensed it to news stations for a profit.  (*See* Fioranelli Cert. ¶¶ 19–20).  This is precisely what CBS intended to do with the Newsreels.  CBS admits that it copied the 9/11 Material onto the Newsreels.  (*See* Defs. 56.1 ¶ 25.)  CBS made no alterations to the 9/11 Material, and did nothing more than create a reel of footage to license for profit.[29]  This commercial use—without more—is not transformative.

Defendants frequently recite that allegedly infringing works are "the type of historical work[s] that 'enjoy favored status' in the fair use analysis."  (Defs.' Mem. 27 (quoting *Monster Commc'ns*, 935 F. Supp. at 493).)  The works at issue in *Monster Communications* and the other two cases heavily relied on by Defendants, *Hofheinz v. A&E Television Networks*, 146 F. Supp.

_____

[29] My continued use of term "no alterations" or "unaltered" excludes the removal of the watermark from the 9/11 Material provided to CBS.

2d 442 (S.D.N.Y. 2001) and *Hofheinz v. AMC Productions, Inc.*, 147 F. Supp. 2d 127 (E.D.N.Y. 2001), were biographies.[30]  In finding that the use of copyrighted clips in a biography about Muhammad Ali was likely fair use, the court in *Monster Communications* observed that a biography "undeniably constitutes a combination of comment, criticism, scholarship and research, all of which enjoy favored status under § 107" and that "there can be little doubt that Ali is a figure of legitimate public concern and that his television biography is a subject of public interest."  935 F. Supp. at 493–94.

The circumstances presented in the cases cited by Defendants are decidedly different from the circumstances presented here.  First, none of the allegedly infringing works described above are biographies, and I do not find that any of them deserve favored status under § 107.  Second, if I were to accept Defendants' argument that because the allegedly infringing works document a historical event, the secondary use should be considered fair, photojournalists like Plaintiff "would be unable to license photos, and would effectively be out of a job."  *BWP Media USA, Inc*., 196 F. Supp. 3d at 406 n.6.  Plaintiff's career is based on capturing newsworthy moments, and licensing such footage to producers like CBS.  (*See* Fioranelli Cert. ¶¶ 1, 11–16.).  Defendants' argument, if accepted, would effectively eliminate the livelihood of many photojournalists like Plaintiff.  Finally, I note that none of the uses described above come close to what the Second Circuit found to be transformative as a matter of law in *Bill Graham Archives*, *Blanch*, and *Cariou.*  The uses are arguably even less transformative than the use at issue in *Andy Warhol*.  Here, the allegedly infringing works use unaltered copies of the 9/11 Material.  Defendants do not argue that there are any visual differences between the 9/11

---

[30] *Hofheinz v. AMC Productions, Inc.* involved a documentary about a film company, so it might be more appropriately categorized as a documentary.

Material and the uses at issue here. The 9/11 Material was not reproduced in a smaller size, it was not obscured, and it was not incorporated into some sort of collage; instead, when shown, the 9/11 Material takes up the entire screen, and is clearly visible. (*Supra* Section IV.A.1.b.) Based on the reasoning above, I do not find that the uses in *Miracle Survivor*, *Crime Scene 9/11*, *DTCW*, *Stairway B*, *Relics*, *How it Was*, and the CBS 9/11 Newsreels are transformative. I note, however, that:

> [t]ransformative use is neither "absolutely necessary" nor sufficient for a finding of fair use, but original works that have been transformed by a subsequent user "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright, and the more transformative the new work, the less will be the significance of other factors . . . that may weigh against a finding of fair use."

*Barcroft Media,* 297 F. Supp. 3d at 351 (quoting *Campbell*, 510 U.S. at 579).

### B. ZERO, Conspiracy Files, Death Ray, Rush to War, Celsius, Untold History, Seven Signs

Three of the allegedly infringing works focus on conspiracy theories surrounding 9/11. *ZERO* seeks to challenge the official version of the events surrounding 9/11, and proceeds to cast doubt on "the official justification for the inexplicable collapse of the Twin Towers" through interviews with a number of conspiracy theorists. (Defs. 56.1 ¶¶ 90, 94.) *Conspiracy Files* examines and debunks various conspiracy theories about 9/11, including a theory about explosives causing the collapse of World Trade Center 7. (*Id.* ¶¶ 112, 115.) *Death Ray* explores a conspiracy about a secret deadly weapon and its relation to 9/11. (*Id.* ¶¶ 123, 126.) Defendants argue that the uses are transformative because they serve an entirely different purpose than the original 9/11 Material. (Defs.' Mem. 24, 28, 30.)

Two of the allegedly infringing works are political documentaries. *Rush to War* examines the motivations for the Iraq War and American foreign policy after 9/11, and uses 9/11 Material showing a rescue worker holding a doll as part of a montage of footage from 9/11 and

its aftermath, set to instrumental music and prefaced by the narration: "It was a day no one will ever forget. Why did nineteen young men from another part of the world want to kill themselves and so many others?" (Defs. 56.1 ¶¶ 41, 43.) *Celsius* was produced as a conservative response to Michael Moore's film Fahrenheit 9/11. (*Id.* ¶ 46.) The portion of 9/11 Material used in *Celsius* appears during a montage of footage from Pearl Harbor and 9/11, juxtaposed with audio and video from President George W. Bush's September 20, 2001 speech to a joint session of Congress following the terrorist attack. (*Id.* ¶ 49.) This sequence is presented as a rebuttal to the view that President Bush did not do enough to stop 9/11. (*Id.* ¶ 51.) Regarding *Rush to War*, Defendants argue that the "ephemeral use of a clip of the Footage in a work that 'undeniably constitutes a combination of comment, criticism, scholarship and research,' employing a degree of creativity not present in the original, clearly satisfies the first factor of the fair use analysis." (Defs.' Mem. 17 (quoting *Monster Commc'ns*, 935 F. Supp. at 493)); *see also Lennon*, 556 F. Supp. 2d at 322. I reject this argument for the same reasons noted above, *supra* Section IV.A.2.b.i.1.A; the film does not critique or comment on the 9/11 Material and what it depicts, and therefore does not transform or alter the 9/11 Material. Similarly, with regard to *Celsius*, Defendants aver that the 9/11 Material is used as "raw material" to create a political argument, and that the combination of the 9/11 Material with other 9/11 imagery and Bush's speech is transformative. Defendants are wrong. The 9/11 Material used in *Celsius* is not critiqued, commented on, or used in a way to make a point about Bush's speech.

The episode of *Untold History* uses the 9/11 Material in its review of the late 80s, the 90s, and the early 2000s. (Pl. 56.1 ¶ 405.) The three clips of the 9/11 Material appear in succession, during a discussion of the effect of the 9/11 attack on the American people and their leaders. (Defs. 56.1 ¶ 132.) Oliver Stone narrates, "And now, to some very powerful American

leaders, it was as if they, the outliers of empire, these terrorists, had dropped Hiroshima on us, at the very least, Pearl Harbor." (*Id.*) In the sequence, the 9/11 Material is juxtaposed with archival footage from World War II. (*Id.*) Defendants again argue that the use is "a combination of comment, criticism, scholarship and research," (Defs.' Mem. 31); I again reject that argument for the same reasons I previously explained, *supra* Section IV.A.2.b.i.1.A. Defendants also argue that the 9/11 Material "in combination with World War II footage to make a point about the reaction of American leaders to 9/11 is highly transformative" but such a juxtaposition is not a critique of or a comment about the 9/11 Material. (Defs.' Mem. 31.)

*Seven Signs* concerns an entirely different topic—a possible connection between modern-day world events and biblical prophecies of the apocalypse. (*See* Defs. 56.1 ¶ 97.) The clip of the 9/11 Material is part of a montage of video footage and images—including a painting of Satan whispering in Jesus's ear, archival footage of Hitler, and a missile strike—that accompanies the following commentary by a biblical scholar: "I think what God is specifically saying, he's saying to the rebellious planet earth, to the Antichrist and his forces, you've martyred my people, you've spilled their blood, you've killed millions of people that believe in God by taking their blood." (*Id.* ¶ 100.) Defendants aver that the use is transformative because it "swiftly conjure[s] up the tragedy of 9/11 in a documentary that is otherwise about an entirely different subject" and "that the accompanying biblical commentary and placement of Fioranelli's Footage alongside imagery of other forms of evil and human suffering 'adds something new, with a further purpose or different character,' to the original." (Defs.' Mem. 26.)

However, given the distinct nature of these seven allegedly infringing works, I find that "[m]aterial questions of fact exist concerning the purpose of" the uses in *ZERO*, *Conspiracy Files*, *Death Ray*, *Celsius*, *Rush to War*, *Untold History*, and *Seven Signs*, "precluding a

determination of the first statutory factor." *Pirro*, 74 F. Supp. 3d at 623. In making this finding, I am guided by the court's opinion in *Pirro*. There, Jeanine Pirro and Fox News Network, LLC were sued for copyright infringement based on posting to Facebook an image that combined plaintiff's copyrighted photograph of three firefighters raising an American flag near the World Trade Center ruins with the World War II photograph of U.S. Marines raising the American flag on Iwo Jima. 74 F. Supp. at 609–12. Before the image was posted, a Fox News employee added the phrase "# neverforget" to the image. *Id.* at 610–11. Defendants averred that the use was transformative because "the connection drawn between the events of September 11, 2001 and Iwo Jima can be comfortably categorized as 'comment,'" and "that they used a derivative of the Work for a distinct purpose: whereas [plaintiff]'s purpose in creating the Work was to report the news of the day, Fox News' use was designed to express solemn remembrance for September 11, 2001 and link the heroic acts of that day and World War II." *Id.* at 615 (internal quotation marks omitted). In analyzing whether the use was transformative, the court observed the image used by defendants was different from the original in five ways: "Fox News used a (1) cropped, (2) lower-resolution version of the Work, (3) which was juxtaposed with *Raising the Flag on Iwo Jima* and (4) in a smaller scale than the Work, and (5) added the phrase "# neverforget." *Id.* The court, however, denied defendants' motion for summary judgment on the fair use defense, reasoning:

> Despite Defendants' claims regarding their use of the Work, however, the Court cannot conclude as a matter of law that the Combined Image transformed the Work sufficiently to merit protection as fair use. As Plaintiff asserts—accurately in the Court's view—the alterations to the Work are "barely discernable" unless the viewer is specifically prompted to look for them. . . . The Work is the clearly predominant feature of the Combined Image. Thus, a casual observer may believe that he is simply viewing the Work with only the hashtag added. Second Circuit authority suggests that more is required to "transform" an image.

*Id.*

Similarly, in *Ferdman v. CBS Interactive Inc.*, the court held that "reasonable jurors could disagree about whether – or the extent to which – [d]efendant's use" of a photograph was transformative. 342 F. Supp. 3d 515, 537 (S.D.N.Y. 2018). In *Ferdman*, CBS Interactive Inc. was sued for its unlicensed uses of copyrighted photographs in two articles posted to its online publication providing video game related news. *Id.* at 521. One of the articles stated that "images and videos from the set [of *Spider-Man: Homecoming*] have steadily emerged. The newest shot comes from [the Instagram of] Spider-Man actor Tom Holland himself." *Id.* at 522. The article then described that image, which had been posted to Holland's Instagram, repeated Holland's accompanying caption, and inserted the photograph below the article. In refusing to grant defendant's summary judgment motion on a fair use defense as to the article, the court explained:

> While . . . Defendant's use of the Holland Photograph is somewhat transformative, it is not so transformative as to entitle Defendant to a fair use defense as a matter of law. First, Defendant does not argue that there are any relevant visual differences between Plaintiff's photograph and the Holland Photograph in the Holland Article. Second, although the Holland Article comments on Holland's posting of the photograph, . . . it also reports on the fact that "[w]ith *Spider-Man: Homecoming* now in production, images and videos from the set have steadily emerged." . . . [T]he use of a photograph to announce its existence is not transformative. Where – as here – reasonable jurors could disagree about whether – or the extent to which – a use is transformative, it is appropriate to deny summary judgment on a fair use defense.

*Id.* at 535–36. The court noted that "[o]n one hand, a jury could give weight to the importance of reporting on the fact that Holland posted the photograph himself. On the other hand, a jury could be persuaded by the argument that . . . the Holland Article used the Holland Photograph solely to present the content of that image[ ] in a commercial capacity." *Id.* at 537 (internal quotation marks omitted).

Like in *Pirro* and *Ferdman*, I find that reasonable jurors could disagree about whether

these seven secondary uses were transformative. For instance, a reasonable juror could be persuaded by the argument that the purpose of the uses in *ZERO*, *The Conspiracy Files*, and *Death Ray* is to educate viewers about conspiracy theories surrounding 9/11, an arguably different purpose than the original aim of proving a "photographic memory of the events of 9/11 for posterity." (*See* Fioranelli Cert. ¶ 19.) Conversely, a reasonable juror could give weight to the fact that there are no visual differences between the original 9/11 Material—in other words what you see is what is depicted—and its subsequent use in these three films. The same is true for *Seven Signs*, which uses the 9/11 Material in a distinct context. Likewise, a reasonable juror could find that the juxtaposition of the 9/11 Material with World War II Footage in *Untold History* is transformative. Finally, a reasonable juror could find that *Rush to War* and *Celsius*'s uses of the 9/11 Material to build a political argument were transformative. Although these uses may be transformative, I do not find them "so transformative as to entitle Defendant[s] to a fair use defense as a matter of law." *Ferdman*, 342 F. Supp. 3d at 535.

## C. WTC and WTC Featurette

*WTC* is a docudrama telling the fictionalized true story of two Port Authority police officers who were trapped in the rubble at Ground Zero. (Defs. 56.1 ¶ 54.) The clip of 9/11 Material used in *WTC* appears in a scene depicting family members of one missing police officer gathered in a kitchen, watching the news on a television set. (*Id.* ¶ 57.) The 9/11 Material shows a group of firefighters walking at Ground Zero, and is one of several clips used in what is portrayed as a news report, superimposed with a news chyron that reads, "Breaking News/America Under Attack/Terrorists Crash Hijacked Airliners Into World Trade Center, Pentagon." (*Id.*) The family members then react emotionally to and comment on the news that hundreds of emergency responders are missing and feared lost. (*Id.* ¶ 58.) Similarly, a portion

of the same scene appears in *Featurette*.  (*Id.* ¶¶ 61–62.)  In this sequence, filmmaker Oliver

Stone explains that he chose to restrict the use of real 9/11 footage in the movie "to television

playback, because you have to keep in mind that the wives know the story as a parallel story

through television.  So, taking that into account, you have to show a certain amount of basic

reference point stuff."  (*Id.* ¶ 63.)

Defendants argue that "Fioranelli's Footage in *World Trade Center* is indisputably

transformative.  The docudrama uses this brief clip, in conjunction with other real 9/11 footage,

to create a fictionalized news report that elicits a response from the characters in the movie."

(Defs.' Mem. 19–20.)  I agree with Defendants.  Unlike the uses in the allegedly infringing

works discussed above, *WTC* does not merely present the 9/11 Material to the viewers in an

unaltered or unfiltered form.  Instead, the film creatively uses the 9/11 Material to simulate

television playback that provokes a fictionalized emotional response from the family depicted in

the film.

The original purpose of capturing the 9/11 Material was "to record history and share it

with the world," and the 9/11 Material serves as a "photographic memory of the events of 9/11

for posterity."  (Fioranelli Cert. ¶¶ 19–20.)  Here, however, Defendant Paramount uses the 9/11

Material to construct a setting that likely occurred in many households on September 11, 2001—

families watching the events of that day unfold on live television and wondering whether their

loved ones were safe.  Paramount's "purpose in using the copyrighted [work] at issue . . . is

plainly different from the original purpose for which [it was] created."  *Bill Graham Archives*,

448 F.3d at 609.  Paramount's unique presentation of the 9/11 Material as part of a television

news program watched by a family further "ensures that the [footage is] employed only to enrich

the presentation of" 9/11's effects on the families of first responders, "not to exploit copyrighted

[]work for commercial gain." *See id.* at 11 (finding that "minimiz[ing] the expressive value of the reproduced images by combining them with a prominent timeline, textual material, and original graphical artwork" favored a finding of transformative use). For these reasons, I find that Defendant Paramount's use is transformative.

Similarly, I find the use of the 9/11 Material in *Featurette* transformative. Defendants' argument that "the companion documentary adds another layer of transformation," (Defs.' Mem. 20), seems to acknowledge that Paramount's use here may be considered "the secondary use of a secondary use," *see Pirro*, 74 F. Supp. 3d at 617 (describing Fox News's addition of a hashtag on a photograph that combined plaintiff's copyrighted photograph with another photograph a "secondary use of a secondary use"). Unlike in *Pirro*, where the court found that Fox News's use of a common hashtag likely did not constitute the creation of "new information, new aesthetics, new insights and understandings," *id.* at 614 (internal quotation marks omitted), I find that Stone's commentary in *Featurette* imbues the 9/11 Material with "new insights and understandings" concerning the rationale behind Stone's cinematic choices and use of the 9/11 Material.

Stone's commentary about restricting the use of real 9/11 footage to television playback comes much closer to the kind of "comment" favored by the preamble to § 107. Here, Stone is essentially commenting on the 9/11 Material itself, as he explains his choice to use real 9/11 footage as television playback. My conclusion that the use is transformative is further supported by the different purposes of the two works. Fioranelli's purpose was to document the events of 9/11 at Ground Zero. Paramount's purpose in *Featurette*, however, was to educate the viewers about the creative choice Stone made regarding the use of real 9/11 footage. *Featurette* is doubly transformative—the documentary uses a clip from *WTC*, which uses the 9/11 Material to

evoke the reactions of families to a 9/11 newscast, and added a layer of commentary explaining why Stone used the 9/11 Material in this way. In other words, *Featurette* is in essence a behind-the-scenes view of *WTC* from Stone's perspective, and clearly transformative.

## 2) Commercial Use

As part of the first factor, I also consider whether the secondary use was commercial. "This consideration arises when a secondary user makes unauthorized use of copyrighted material to gain a profit through copying the original work." *Pirro*, 74 F. Supp. 3d at 618. The importance of this sub-factor is determined on a sliding scale. Although the commercial nature of a use weighs against fair use, *TVEyes*, 883 F.3d at 178, "the more transformative the work, the less important the commercial purpose," *Pirro*, 74 F. Supp. 3d at 618.

I agree with Plaintiff that each of the sixteen uses were for commercial purposes. (*See* Pl.'s Mem. 29.) The uses arose out of licensing agreements between CBS, BBC, and T3, who subsequently licensed the 9/11 Material to other defendants and non-parties for profit. (*See* Defs. 56.1 ¶¶ 33, 35–38).

The commercial nature of Defendants' uses in *Miracle Survivor*, *Crime Scene 9/11*, *DTCW*, *Stairway B*, *Relics*, *How It Was*, and CBS 9/11 Newsreels weighs against a finding of fair use, where, as here, "the transformative character of the secondary use is modest." *TVEyes, Inc.*, 883 F.3d at 178; *see Andy Warhol*, 992 F.3d 99, 117 (noting that although the commercial non-transformative work at issue served the greater public interest, it did "not factor significantly in favor of finding fair use"). However, with regard to *ZERO*, *Conspiracy Files*, *Death Ray*, *Rush to War*, *Celsius*, *Untold History*, and *Seven Signs*, I find that this factor slightly favors Plaintiff. Finally, given the transformative nature of both *WTC* and *Featurette*, this sub-factor carries little weight in my analysis.

In short, although this sub-factor favors Plaintiff, I do not find this factor dispositive in my fair use analysis.

### 3) Bad Faith

Finally, as part of the first fair use factor, I consider whether Defendants acted in bad faith. *See NXIVM*, 364 F.3d at 478–79. Plaintiff alleges that Defendants' bad faith is evidenced by "CBS chos[ing] Fioranelli's footage for inclusion on those reels, despite the fact that all of Fioranelli's footage on CBS's servers were prominently watermarked 'NOT FOR BROADCAST.'" (Pl.'s Mem. 32–33.) A watermark does not appear on the first CBS 9/11 Newsreel, (*see* Relyea Decl. Ex. 2), but does appear on the second Newsreel, (*id.* Ex. 3). There are no watermarks present in the remaining 15 films.

Viewing all of the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in his favor, I find that the inclusion of watermarked 9/11 Material in the CBS 9/11 Newsreels, which were created for distribution to third parties, and the subsequent removal of that watermark, may suggest bad faith. *See Rogers v. Koons*, 960 F.2d 301, 309 (2d Cir. 1992) (finding tearing off copyright mark suggested bad faith); *Yang*, 405 F. Supp. 3d at 546 (finding that cropping of the photograph, which removed the label crediting plaintiff, suggested bad faith). The Second Circuit, however, "has cautioned that bad faith is not 'itself conclusive of the fair use question, or even of the first factor.'" *Id.* (quoting *NXIVM*, 364 F.3d at 479); *see also Google LLC*, 141 S.Ct. 1204 ("[C]opyright is not a privilege reserved for the well-behaved." (internal quotation marks omitted)). I find that with regard to Defendant CBS, this subfactor slightly favors Plaintiff.

ii.     *Nature of the Copyrighted Work*

Defendants argue that both prongs of this factor favor a determination of fair use.

Defendants aver that the work is "primarily factual and historical in nature," and "was already

published at the time of the challenged uses." (Defs.' Mem. 14–15.)  Plaintiff does not explicitly

address whether the work should be considered creative or factual in nature, but asserts that

"[e]ven if one terms the footage as published, the principles of the second factor speak loudly to

this situation, as Fioranelli wanted to preserve the value of his copyrighted work by tightly

controlling its dissemination, and the Defendants' violations destroyed that value." (Pl.'s Mem.

33.)  Plaintiff's argument concerning the value of the 9/11 Material is misplaced here and is

better addressed in the analysis of the fourth factor.

The work here closely resembles the work at issue in *Pirro*—images from the aftermath

of 9/11.  In *Pirro*, the court held that the nature of the work favored a finding of fair use,

observing:

> There can be no dispute that the Work is a non-fictional rendering of an event of
> utmost historical importance, which Franklin created during the course of his duties
> as a news photographer.  Franklin did not create the scene or stage his subjects—to
> the contrary, he plainly acknowledged that the photograph "just happened."  While
> there can be no dispute that Franklin exhibited great artistry in carrying out his
> task—for which he has been rightfully recognized and rewarded—there can also be
> no dispute that the Work is a quintessential example of photojournalism.

74 F. Supp. 3d at 620.  I find this analysis in *Pirro* persuasive.  Plaintiff explains that upon

heading towards the World Trade Center site, "[t]he remains of the buildings were engulfed in

flames, and the air was thick with smoke . . . there were constant explosions from stores of

ammunition being ignited, and larger explosions," there was "a constant rain of broken glass,"

and that he moved forward to "capture video footage of firefighters and other rescue workers

searching for survivors." (Fioranelli Cert. ¶ 23.)  Plaintiff's description paints the expectedly

chaotic and dangerous surroundings that he encountered when capturing the 9/11 Material. Although Plaintiff asserts that he "brought [his] many years of experience to bear when deciding where to go, what to capture, how to frame the shots, and how to selectively edit what [he] captured in real time," (*id.* ¶ 18), he provides no information on what editing actually occurred. In other words, he does not explain why he captured the footage in the 9/11 Material as opposed to other images that presented themselves to him. Instead, the nature of his profession suggests that there rarely is time for substantial framing and editing. (*See* Pl. 56.1 ¶¶ 168–72.) Like the photojournalist in *Pirro*, Plaintiff did not "did not create the scene or stage his subjects." *Pirro*, 74 F. Supp. 3d at 620.

The court in *Ferdman* similarly held that "[t]he fact that Plaintiff was photographing the events around him as they occurred supports a finding of fair use." 342 F. Supp. 3d at 538. I note that in *Ferdman*, the court also relied on the fact that "Plaintiff took his photographs from a spot accessible to the general public, and that he was not given special access to the movie set." *Id.* Here, however, Plaintiff was one of only four reporters allowed into Ground Zero on September 11, 2001. (*See* Sec. Am. Compl. ¶ 18.) The exclusivity of this access cuts in Plaintiff's favor.

Finally, weighing in Defendants' favor is the fact that at the time of the challenged uses, Plaintiff had previously licensed the 9/11 Material to CBS for use. (*See* Fioranelli Cert. Ex. 11.) Under the Copyright Act, "publication" includes "[t]he offering to distribute copies . . . to a group of persons for purposes of further distribution, public performance, or public display." 17 U.S.C. § 101. It is undisputed that Plaintiff licensed the 9/11 Material to CBS for its use in 2001 and 2002. (Defs. 56.1 ¶ 9; Pl. 56.1 ¶ 238; Fioranelli Cert. Ex. 11.) Moreover, in September 2001, Plaintiff licensed the 9/11 Material to WOR. (Pl. 56.1 ¶ 284.)

Accordingly, I find that while it is beyond dispute that the 9/11 Material is "a non-fictional rendering of an event of utmost historical importance," that Plaintiff "exhibited great artistry in carrying out his task," *Pirro*, 74 F. Supp. 3d at 620, and that Plaintiff captured exclusive footage, Plaintiff's creation of the 9/11 Material was part and parcel of his career as a photojournalist. The 9/11 Material is "a quintessential example of photojournalism." *Id.* Additionally, given that Plaintiff had previously licensed the 9/11 Material to both CBS and WOR, I find that on balance, the second factor favors Defendants. I, note, however that this factor is rarely determinative. *See id.* at 619.

### iii.    *Amount and Substantiality of Use*

Under the third factor, I compare the portion of the use with the copyrighted work as a whole. *Campbell*, 510 U.S. at 586. I look to "not only the quantity of the materials taken but also their quality and importance to the original work." *Cariou*, 714 F.3d at 710 (internal quotation marks omitted). "As applied to photographs, [copyright] protection encompasses the photographer's posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved." *Andy Warhol*, 992 F.3d at 118 (internal quotation marks omitted). "The cumulative manifestation of these artistic choices – and what the law ultimately protects – is the image produced in the interval between the shutter opening and closing, *i.e.*, the photograph itself." *Id.*

Defendants argue throughout that the small amount of 9/11 Material used favors a finding of fair use under the third factor. (*See generally* Defs.' Mem.) Plaintiff responds that the third factor weighs against Defendants because Defendants selected and edited the 9/11 Material "to capture the 'heart' of each clip." (Pl.'s Mem. 34.) Plaintiff also asserts that the third factor requires an analysis similar to *de minimis* use. (*Id.*)

With regard to Plaintiff's invoking *de minimis* use, it bears mentioning that the *de minimis* use defense and the third factor of the fair use analysis are distinct concepts; the former of which should be analyzed first. *See Ringgold*, 126 F.3d at 75. In *Ringgold,* the Second Circuit explained:

> The third fair use factor concerns a quantitative continuum. Like all the fair use factors, it has no precise threshold below which the factor is accorded decisive significance. If the amount copied is very slight in relation to the work as a whole, the third factor might strongly favor the alleged infringer, but that will not always be the case. . . . More important, the fair use defense involves a careful examination of many factors, often confronting courts with a perplexing task. If the allegedly infringing work makes such a quantitatively insubstantial use of the copyrighted work as to fall below the threshold required for actionable copying, it makes more sense to reject the claim on that basis and find no infringement, rather than undertake an elaborate fair use analysis in order to uphold a defense.

*Id.* at 75. Plaintiff is correct, however, that like the *de minimis* analysis, the third factor involves both a quantitative and a qualitative component. *NXIVM*, 364 F.3d at 480. For example, even where an infringing work uses only a small portion of the original work, this factor has been found to favor the copyright holder where the portion used was "the heart of" the work. *Harper & Row*, 471 U.S. at 565 (internal quotation marks omitted). The crux of the third factor is a determination as to whether "no more [of the copyrighted work] was taken than necessary." *Pirro*, 74 F. Supp. 3d at 620–21 (quoting *HathiTrust*, 755 F.3d at 98); *Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc.*, 150 F.3d 132,144 (2d Cir. 1998) (inquiry focuses on "whether the extent of copying is consistent with or more than necessary to further the purpose and character of the use" (internal quotes and alterations omitted)).

Here, it is undisputed that the allegedly infringing works used a small portion of the original work. *Supra* Section IV.A.1.b. Defendants again rely on *Hofheinz v. A&E*, *Hofheinz v. AMC*, and *Monster Communications* to support their argument that the third factor favors fair use. (*See* Defs.' Mem. 17.) In finding that the third favor favored a finding of fair use, the court

in *Hofheinz v. A&E* observed that defendant used 20 seconds of footage from the 70-minute original work, "constitut[ing] less than 1% of the film," that the "three short snaps [were] not even in the same sequence as they appear[ed] in the motion picture," and that the footage used told nothing "about the film's plot, characters, themes, or resolution." 146 F. Supp. 2d at 448. In rejecting plaintiff's argument that defendant used the heart of the film, the court explained that the footage was "enough to give a viewer an idea of the absurdity of the pictures [the actor] was appearing in" and nothing more. *Id.* Similarly, in *Hofheinz v. AMC*, the court observed that "an average of twenty-six seconds from each of the films in question appear[ed] in the Documentary" and that no more work was "taken than was necessary for defendants to produce the Documentary," which tracked the progression of film company, AIP. 147 F. Supp. 2d at 139. The court explained that "in order to effectively depict the character and nature of AIP's evolution, some exhibition of actual movie clips, props used to create AIP's revered low-budget special effects, misleading posters used to promote AIP's films by promising more in advertisements than the films actually delivered, and momentary shots of the late Nicholson— one of the principals behind the small studio—was necessary." *Id.* at 139–40. Finally, in *Monster Communications*, the court found the third factor favored a finding of fair use because the allegedly infringing use was 0.7 to 2.1 percent of the original work and the footage was "by no means the focus" of the infringing film. 935 F. Supp. at 495. On the other end of the spectrum, in *Iowa State Univ. Research Found., Inc. v. Am. Broad. Companies, Inc.*, 621 F.2d 57, 59 (2d Cir. 1980), which concerned the use of video clips for a biography about a wrestler, the Second Circuit held that defendant's use was not fair although Defendant used only eight percent of the original work.

I decline to employ the purely mathematical approach that Defendants suggest, and

decline to decide whether Defendants took the "heart" of the 9/11 Material.  Plaintiff offers little to suggest that Defendants took the "heart" of the 9/11 Material, and again tries to break the works into segments, claiming Defendants edited each segment to capture its "heart."  (Pl.'s Mem. 34.)  Although the fact that two portions, "Silhouette" and "Horizontal Void 1" were used in five different films, (*see id.* at 1–2), could lead to an inference that some of the material used was the core of the 9/11 Material, I find it unnecessary to decide this question.  Instead, I consider whether "the extent of" Defendants' copying "is consistent with or more than necessary to further the purpose and character of the use."  *Castle Rock Entm't, Inc.*, 150 F.3d at 144 (internal quotation marks and alterations omitted).  As the Second Circuit has explained, "by focussing [sic] on the amount and substantiality of the original work used by the secondary user, we gain insight into the purpose and character of the use as we consider whether the quantity of the material used was reasonable in relation to the purpose of the copying."  *Id.* (internal quotation marks omitted).

Among the seven uses that I find are not transformative, the 9/11 Material is observable for as little as approximately 2 seconds, (Defs. 56.1 ¶ 120), and at most, approximately 42 seconds, (*id.* ¶¶ 26, 29).  These seven works used a small portion of the 9/11 Material compared to the 9/11 Material as whole; however, Defendants did not transform the footage in any meaningful way.  Given these competing considerations, I find this factor balanced between fair use and infringement; in other words, this factor is neutral.  *See Fitzgerald v. CBS Broad., Inc.*, 491 F. Supp. 2d 177, 188 (D. Mass. 2007) (finding third factor neutral where CBS slightly cropped the copyrighted photo but preserved most of the photo's meaning).

With regard to *ZERO*, *Conspiracy Files*, *Death Ray*, *Rush to War*, *Celsius*, *Untold History*, and *Seven Signs*, I find that because reasonable jurors could disagree about whether the

secondary uses may have had some transformative purpose, jurors could likewise disagree as to whether Defendants used no more of the 9/11 Material than necessary to accomplish this purpose. With regards to these seven films, I find that this issue cannot be resolved a matter of law.

Finally, I find that *WTC Center* and *Featurette*, which used two seconds of the 9/11 Material, (Defs. 56.1 Reply ¶¶ 56, 62), copied no more 9/11 Material than was necessary for Defendant Paramount to accomplish its purpose. To achieve Stone's goal of creating the parallel story of the wives experiencing 9/11 through what they learned on the television, (Defs. 56.1 ¶ 63), Paramount had to use 9/11 footage. I conclude that Paramount's use of the 9/11 Material "is tailored to further its transformative purpose" because Paramount used a very small amount of the 9/11 Material, which was no more than was necessary to ensure the viewer understood that the family was watching the events of 9/11 unfold on television. *See Bill Graham Archives*, 448 F.3d at 613 (finding third factor did not weigh against fair use because "DK's reduced size reproductions of BGA's images in their entirety displayed the minimal image size and quality necessary to ensure the reader's recognition of the images as historical artifacts of Grateful Dead concert events").

In sum, I find this factor is neutral in my fair use analysis of *Miracle Survivor*, *Crime Scene 9/*11, *DTCW*, *Stairway B*, *Relics*, *How It Was*, and the CBS 9/11 Newsreels, and that it favors fair use for *World Trade Center* and *Featurette*. I do not resolve this factor regarding *ZERO*, *Conspiracy Files*, *Death Ray*, *Rush to War*, *Celsius*, *Untold History*, and *Seven Signs.* Regardless, the significance of this factor to my overall fair use analysis is relatively minor.

iv.     *Effect on Potential Market for Copyrighted Work*

Finally, I consider the fourth factor, "the effect of the use upon the potential market for or value of the copyrighted work." § 107(4).  In doing so I consider "whether the copy brings to the marketplace a competing substitute for the original, or its derivative, so as to deprive the rights holder of significant revenues because of the likelihood that potential purchasers may opt to acquire the copy in preference to the original." *TVEyes*, 883 F.3d at 179 (internal quotation marks omitted).  "This factor is undoubtedly the single most important element of fair use." *Id.* (internal quotation marks omitted).

Generally, Defendants argue that due to the transformative nature of the secondary works, it is unlikely that the market for the 9/11 Material would be affected.  (Defs.' Mem. 16.) Plaintiff, relying on *Ferdman*, avers that because "he licenses his video recordings and still images" and Defendants "are licensees and licensors of video recordings and still images," Defendants' infringements supersede his original works and the market for his footage.  (Pl.'s Mem. 34–36.)

In *Ferdman*, the court rejected defendants' argument that there was an absence of market harm when CBS published two copyrighted photographs in its online publication, explaining:

> Defendant's use of the photographs in its articles is a clear substitute for the market use of Plaintiff's photographs.  Indeed, Defendant's use is paradigmatic of the only market the photographs could reasonably have: licensing to media outfits.  Moreover, the licensing of photographs to media outlets is a traditional, reasonable, and likely to be developed market of the sort courts consider in assessing this factor.

*Ferdman*, 342 F. Supp. 3d at 541–42 (internal quotation marks and citations omitted).  Similarly, in *Pirro*, the court rejected defendants' argument that the fourth factor favored a finding of fair use because plaintiff did not produce evidence that it lost licensing revenue, and observed:

> the [secondary use] is not substantially transformative.  It does not present an "entirely different aesthetic" but instead relies upon the Work's original subjects and setting to retain the Work's historical meaning.  And it is this historical meaning that has allowed the Work to remain popular to this day, as evidenced by the fact

that NJMG has raised more than $1 million in licensing revenue from the Work to date. Indeed, there is no dispute that NJMG, which was "inundated" with licensing requests at the time of the Work's original publication, still maintains an active licensing program for the photograph, including by licensing the Work to media entities for editorial use, precisely the type of use Defendants urge they intended here. Fox News' interest in the Combined Image therefore poses a very real danger that other such media organizations will forego paying licensing fees for the Work and instead opt to use the Combined Image at no cost.

74 F. Supp. 3d at 622. I find the analyses in *Ferdman* and *Pirro* instructive. Here, like in *Ferdman*, Defendants' uses were "paradigmatic" of the market for the 9/11 Material—"licensing to media outfits." *Ferdman*, 342 F. Supp. 3d at 541 (internal quotation marks omitted). Indeed, Plaintiff licensed the 9/11 Material to CBS for a fee, and subsequently licensed it to WOR. (Pl. 56.1 ¶ 284.)

First, CBS's use, the creation of the CBS 9/11 Newsreels to license to other media outlets, was a "clear substitute" for Plaintiff's Footage. *Ferdman*, 342 F. Supp. 3d at 541. Instead of licensing from Plaintiff directly, media outlets could instead license from CBS; this usurped the market for Plaintiff's work. Second, the remaining Defendants' uses harmed the market for Plaintiff's work. There is "no significant demand" for two hours of raw 9/11 footage "sold directly to the public." *See Fitzgerald*, 491 F. Supp. 2d at 189. The market for this type of work is the media licensing market, and Defendants were able to use Plaintiff's work without paying him a licensing fee.

A majority of the uses at issue are not substantially transformative, and "instead rel[y] upon the [9/11 Material's] original subjects and setting to retain the Work's historical meaning." *See Pirro*, 74 F. Supp. 3d at 622 (finding fourth factor weighed against fair use where image was not "substantially transformative"). Although I found two of the uses transformative, Paramount's uses are not too far afield from the kind of projects that for which Plaintiff licenses his work. (*See* Fioranelli Cert. ¶ 16.) If Defendants' argument as to this factor was accepted,

media outlets could "forego paying licensing fees" to the work's creator and "instead opt to use the" work at a potentially lower cost. *See Pirro*, 74 F. Supp. 3d at 622. "It is hard to imagine that freelance photojournalists would continue to seek out and capture difficult to achieve pictures if they could not expect to collect any licensing fees. This is exactly the kind of situation that copyright is meant to impact—where unrestricted use would likely dry up the source." *Fitzgerald*, 491 F. Supp. 2d at 189. Accordingly, the fourth factor weighs against a finding of fair use.

v.      *Balancing of the Four Fair Use Factors*

With regards to *Miracle Survivor*, *Crime Scene 9/*11, *DTCW, Stairway B*, *Relics*, *How It Was*, and CBS 9/11 Newsreels, I find that Defendants' uses are not fair. Defendants copied the 9/11 Material, with no alteration, for the same commercial purpose that Plaintiff originally intended for the 9/11 Material, thereby undermining the market for Plaintiff's work. "The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance." *Iowa State Univ. Research Found., Inc.*, 621 F.2d at 61. Defendants' fair use defense regarding these seven works fails.

With regard to *ZERO*, *Conspiracy Files*, *Death Ray*, *Rush to War*, *Celsius*, *Untold History*, and *Seven Signs*, I find that the fair use issue cannot be resolved as a matter of law and that issues of fact remain. As discussed above, reasonable jurors could disagree about whether the uses were transformative, and if found transformative, whether the amount of 9/11 Material copied was no more than was necessary to achieve this transformative purpose.

Finally, I find that balancing the transformative nature of Paramount's uses in *WTC* and *Featurette*, the nature of Plaintiff's work, and the small amount of 9/11 Material taken, Defendant Paramount's uses in *WTC* and *Featurette* are fair.

### 3. *Statute of Limitations*[31]

Defendants additionally move for summary judgment on the grounds that Plaintiff's copyright infringement claims, other than those related to *Miracle Survivor*, *Death Ray*, *Untold History*, and *Relics*, are barred by the applicable statute of limitations.

#### a. Applicable Law

"Civil actions for copyright infringement must be 'commenced within three years after the claim accrued.'" *Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 124 (2d Cir. 2014) (quoting 17 U.S.C. § 507(b)). In *Psihoyos*, the Second Circuit joined all other circuits that have considered the issue by adopting the "discovery rule" to determine when an infringement claim accrues: "copyright infringement claims do not accrue until actual or constructive discovery of the relevant infringement."[32] *Id.* at 125. Therefore, a copyright infringement claim accrues when a plaintiff discovers, or with due diligence should have discovered, the relevant infringement. *Id.* at 124. "In determining the time at which 'discovery' . . . occurred, terms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating." *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010). However, "the limitations period does not begin to run until the plaintiff thereafter discovers or a reasonably diligent plaintiff would have discovered 'the facts constituting the [infringement]'. . . irrespective of whether the actual

---

[31] The analysis in this section does not apply to *WTC* and *Featurette* because I have found that Defendant Paramount's uses are fair.

[32] Defendants urge that following the Supreme Court's decision in *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663 (2014), the statute of limitations for infringement claims should be governed by the "injury rule." (Defs.' Mem. 34 n.6.) Recently, this Circuit noted that "[t]he Supreme Court . . . has not overruled *Psihoyos*, either implicitly or explicitly, and therefore we must continue to apply the discovery rule." *Sohm v. Scholastic Inc.*, 959 F.3d 39, 50 (2d Cir. 2020). Therefore, I apply the discovery rule. *See also PK Music Performance, Inc. v. Timberlake*, No. 16-CV-1215 (VSB), 2018 WL 4759737, at *10 (S.D.N.Y. Sept. 30, 2018) (applying discovery rule post-*Petrella*); *Hirsch v. Rehs Galleries, Inc.*, No. 18-CV-11864 (VSB), 2020 WL 917213, at *4–5 (S.D.N.Y. Feb. 26, 2020) (same).

plaintiff undertook a reasonably diligent investigation." *Id*. "The standard for whether a plaintiff should have discovered the relevant infringement is an objective one." *Masi v. Moguldom Media Grp. LLC*, No. 18 Civ. 2402 (PAC), 2019 WL 3287819, at *5 (S.D.N.Y. July 22, 2019) (quoting *PK Music Performance, Inc. v. Timberlake*, No. 16-CV-1215 (VSB), 2018 WL 4759737, at *7 (S.D.N.Y. Sept. 30, 2018)).

### b. <u>Application</u>

Plaintiff argues that the statutes of limitation on all of his copyright claims are tolled until at least October 2014, when CBS indicated to him that it "believe[d] a total of fifteen licenses in the aggregate had been granted by BBC Worldwide Limited and T3 Media, Inc., that included Big Daddy Material covering the period 2004 through 2013." (Pl.'s Mem. 37.)

Defendants argue that because Plaintiff had previously entered into a settlement agreement with CBS, "a 'reasonable person in Plaintiff's shoes would have been diligent in ensuring that Defendants' uses of the Copyrighted Work was within the scope of the Agreement.'" (Defs.' Mem. 35 (quoting *Luar Music Corp. v. Universal Music Grp., Inc.*, 847 F. Supp. 2d 299, 309 (D.P.R. 2012)).) In other words, Plaintiff was on inquiry notice by 2002, when he settled with CBS, and should have discovered all of the infringements alleged. (*Id.* at 36.) Additionally, Defendants aver that "[n]early all of the challenged uses of Fioranelli's Footage were published openly more than three years before Fioranelli initiated this case" and that "when applying the statute of limitations to infringements arising from an alleged unauthorized use contained in a publicly shown or distributed work, the cause of action is deemed to accrue upon publication of that work." (*Id.* at 35, 37.)

First, there is no evidence in the record that Plaintiff had actual knowledge of infringement until he saw the 9/11 Material in *DTWC* in February 2014. (*See* Pl. 56.1 ¶ 314.)

Defendants aver that by Plaintiff's own admission, the alleged infringement "began 'in about 2005-2006,' when 'CBS began an extensive program of sublicensing Plaintiff's works to at least 15 companies.'" (Defs.' Mem. 35 (quoting Sec. Am. Compl. ¶ 24).) "An allegation that Defendants violated the copyright laws ['in about 2005-2006'] is not akin to having knowledge of the alleged infringement" at that time. *Luar Music Corp.*, 847 F. Supp. 2d at 308; (Sec. Am. Compl. ¶ 24).

Second, I am not persuaded by Defendants' argument that Plaintiff should have discovered the sixteen different infringements because he had previously entered a settlement agreement with CBS regarding CBS's use of the 9/11 Material. In the case that resulted in settlement, Plaintiff did not allege that CBS had engaged in the sort of behavior at issue here—distributing the 9/11 Material to third parties without Plaintiff's permission—rather, Plaintiff alleged that CBS had failed to pay Plaintiff for certain uses of the 9/11 Material. (*See* Fioranelli Cert. Ex. 10.) CBS itself states that in 2014 it "became aware that a small amount of Fioranelli's Footage had somehow been mixed with CBS's own footage and inadvertently was included in two of the CBS 9/11 Newsreels." (Lukaris Decl. ¶ 10.) Although the governing standard is an objective one, assuming that CBS itself did not know that the 9/11 Material had been included on newsreels—as CBS suggests—and subsequently distributed until 2014 demonstrates the improbability that a reasonable copyright holder in Plaintiff's position would be suspicious that CBS might include the 9/11 Material in newsreels, and that those newsreels would subsequently be distributed to numerous different parties. If anything, a reasonable copyright holder might have at most been on the lookout for the potential that CBS would fail to pay for its own uses of the 9/11 Material based upon CBS's conduct that led to its settlement with Plaintiff, but it is equally reasonable the Plaintiff would have assumed that CBS having been caught once would

have learned its lesson. Plaintiff was under no obligation either under the settlement or his license with CBS to police CBS actions with regard to the 9/11 Material. CBS points to Plaintiff's statement that in 2002 CBS indicated that removal of the 9/11 Material from CBS's systems "would be 'nearly impossible,'" (Defs.' Reply Mem. 10 (quoting Fioranelli Cert. ¶ 38)), as evidence that Plaintiff was put on inquiry notice. Although this cuts in favor of Defendants' argument, I do not find it dispositive given the complexity of the infringements at issue especially in light of the fact that CBS itself did not become aware of the uses at issue here until 2014.

Still, a "plaintiff need not know every permutation of their injury – they simply need to have a suspicion of the injury and its cause to be put on inquiry notice;" however, even with "reasonable diligence," Plaintiff likely would not have known of his injury. *Cf. Minden Pictures, Inc. v. Buzzfeed, Inc.*, 390 F. Supp. 3d 461, 467 (S.D.N.Y. 2019) (holding that a "reasonable copyright holder in Plaintiff's position, exercising due diligence, should have discovered that its copyright was being violated" where plaintiff was "a seasoned litigator that ha[d] filed 36 lawsuits to protect its copyrights" (internal quotation marks omitted)). Other than the CBS 9/11 Newsreels, which were an internal production, none of the remaining works at issue were produced by CBS. Plaintiff would have had to exercise something beyond reasonable diligence to find that third parties had used his material. In fact, the licensing agreements between CBS and BBC contained confidentiality provisions, (*see* Parness Cert. Ex. 6); therefore, even if Plaintiff had inquired, he might not have received a response. Defendants also do not suggest that Plaintiff was the sort of "seasoned litigator" who would have been searching for possible infringements, *see Minden Pictures*, 390 F. Supp. 3d at 467.

Due to the "fact-sensitive" nature of this inquiry, I am not persuaded by the court's

reasoning in *Luar*. 87 F. Supp. 2d at 309. There, plaintiff had previously entered into a settlement with a non-party, which was a joint venture involving one of the defendants, based on allegations that the non-party had violated plaintiff's copyright by reproducing two phonorecords. *Id.* at 302. Plaintiff subsequently sued two defendants alleging that their actions violated the licensing agreement entered into at the time of settlement. *Id.* The court held that "a reasonable person in Plaintiff's shoes charged with a duty of diligence should have been paying attention to Defendants' activities relating to the Copyrighted Work once [one of those defendants] infringed on the Copyrighted Work." *Id.* at 310. Here, even assuming Plaintiff had been paying attention to CBS's activities, it seems unlikely—and Defendants do not provide facts to dispute—that he would have discovered the downstream infringement, which involved wholly different parties from the original settlement. Considering the allegations at issue in this case, Defendants have not shown as a matter of law that there are sufficient facts that would lead a reasonable copyright holder in Plaintiff's position to suspect that his or her rights were being infringed.

Finally, I reject Defendants' argument that because the allegedly infringing works were published openly, Plaintiff had constructive notice. I have considered and rejected this argument twice before, along with other judges in this district. *See, e.g.*, *Rehs Galleries, Inc.*, 2020 WL 917213, at *5 (denying motion to dismiss and rejecting argument that "Plaintiff was under a general duty to police the internet to discover Defendant's use of his Photograph, particularly given the notoriety of the story and the Photograph at the time it was taken and published" (internal quotation marks and alterations omitted)); *PK Music Performance, Inc.*, 2018 WL 4759737, at *8 (denying a motion to dismiss and stating, "Defendants' argument that the popularity and success of the Album, DVD, Tour, and HBO Special gave rise to constructive or

inquiry notice of Plaintiff's claims is unpersuasive. Nothing in the record before me suggests that *Damn Girl* was ever played on the radio, and even if it was, that Plaintiff had the opportunity to hear it. . . . Moreover, copyright owners do not have a general duty to police their copyrights."); *see also Masi*, 2019 WL 3287819, at *5 (denying a motion for summary judgment and stating "Plaintiff's knowledge about general interest in the Halden Prison following a gruesome news story is not sufficient to constitute constructive discovery that his photographs of that prison were being infringed," and "[Plaintiff] did not have knowledge of any infringement of his work and there was no reason for him to think, or duty for him to scour the internet to find out if, anyone was using his photographs without his consent").[33]

In conclusion, Defendants have failed to establish as a matter of law that Plaintiff knew or should have known that his copyright was being infringed prior to February 9, 2012, three years before Plaintiff filed suit.

### 4. Plaintiff's Cross Motion for Partial Summary Judgment

Plaintiff moves for summary judgment on his copyright infringement claim. (Pl.'s Mem. 39.) Defendants aver that "[e]ven if this Court found as a matter of law that the de minimis and fair use defenses were not viable, Fioranelli would still not be entitled to summary judgment. To establish infringement a plaintiff must prove 'ownership of a valid copyright.'" (Defs.' Reply 13 (quoting *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).) Defendants argue that consistent with Plaintiff's "general failure to provide [me] with admissible evidence to support his claim or rebut Defendants' arguments, Fioranelli has not cited to any such evidence

---

[33] Defendants claim that "when applying the statute of limitations to infringements arising from an alleged unauthorized use contained in a publicly shown or distributed work, the cause of action is deemed to accrue upon publication of that work." (Defs.' Mem. 37.) That is not the law in this Circuit, and the cases cited to by Defendants are inapposite or outside of this jurisdiction. *See, e.g.*, *Kwan v. Schlein*, 441 F. Supp. 2d 491, 499 (S.D.N.Y. 2006) (co-authorship case); *Ortiz v. Guitian Bros. Music Inc.*, No. 07 Civ. 3897, 2008 WL 4449314, at *3 (S.D.N.Y. Sept. 29, 2008) (copyright ownership case).

in connection with his cross-motion." (*Id.*)

Defendants are correct that to establish infringement, Plaintiff must prove ownership of a valid copyright. *Yurman Design, Inc.*, 262 F.3d at 108–09; *Otto*, 345 F. Supp. 3d at 424. Plaintiff must also show infringement by the Defendants, which requires that Plaintiff show actual copying and "substantial similarity." *Yurman Design, Inc.*, 262 F.3d at 110.

Defendants submit that Plaintiff has failed to establish ownership of a valid copyright. Plaintiff, however, has submitted certificates of registration for the 9/11 Material, (Sec. Am. Compl. Exs. 1–2), which Defendants themselves refer to, (*see* Defs.' Reply 5). "A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright." *Otto*, 345 F. Supp. 3d at 424. Defendants provide no facts to dispute the validity of Plaintiff's copyright; indeed, Defendants papers suggest that they do not in fact dispute this point.

As to infringement, the record before me shows that Defendants actually copied the 9/11 Material, and Defendants apparently concede this fact. (*See* Defs. 56.1 ¶¶ 23, 25, 33, 35–38, 68, 78, 85, 105, 120, 137.) Additionally, as described above, the 9/11 Material and the allegedly infringing works are substantially similar. Defendants' uses rise to the level of actionable copying.

Finally, because Plaintiff has established the elements of copyright infringement, I turn to my findings on Defendants' fair use defense. I found that Defendants' uses in *Miracle Survivor*, *Crime Scene 9/11*, *DTCW*, *Stairway B, Relics*, *How It Was*, and the CBS 9/11 Newsreels were not fair. As Defendants' fair use defense regarding those works fails, Plaintiff is granted summary judgment on his copyright infringement claim related to those works, but his partial summary judgment motion is denied as to the other works.

### B. *Copyright Inducement*

Plaintiff brings a claim for copyright inducement against Defendants CBS, BBC, and T3.

#### a. Applicable Law

The Supreme Court, in *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005), confirmed that copyright inducement constitutes a distinct cause of action. The Second Circuit has observed that "although the Copyright Act does not expressly render anyone liable for infringement committed by another, . . . it is well established, based on the common-law doctrine that one who knowingly participates or furthers a tortious act is jointly and severally liable with the prime tortfeasor, that one who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a contributory infringer." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 117 (2d Cir. 2010) (internal quotation marks, alterations, and citation omitted).

To establish a claim for copyright inducement, a plaintiff must show that the defendant "(1) engaged in purposeful conduct that encouraged copyright infringement, with (2) the intent to encourage such infringement." *Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 425 (S.D.N.Y. 2011). "A defendant's intent to foster infringement can be established by evidence of the defendant's 'clear expression' of such an intent, or of 'affirmative steps the defendant has taken to foster infringement.'" *Id.* (quoting *Grokster*, 545 U.S. at 936–37). Direct evidence of inducement could be "advertising an infringing use or instructing how to engage in an infringing use." *Grokster*, 545 U.S. at 936. Additionally, the Supreme Court in *Grokster* "found that three specific kinds of evidence, considered in the context of the record as a whole supported a finding that the defendants intended to induce infringement:"

> (1) defendants' internal communications and advertising efforts, which evidenced a clear intent to target users of Napster, a population well-known for committing

copyright infringement through file-sharing programs; (2) defendants' failure to develop and implement filtering tools or other means of limiting infringement; and (3) defendants' reliance on infringing activity for the success of their business (including evidence that defendants' advertising revenue depended on Grokster having a high volume of users, which in turn depended overwhelmingly on users' ability to engage in infringing activities through the program).

*Arista Records*, 784 F. Supp. 2d at 425 (citing *Grokster*, 545 U.S. at 938–39).

Knowledge of the risk that infringement might happen is insufficient to meet the required level of intent. *Grokster*, 545 U.S. at 937.

### b. Application

Plaintiff alleges that "CBS, BBC, and T3 willfully and recklessly, in disregard of and with indifference to Plaintiff's rights . . . infringed Plaintiff's copyrights by inducing other people to reproduce and distribute films embodying the copyrighted material without authorization" and "[a]t a minimum, CBS, BBC, and T3 have been willfully blind and have acted in reckless disregard of Plaintiff's rights. . . . Upon information and belief CBS, BBC, and T3 introduced retailers to continue this illegal conduct down the chain of sale and commit multiple copying infringements up to and including the consumer level." (Sec. Am. Compl. ¶¶ 60–61.) Plaintiff's opposition and cross motion for partial summary judgment does not mention his inducement claim.

In their motion, Defendants note that they do not separately address the inducement claim "because it is subject to the same defects as his direct copyright infringement claim. Moreover, because the uses made by the downstream licensees, including by the other Defendants, are non-infringing, there is no direct infringement of a third party, which is a prerequisite for such a claim." (Defs.' Mem. 6 n.4) (internal quotation marks omitted). Additionally, Defendants aver that Plaintiff "offers no evidence of Defendants' knowledge of the infringement, a required element of such a claim." (*Id.*)

Here, as noted above, I have found direct infringement by third parties in certain instances. *Supra* Section IV.A.4. Plaintiff, however, has not come close to alleging facts to establish that the three Defendants had the required level of intent. In *Arista Records*, the court found that Lime Wire LLC ("LW") was liable for inducement of copyright infringement because "there [was] overwhelming evidence that LW engaged in purposeful conduct that fostered infringement: LW created and distributes LimeWire, which users employ to commit a substantial amount of infringement," and that five factors taken together established that LW intended to encourage infringement by distributing LimeWire:

> (1) LW's awareness of substantial infringement by users; (2) LW's efforts to attract infringing users; (3) LW's efforts to enable and assist users to commit infringement; (4) LW's dependence on infringing use for the success of its business; and (5) LW's failure to mitigate infringing activities.

784 F. Supp at 426. Plaintiff presents no significant evidence that Defendants were aware of the infringement; instead, CBS presented evidence that inclusion of the 9/11 Material on the 9/11 Newsreels was accidental. (Lukaris Decl. ¶ 10.) Although Plaintiff presented evidence that might suggest bad faith, this suggestion of bad faith is insufficient to raise a genuine dispute as to whether CBS induced third parties to commit infringement. Additionally, there is no evidence to suggest that T3 and BBC knew that the material they licensed to third parties was infringing. Based on Plaintiff's allegations, CBS took efforts to mitigate the infringing activities. (*See* Sec. Am. Compl. ¶ 43) ("CBS has informed Plaintiff that it has approached all of its sublicensees to stop additional infringement"); (Fioranelli Cert. Ex. 17) (email from CBS stating that "On May 8, 2014, CBS withdrew the Big Daddy Material from license to BBC Worldwide Limited and on May 22, 2014 did the same with respect to T3 Media, Inc . . . [B]oth companies agreed to assist CBS with its withdrawal requests. . . . In certain circumstances, CBS News even agreed to furnish the sublicensee with its own 9/11 footage to replace the Big Daddy Material."). This is

not a case like *Arista Records*, where the whole purpose behind Defendants' business was to encourage parties to commit infringement—rather, this is a case where small amounts of copyrighted work were included in footage that was then distributed to licensees and sub-licensees. Plaintiff relies only on "conclusory allegations," "unsubstantiated speculation," *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998), and does not provide "significant probative evidence" on which a reasonable jury could decide in his favor, *Anderson*, 477 U.S. at 249 (internal quotation marks omitted). I find that no reasonable trier of fact could find CBS, T3, and BBC liable for inducement to commit copyright infringement.

### C.    *Breach of Contract*

Plaintiff claims that CBS breached the License Agreement by "engaging in unauthorized distribution and licensing of Plaintiff's Works with numerous sublicensees." (Sec. Am. Compl. ¶ 69.) Defendants move for summary judgment on the grounds that Plaintiff's breach of contract claim is barred by the applicable statute of limitations. (Defs.' Mem. 38.) Plaintiff responds that he had no reason to know of the breaches until 2014, and asserts that he is entitled to equitable tolling. (Pl.'s Mem. 38.)

#### a.    Applicable Law

The License Agreement explicitly provides that New York law governs any disputes or controversies arising from the Agreement. (*See* Fioranelli Cert. Ex. 11 ¶ 12.) Neither party appears to dispute the application of New York law.

New York has a six-year statute of limitations for breach of contract actions. N.Y. C.P.L.R. § 213. Generally, the six-year limitations period runs from the time the contract was breached. *See* N.Y. C.P.L.R. §§ 203(a), 213(2); *Deutsche Bank Nat. Tr. Co. v. Quicken Loans Inc.*, 810 F.3d 861, 865 (2d Cir. 2015); *Lehman XS Tr., Series 2006-4N, ex rel. U.S. Bank Nat.*

*Ass'n v. Greenpoint Mortg. Funding, Inc.*, 643 F. App'x 14, 16 (2d Cir. 2016). "New York does not apply the discovery rule to statutes of limitations in contract actions. . . . Rather, the statutory period of limitations begins to run from the time when liability for wrong has arisen even though the injured party may be ignorant of the existence of the wrong or injury." *ACE Secs. Corp. v. DB Structured Prod., Inc.,* 25 N.Y.3d 581, 594 (N.Y. 2015) (internal quotation marks and citation omitted).

Equitable tolling requires that a litigant establish "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Rein v. McCarthy*, 803 F. App'x 477, 480 (2d Cir. 2020) (internal quotation marks omitted). "Because statutes of limitations protect important social interests in certainty, accuracy, and repose, equitable tolling is considered a drastic remedy applicable only in rare and exceptional circumstances." *Id.* (internal quotation marks omitted); *see also Tenamee v. Schmukler*, 438 F. Supp. 2d 438, 444 (S.D.N.Y. 2006) (equitable tolling "applies only in rare and exceptional circumstances, where the plaintiff has acted with due diligence but some egregious conduct by defendant or a third party, or some other exceptional circumstance beyond his control makes a timely filing impossible" (internal quotation marks omitted)).[34] "The burden of demonstrating the appropriateness of equitable tolling rests with the plaintiff." *Webster v. Potter*, 746 F. Supp. 2d 635, 640 (S.D.N.Y. 2010) (internal quotation marks omitted).

---

[34] It bears mentioning that New York courts typically use the terms "equitable tolling" and "equitable estoppel" interchangeably, while federal courts distinguish between the two. *Coleman & Co. Sec. v. Giaquinto Family Tr.*, 236 F. Supp. 2d 288, 299 (S.D.N.Y. 2002). Equitable estoppel is reserved for instances in which it "would be unjust to allow a defendant to assert a statute of limitations defense." *Twersky v. Yeshiva Univ.*, 993 F. Supp. 2d 429, 442 (S.D.N.Y.) (quoting *Zumpano v. Quinn,* 6 N.Y.3d 666, 673 (N.Y. 2006)), *aff'd*, 579 F. App'x 7 (2d Cir. 2014). "This is the case where a plaintiff is induced by fraud, misrepresentations or deception to refrain from filing a timely action." *Id.* (internal quotation marks omitted).

### b. Application

Plaintiff alleges that "in about 2005-2006, in violation of the contract between Plaintiff and CBS, and never informing Plaintiff until about May 2014, CBS began an extensive program of sublicensing Plaintiff's works to at least 15 companies." (Sec. Am. Compl. ¶ 24.) In both 2002 and 2006, CBS and BBC entered an agreement, under which CBS granted BBC the right to sublicense to third parties stock video footage from CBS's news archives, which included the CBS 9/11 Newsreels. (Defs. 56.1 ¶¶ 33, 35, 36.) Based on these facts, CBS allegedly breached the License Agreement as early as 2002 because it licensed the 9/11 Material, which was included on the CBS 9/11 Newsreels, to a third party.[35] In 2013, CBS entered into another agreement, this time with T3, which granted T3 the right to sublicense its footage, which included the CBS 9/11 Newsreels, to third parties. (*Id.* ¶¶ 37–38.)

As a threshold matter, Plaintiff's reliance on the discovery rule for statute of limitations, (*see* Pl.'s Mem. 38), is misplaced. New York does not apply the discovery rule in breach of contract cases. *ACE Secs. Corp.*, 25 N.Y.3d at 594; *see Deutsche Bank*, 810 F.3d at 865 ("New York's six-year limitations period on contractual claims generally runs from the time the contract was breached.").

There are certain exceptions to the rule that contractual claims run from the time the contract was first breached. For example, where "claims [are] premised on a continuing wrong, . . . each successive breach may begin the statute of limitations running anew." *Mindspirit, LLC v. Evalueserve Ltd.*, 346 F. Supp. 3d 552, 593 (S.D.N.Y. 2018) (internal quotation marks omitted); *see also Guilbert v. Gardner*, 480 F.3d 140, 150 (2d Cir. 2007) ("If . . . a contract requires

---

[35] I do not resolve whether in fact CBS's actions constituted breach, but rather assume they did for purposes of resolving the statute of limitations issue.

continuing performance over a period of time, each successive breach may begin the statute of limitations running anew.") (collecting cases). This exception is narrow, and "only extends the statute of limitations when a contract imposes a continuing duty that is repeatedly breached." *Mindspirit, LLC*, 346 F. Supp. 3d at 593 (internal quotation marks omitted). Although Plaintiff does not explicitly mention the continuing wrong doctrine, he does allege that CBS "began an extensive program of sublicensing." (Sec. Am. Compl. ¶ 24.) Regardless, the continuing wrong doctrine would not save his breach of contract claim. *See Comm Trade USA, Inc. v. INTL FCStone, Inc.*, No. 13 Civ. 3998 KBF, 2014 WL 787912, at *9 (S.D.N.Y. Feb. 27, 2014) ("To the extent that plaintiff asserts simply an ongoing breach of the contract-with damages increasing as the breach continued-the continuing wrong theory does not apply."); *see Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1041 (2d Cir. 1992) (explaining that plaintiffs could not use the continuing wrong theory for an "ongoing" violation, because "performance under the contract merely affects damages and does not give rise to a new cause of action"); *cf. Kermanshah v. Kermanshah*, 580 F. Supp. 2d 247, 260–61 (S.D.N.Y. 2008) (applying doctrine where "defendants' obligation to share equally in corporate opportunities, investments, and businesses was a continuing contractual obligation" (internal quotation marks omitted)). Here, CBS's two alleged subsequent breaches, in 2006 and in 2013, would not give rise to new causes of action but rather would potentially increase damages.

Finally, Plaintiff is not entitled to equitable tolling. Plaintiff himself recognizes that equitable tolling is available under "extraordinary circumstances," but rests on the fact that with reasonable diligence he would not have been aware that a cause of action existed. (*See* Pl.'s Mem. 38.) While the latter is likely true, *see supra* Section IV.A.3.b, this is not the sort of "extraordinary circumstance" required for application of the applicable tolling doctrine. The

Second Circuit has explained that "'extraordinary' refers not to the uniqueness of a party's circumstances, but rather to the severity of the obstacle impeding compliance with a limitations period." *Harper v. Ercole*, 648 F.3d 132, 137 (2d Cir. 2011) (finding extraordinary circumstances where plaintiff was hospitalized for more than three months); *cf. Rein*, 803 F. App'x at 480 (plaintiff not entitled to equitable tolling where attorney erred in failing to meet deadline). Put simply, while Plaintiff recites that "extraordinary circumstances" exist, he does not identify any facts that come close to meeting the standard. His conclusory allegations are insufficient to save his breach of contract claim.[36]

In conclusion, Plaintiff is not entitled to equitable tolling, and because CBS's first alleged breach occurred as early as 2002, and Plaintiff's lawsuit was not filed until February 9, 2015, Plaintiff's breach of contract claim is time-barred.[37]

---

[36] Additionally, an argument for equitable estoppel would be unsuccessful because Plaintiff has offered no facts to suggest that Defendants prevented him from timely filing suit.

[37] Plaintiff argues that because liability discovery and damages discovery have been bifurcated in this case, "the record lacks sufficient information to fully apply the accrual or the discovery rules." (Pl.'s Mem. 39.) Plaintiff states that "Defendants have refused to produce documents and information that could pinpoint when each act of infringement or breach of contract took place," and that doing so could give rise to actionable instances of copyright infringement or breach of contract." (*Id.*) The Parness Certification states, "[a]s to each of the 15 Infringing Films, there is no evidence in the record as to when the film was shown, distributed, sold or licensed after its initial release. There is no evidence in the record – because Defendants refused to provide such evidence during the infringement phase of the case – as to the timing and amount of revenues received by the Defendants in connection with each of the 15 Infringing Films." (Parness Cert. ¶ 30.) The Certification also attaches Defendants' response to Plaintiff's first set of requests for documents and interrogatories. (Parness. Cert. Ex. 5.) Under Federal Rule of Civil Procedure 56(d), "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may: (1) defer considering the motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery; or (3) issue any other appropriate order." "It is well established in this Circuit that a party seeking additional discovery under Rule 56(d) . . . must submit an affidavit describing: (1) what facts are sought and how they are to be obtained; (2) how these facts are reasonably expected to raise a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why the affiant's efforts were unsuccessful." *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Grp.*, No. 14 CV 6294-LTS-HBP, 2016 WL 406383, at *4 (S.D.N.Y. Feb. 2, 2016) (internal quotation marks omitted). First, the assertions within the Parness Certification are insufficient to meet this standard. Second, the sort of evidence that Plaintiff seeks seems applicable to determining damages, not liability. Finally, "[m]ere restatement of conclusory allegations and amplifying them only with speculation regarding what discovery might uncover is insufficient to defeat a motion for summary judgment." *Id.* at *4–5 (denying request for additional discovery where defendant failed to identify what "facts are sought or how they are to be obtained," "any efforts on its part to obtain the facts or explained why its efforts were unsuccessful," and had not "demonstrated that any of its proposed discovery requests are reasonably expected to raise a genuine issue of material fact").

## V.    Conclusion

Defendants' motion *in limine* to exclude evidence, testimony, or argument concerning expert opinions is DENIED as moot.

Plaintiff's request to submit corrected certifications of Anthony Fioranelli and Hillel Parness is GRANTED, and Defendants' letter motion opposing that request is DENIED.

Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART.  Because I find that Defendant Paramount Pictures Corporation's uses of Plaintiff's 9/11 Material in *World Trade Center* and *World Trade Center Featurette* are fair, Defendants' summary judgment motion is GRANTED as to these works, and Plaintiff's copyright infringement claim related to those works is dismissed.  Defendant Paramount is dismissed from this action.

I find that there are issues of fact relating to the purposes of Defendants' uses in *ZERO*, *Conspiracy Files*, *Death Ray*, *Rush to War*, *Celsius*, *Untold History*, and *Seven Signs*; therefore, Defendants' motion for summary judgment dismissing Plaintiff's copyright infringement claims related to those films is DENIED.  Defendants' motion for summary judgment dismissing Plaintiff's copyright inducement claim is GRANTED.  Defendants' motion for summary judgment dismissing Plaintiff's breach of contract claim is GRANTED.

Plaintiff's motion for summary judgment on his copyright infringement claim is GRANTED IN PART and DENIED IN PART.  Because I find that Defendants' uses in *Miracle Survivor*, *Crime Scene 9/11*, *DTCW*, *Stairway B*, *Relics*, *How It Was*, and the CBS 9/11 Newsreels are not *de minimis*, are not fair, and that the record demonstrates Defendants' liability for copyright infringement, Plaintiff's motion is GRANTED as to these works.  Plaintiff's motion is DENIED as to the remaining works.

Because the parties' motions involve redacted documents and documents filed under seal, the parties are directed to jointly submit any proposed redactions to this Opinion & Order by August 2, 2021, so that the Opinion & Order can then be publicly filed.

The Clerk of Court is respectfully directed to terminate the motions at Documents 144, 150, 159, 176, 177, and 178.

The Clerk of Court is respectfully directed to make the unredacted Opinion & Order viewable only to counsel for the parties: Hillel Ira Parness, Elizabeth Seidlin-Bernstein, and Thomas Byrne Sullivan.

SO ORDERED.

Dated: July 28, 2021
      New York, New York

                                   Vernon S. Broderick
                                   United States District Judge